**Kauff McGuire & Margolis LLP**
**950 Third Avenue**
**Fourteenth Floor**
**New York, New York 10022**
**(212) 644-1010 (Tel)**
**(212) 644-1936 (Fax)**

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PIG NEWTON, INC.,

               Plaintiff,

      -against-

THE BOARDS OF DIRECTORS OF THE MOTION
PICTURE INDUSTRY PENSION PLAN, THE
MOTION PICTURE INDUSTRY INDIVIDUAL
ACCOUNT PLAN, AND THE MOTION PICTURE
INDUSTRY HEALTH PLAN,

               Defendants.

13-CIV-7312 (KPF)

ECF Case

**BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ......................................................................................2

A.   The Parties ..................................................................................................2

B.   The IA Collective Bargaining Agreements and Attendant Documents .....................4

C.   Pig Newton's Contributions to the Plans and the Plans' Application of the
     Controlling Employee Rules .......................................................................6

STANDARD OF REVIEW ...................................................................................10

ARGUMENT ........................................................................................................10

I.   Defendants Lacked the Authority to Adopt the Controlling Employee Rules..........10

     A.   The Rules are Invalid under *La Barbera*.......................................................10

     B.   *UPS* Further Refutes Defendants' Position. ................................................16

II.  The Trust Agreements Were Not Properly Incorporated into the IA CBAs. ...........20

III. The Trust Agreements Containing The Controlling Employee Rules Provide
     That Plaintiff Is Not Subject To The Rules Because Mr. Szekely Is Not An
     "Employee." ...............................................................................................23

CONCLUSION .....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. DCI Signs & Awning, Inc.,*
No. 08 Civ. 15, 2008 WL 640252 (E.D. Va. Mar. 5, 2008)................................................20

*Benson v. Brower's Moving & Storage, Inc.,*
907 F.2d 310 (2d Cir. 1990) ...........................................................................................4

*Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,*
472 U.S. 559 (1985) .....................................................................................................12

*Chiacchia v. Nat'l Westminster Bank USA,*
124 A.D.2d 626 (2d Dep't 1986) ..................................................................................21

*Firestone Tire and Rubber Co. v. Bruch,*
489 U.S. 101 (1989) .....................................................................................................10

*Hauskins v. Stratton,*
721 F. 2d 535 (5th Cir. 1983)........................................................................................19

*Hawkins v. Bennett,*
704 F. 2d 1157 (9th Cir. 1983)......................................................................................19

*Hertz Corp. v. Zurich American Ins. Co.,*
496 F. Supp. 2d 668 (E.D. Va. 2007).............................................................................20

*Hollow Metal Funds v. Elevator Entrances,*
10 Civ. 8535(JSR), 2011 U.S. Dist. LEXIS 151138 (S.D.N.Y. Jan. 4, 2012) .........................8

*La Barbera v. J.D. Collyer Equip. Corp.,*
337 F.3d 132 (2d Cir. 2003)....................................................................................passim

*Level Export Corp. v. Wolz, Aiken & Co.,*
305 N.Y. 82 (1953) .......................................................................................................21

*New York State Teamsters Conference Pension & Retirement Fund v. United Parcel Service, Inc.,*
382 F.3d 272 (2d Cir. 2004) ("UPS") ........................................................................passim

*New York State Teamsters Conference Pension and Retirement Fund v. Boening Bros., Inc.,*
92 F.3d 127 (2d Cir. 1996)............................................................................................11

*NLRB v. Amax Coal Co.,*
453 U.S. 322 (1981) .....................................................................................................17

*PaineWebber Inc. v. Bybyk,*
    81 F.3d 1193 (2d Cir. 1996) ................................................................................ 20, 21

*Professional Administrators, Ltd. v. Kopper-Glo Fuel, Inc.,*
    819 F. 2d 639 (6th Cir. 1987) .................................................................................. 18

*Roca v. Westbury Transp. Inc.,*
    19 F. Supp. 2d 44 (E.D.N.Y. 1998) ......................................................................... 10

*Standard Bent Glass Corp. v.  Glassrobots Oy,*
    333 F. 3d 440 (3d Cir. 2003) ................................................................................... 20

*Trustees for Michigan BAC Funds v. OCP Contractors,*
    136 Fed. Appx. 849 (6th Cir. 2005) ........................................................................... 8

*United Food and Commercial Workers and Participating Food Industry Employers Tri-*
    *State Health and Welfare Fund v. Super Fresh Food Markets Inc.,*
    No. 04 Civ. 1226, 2008 WL 3874304 (D.N.J. Aug. 19, 2008) ............................... 17

*Weiner v. Mercury Artists Corp.,*
    284 A.D. 108 (1st Dep't 1954) ................................................................................ 22

## STATUTES AND RULES

26 U.S.C. § 401(A) .......................................................................................................... 13

29 U.S.C. § 151 ............................................................................................................... 19

29 U.S.C. § 158 ......................................................................................................... 18, 19

29 U.S.C. § 1002 .......................................................................................................... 3, 23

29 U.S.C. § 1145 ............................................................................................................... 9

Local Rule 56.1 ................................................................................................................. 2

Fed. R. Civ. P. 56(a) ......................................................................................................... 9

## OTHER AUTHORITIES

http://www.merriam-webster.com/dictionary/ ................................................................ 24

IRS Revenue Ruling 73-238 ........................................................................................... 13

Plaintiff, Pig Newton, Inc. ("Plaintiff" or "Pig Newton") respectfully submits this Brief in Support of its Motion for Summary Judgment. As set forth below, summary judgment is appropriate in this case, and the Court should invalidate the rules adopted by the Boards of Directors of the Motion Picture Industry Pension Plan, Individual Account Plan, and Health Plan ("Defendants" or "Directors"), dismiss their amended counterclaim, and award Plaintiff its attorney's fees and costs.

## <u>INTRODUCTION</u>

This case addresses the authority of directors of multiemployer benefit plans to adopt rules that change the terms of a collective bargaining agreement (a "CBA") as they relate to contributions that must be made to those plans. In *La Barbera v. J.D. Collyer Equip. Corp.*, 337 F.3d 132 (2d Cir. 2003), a case analyzing remarkably similar facts, the Second Circuit held that plan trustees were not authorized to modify a CBA by increasing the number of hours for which contributions were owed. In this case, Defendants' contribution rules (the "Controlling Employee Rules" or the "Rules") improperly modified the number of hours for which contributions are due from the number of hours that Plaintiff negotiated with the union and that are memorialized in CBAs, thereby increasing Plaintiff's contribution liability by tens of thousands of dollars. Based upon facts that cannot be distinguished from those in this case, the Second Circuit in *La Barbera* held that trustees lacked the unfettered power that they purported to wield in adopting similar (though much less harsh) rules. The Court invalidated those rules as being overly broad and inconsistent with the CBAs. *La Barbera* is directly on point, and it requires the invalidation of the Controlling Employee Rules.

Defendants cannot escape *La Barbera* by insisting that Plaintiff agreed to the Rules when it signed two single-page documents attendant to the CBA containing boilerplate provisions purporting to bind Plaintiff to certain undisclosed "Trust Agreements,"[1] the documents in which

---

[1] There are separate trust documents for each of the three employee benefit plans in this case, and there are an untold number of restated versions of each of those documents. The term "Trust Agreements" is used herein to collectively refer to all of the documents that comprise the many various Trust Agreements.

Defendants promulgated the Rules. The Second Circuit rejected just such an attempt to vary the terms of a CBA in *New York State Teamsters Conference Pension & Retirement Fund v. United Parcel Service, Inc.*, 382 F.3d 272, 279 (2d Cir. 2004) ("*UPS*"). There the Court considered virtually identical provisions in a "participation agreement" and held that they could facilitate the administration of contribution collections but they could not be used as an alternative source for collective bargaining terms. The Court in *UPS* also observed that it would be inconsistent with the strong traditional labor policy in favor of collective bargaining if the participation agreement were to supersede the terms of the CBA.

Undisputed facts demonstrate that Defendants are prohibited from collecting additional contributions from Plaintiff on two other grounds, as well. First, the Trust Agreements were not properly incorporated by reference into the documents Plaintiff signed, thereby dooming any claim that Plaintiff agreed to be bound by the Rules. Second, the Rules are inapplicable to Plaintiff because its sole owner, Louis Szekely (the alleged "Controlling Employee"), is ineligible to participate in the plans under Defendants' own requirements. As such, not only are Defendants barred from demanding additional contributions, they must refund Plaintiff all contributions made on Mr. Szekely's behalf.

For all of these reasons, Plaintiff is entitled to summary judgment.

### STATEMENT OF FACTS

The factual basis for Plaintiff's Motion for Summary Judgment is set forth in Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, the Declaration of Blair Breard in Support of Plaintiff's Motion for Summary Judgment ("Breard Decl."), the Declaration of Elizabeth O'Leary in Support of Plaintiff's Motion for Summary Judgment ("O'Leary Decl."), and the parties' Joint Appendix ("J.A.").

A.    **The Parties**

Pig Newton, a New York corporation solely owned by Mr. Szekely, is the producer of the television series entitled "Louie" (the "Series"). (Breard Decl. ¶ 2.) Mr. Szekely is the creator of the Series, and wears several hats with respect to the Series: as its producer, sole writer, editor, sole director, and star performer. (Breard Decl. ¶ 6.) Pig Newton employs Mr. Szekely and other individuals who work on the Series. (*Id.*)

Pig Newton is a party to different CBAs with various unions, including SAG-AFTRA (representing actors), the Directors Guild of America ("DGA") (representing directors), the Writers Guild of America ("WGA") (representing writers), and, as relevant here, local unions affiliated with the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists, and Allied Crafts, AFL-CIO, CLC ("IA" or the "Union") (representing production crew members, including editors), and the International Brotherhood of Teamsters ("IBT") (representing drivers). (Breard Decl. ¶ 7.)  Pig Newton contributes to the benefit funds affiliated with such guilds and unions on behalf of Mr. Szekely and its other employees. (*Id.*)

Defendants administer benefit plans for employees covered by CBAs with the IA and Local 399, IBT, representing drivers on the West Coast. Those CBAs require contributions to the Motion Picture Industry Pension Plan (the "Pension Plan"), the Motion Picture Industry Individual Account Plan (the "IA Plan"), and the Motion Picture Industry Health Plan (the "Heath Plan") (collectively, the "Plans"). (Breard Decl. ¶ 9; J.A. 354-794.)  These jointly administered labor-management trust funds are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), and the Labor Management Relations Act ("LMRA"). (Complaint ¶¶ 21-25; Answer ¶¶ 21-25.)[2] The

---

[2] The Pension Plan and the IA Plan are "employee pension benefit plans" under Section 3(2) of ERISA, 29 U.S.C. § 1002(2), and the Health Plan is an "employee welfare benefit plan" under Section 3(1) of ERISA, 29 U.S.C. § 1002(1). They are each a "multiemployer plan" under Section 3(37)(A) of ERISA, 29 U.S.C. § 1002(37)(A).

Directors are the Plans' fiduciaries under ERISA, 29 U.S.C. § 1002(21)(A). (Complaint ¶ 26; Answer ¶ 26.)

**B.    The IA Collective Bargaining Agreements and Attendant Documents**

In 2010 Plaintiff and IA executed a Low Budget Episodic Cable Agreement (an "IA CBA") for season two of the Series.[3] (J.A. 821-44.) They entered into other CBAs covering the other seasons; each CBA is identical with respect to the pertinent provisions in this case. (J.A. 795-818, 847-872, 876-901.) Mr. Szekely's editing work, which is the subject of contributions here, is covered by Local 700, IA. (Breard Decl. ¶ 8.)

The IA CBA requires Plaintiff to contribute set hourly rates to the Plans on behalf of covered employees "for all hours worked or guaranteed." (JA 805, 831, 857, 886.) As to the Health Plan only, the CBA states that such rates "may be modified to rates set by the Board of Directors of the Health Plan on a determination by the actuaries and consultants of the MPIPHP, which will be based upon the hourly cost per participant of benefits."[4] (*Id.*) As such, the IA CBA expressly authorizes the Directors to change the hourly rates in the CBA if necessary to cover the cost of health benefits. Absent from the IA CBA is any provision authorizing the Directors to change the contractual limitation that contributions are only due on "hours worked or guaranteed." (J.A. 159-60, 304.)

---

[3] The Plans are not parties to the IA CBA but are third party beneficiaries of the CBA. *See Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 313 (2d Cir. 1990).

[4] While the IA CBA contemplates that the Directors may modify the Health Plan's hourly contribution rate, the cost for such change would be covered by IA's reallocation from wages and/or the IA Plan, or any combination thereof.  In other words, even with this authority to modify rates, the Employer's cost under the CBA is fixed. The 2010 IA CBA, Article VII(A)(ii), states: "Should the above rates be revised, pursuant to the Basic Agreement, the rates set forth in this Agreement shall automatically be modified to reflect those new rates." (J.A. 831.) The Producer-I.A.T.S.E. And A.P.T.A.A.C. Basic Agreement of 2009, Article XII(b), states: "If . . . the consultants project that the level of reserves in the Active Health Fund will fall below six (6) months, . . . then the IATSE will reallocate up to one percent (1%) from wages and/or the Individual Account Plan, or any combination thereof, until such time as the reserves are restored to the six (6) or eight (8) month level, as applicable." (J.A. 83.)

Guaranteed hours refer to daily, weekly, and holiday guarantees under the IA CBA. The IA 2010 CBA, Article 4(B), states that a work day is a minimum of 8 hours; Article 4(C) states that a work week is 5 or 6 consecutive days; Article 8 discusses holiday guarantees. (J.A. 825, 833.) The IA CBAs do not include any guarantees for Controlling Employees; in fact, that term never appears in the CBAs.

Pig Newton and IA also entered into an "Agreement of Consent – Limited Production Agreement for Project Titled 'Louie' " for each of the four seasons ("Agreement(s) of Consent"). These one-page documents, signed by the bargaining parties, required Pig Newton to "become a party to and bound by. . . the Trust Agreements established pursuant to the above [CBAs], specifically: (a) the Health Plan; (b) the Pension Plan; (c) the Individual Account Plan." (J.A. 819, 845, 873, 902.) The Agreements of Consent recited the Producer's agreement "to be bound by any amendments, modifications, extensions, supplements or renewals of any or all of the Agreements specified in this paragraph." (*Id.*)

The IA CBAs required Pig Newton to execute the "Trust Acceptance Agreement" (the "Trust Acceptance"). This one-page document signed by Plaintiff and the Union states that contributions are only required for services "actually rendered in connection with motion picture production," and that contributions are required to the Health Plan "for each hour guaranteed by or each hour worked for the Employer by employees for whom the Employer is obligated hereunder to make the required contributions." (J.A. 820, 846, 874, 875, 903.) Section 7 of the Trust Acceptance states that the Employer also "agrees and intends to become a party to and to participate in the [Plans] to the same extent as though the Employer had executed such Trust Agreements . . . ." (*Id.*)

The Plans each have separate Trust Agreements. As reflected by the 10 different versions just between 2010 and 2014, they are constantly being amended. (O'Leary Decl. ¶ 8 & Ex. E.) They are voluminous: for example, the March 2014 Trust Agreement for the Health Plan includes 129

amendments and consists of 72 pages plus a 42-page appendix. (J.A. 354-472.) It is undisputed that Plaintiff has never signed any of the iterations of the Trust Agreements, and although the IA CBAs have eight exhibits, none of those exhibits are the Trust Agreements.

C.    **Pig Newton's Contributions to the Plans and the Plans'**
      **Application of the Controlling Employee Rules**

Pig Newton contributed to the Plans on behalf of Mr. Szekely when he performed editing work as specified below.[5]

| Year | Period | Number of Hours |
|------|--------|-----------------|
| 2011 | 4/17/11 – 7/16/11 | 50 hours per week |
| 2013 | 2/17/13 – 3/2/13 | 50 hours per week |
| 2014 | 3/9/14 – 3/22/14 | 40 hours per week |

(Breard Decl. ¶ 11.)

The limited contributions to the Plans for Mr. Szekely reflect that his editing responsibilities – his only work covered under the IA CBAs – required the smallest portion of Mr. Szekely's time, only about 15%, with long periods of no editing at all. (J.A. 21-22.) These intermittent contributions do not violate the IA CBAs, which require contributions only on hours worked (or guaranteed by the employer), nor do they run afoul of the Trust Acceptance, which reiterates the obligation to contribute only on hours worked/guaranteed, and only for services "actually rendered" by the employee. Other than the limited guarantees discussed above, which are not relevant here, neither the CBAs, the Trust Acceptances, or the Agreements of Consent require contributions other than for Mr. Szekely's actual editing work. Moreover, Pig Newton contributed to other plans for Mr.

---

[5] In the course of discovery, it was determined that Mr. Szekely performed limited editing work on Season One of the Series for which contributions were not paid to the Plans. (J.A. 11-12.) The Plans' subsequent demand for contributions for such work was the basis of Defendants' amended counterclaim. *See* Docket No. 11. However, as demonstrated in Section III, *infra*, based upon the limited nature of Mr. Szekely's editing work, he does not satisfy the Plans' definition of "Employee" and accordingly no contributions are due for the editing work performed in connection with Season One (or any season) of the Series, and Plaintiff is due a refund of all contributions made on behalf of Mr. Szekely.

Szekely's non-IA work – *i.e.*, acting (SAG-AFTRA), writing (WGA), and directing (DGA) – in accordance with its other CBAs.[6]

The Plans audited Pig Newton for November 2009 through February 2011 and found that it complied with the IA CBAs and the Trust Agreements and that no additional contributions were due. (J.A. 904.) Reversing course, the Plans then billed Pig Newton $10,531 for Mr. Szekely for 25 weeks between July 24, 2011, and January 21, 2012. (J.A. 932.) The Plans then audited Pig Newton for the period from January 30, 2011, to November 12, 2012, and assessed $27,935.16 in contributions plus interest, liquidated damages, and audit costs. (J.A. 909.) The report stated that Pig Newton cooperated with the audit, that its records were "in good condition," and that it complied with reporting and contribution requirements – noting that there were no non-reported employees, that Pig Newton reported all daily, weekly, holiday, and on-call guarantees correctly, and that there were no missing hours, non-reported overtime, or other deficiencies. (J.A. 918-19.) Notwithstanding these findings, and even though Mr. Szekely performed no editorial services during this period, the Plans demanded contributions on his behalf for the 66-week period between July 24, 2011 and November 10, 2012. (*Id.*) The Plans demanded an additional $15,053.84 through July 20, 2013, with ever more contributions not tied to Mr. Szekely's IA-covered work continuing to accrue. (J.A. 922-23.)

The Plans seek to justify these demands by invoking the Controlling Employee Rules buried in an exhibit to the Trust Agreements.[7] The Rules purport to transform Pig Newton's obligation in

---

[6] Mr. Szekely testified that none of the other benefit funds to which Plaintiff contributes has requirements comparable to the Controlling Employee Rules. (J.A. 22.)

[7] As noted, Pig Newton never agreed to be bound to the Controlling Employee Rules. Interestingly, Defendants' discovery production included a two-page document signed by an Employer (in that case, AnEFX, Inc.) that had expressly agreed to the Controlling Employee Rules. (O'Leary Decl. ¶ 16 & Ex. L.) That agreement, entitled "Employee-Shareholder Company Agreement," provides, among other things, that its purpose is to put the employer on notice of the Rules. The agreement suggests that the Plans understood that they needed such an express disclosure and a separate agreement in order to bind an employer to contribution rules that conflict with the CBA. No such agreement was ever presented to or signed by Pig Newton.

the IA CBAs as it pertains to Mr. Szekely to contribute for "hours worked or guaranteed" into a minimum contribution requirement for 40 hours per week/50 weeks per year regardless of the number of weeks in which he performs any work.[8]

The Rules define a "Controlling Employee" of an Employer as an Employee who is a shareholder of the corporation, a member of the LLC, or an officer of the Employer, and is not the only Employee who works under a CBA; the Employer of such Controlling Employee is a "Controlled Employer." (J.A. 446.) The Rules require contributions for any Controlling Employee either at 56 hours per week for at least 48 weeks per year, or, in the case of Mr. Szekely, who is

---

[8] Discovery has revealed that there were many years in which the Plans did not have any monitoring system in effect regarding the Controlling Employee Rules and did not enforce the Rules. The Plans have acknowledged instances in which they knew that a company was not complying with the Rules but took no action to enforce them. *See* e-mails to Chuck Gordon, Manager of Audit Collections, stating: "The []1999, 2000 and 2005 company data sheets reflect Lance Accord as controlling shareholder, as well as his union affiliation – L.600. . . [T]he controlling employee monitoring-system was not in place during that time, thus we were not able to bill the company." (O'Leary Decl. ¶ 20 & Ex. P.)

Defendants' difficulty in understanding the Rules was evidenced when they initially alleged that Pig Newton was required to contribute 56 hours per week/48 weeks per year on behalf of Mr. Szekely. But that purported contribution scheme presumed that Mr. Szekely was covered by a West Coast Local 700 CBA, rather than an East Coast Local 700 CBA, pursuant to which the Rules purport to require a 40 hour per week/50 week per year obligation. The Plans' difficulties in applying their own Rules undermine Defendants' position that Plaintiff should have complied with requirements it never agreed to or knew existed. To this point, we note that the Second Circuit case law under ERISA Section 515 highlights the importance to an ERISA fund in being able to easily ascertain contribution requirements. *See UPS*, 382 F.3d at 280 ("[m]ultiemployer plans should be able to ascertain the controlling provisions of a CBA by reading it").  The same principle should apply to the employers required to contribute to such plans and they, too, should not be bound to undisclosed rules.

The Plans' haphazard interpretation and application of the Rules is further evidenced in their wavering position as to a Controlling Employer's liability if, as here, contributions are made to other funds. Nothing in the Rules excuses the contribution obligation in this circumstance; however, Defendants' submissions to the Court suggest that they would not seek contributions for non-IA hours worked if contributions were made to another union's plans. *See* Jan 3, 2014 letter by Plaintiff on behalf of both parties, noting Defendants' position that discovery is required to determine "if Plaintiff has made contributions to other benefit plans." (O'Leary Decl. ¶ 17 & Ex. M.) Defendants' document production further reflects Defendants' flip-flopping on this point and others. *See* November 11, 1981 Minutes of Board of Trustees Meeting, stating: "shareholders who work in other jurisdictions, regardless of whatever other affiliations they have, must contribute to the Health Fund on a continuous 56 hours a week basis when not working in their classification" (O'Leary Decl. ¶ 14 & Ex. J); Report of the May 23, 2002 Joint Legal Subcommittee, discussing amendment to carve out one employee/ shareholder group under the Rules and not require contributions for what in the past was considered covered work and considering "the issue of amnesty for those employees/shareholders who have not complied with the Trust rules" (O'Leary Decl. ¶ 13 & Ex. I); *and* Report of March 13, 2002 Joint Legal Subcommittee, discussing an agreement to allow a one-time irrevocable opt-out election of the Health Plan for commercials work (O'Leary Decl. ¶ 12 & Ex. H). In the event that the Court finds any underpayment, such underpayment should be reduced by any hours paid to other benefit funds under other CBAs. *See, e.g. Trustees for Mich. BAC Funds v. OCP Contractors*, 136 Fed. Appx. 849, 851-52 (6th Cir. 2005) (denying Bricklayers Funds claims for contributions for hours worked by members of Carpenters Union); *Hollow Metal Funds v. Elevator Entrances*, No. 10 Civ. 8535, 2011 U.S. Dist. LEXIS 151138, *2-3 (S.D.N.Y. Jan. 4, 2012) (denying Carpenters Funds' claims for contributions for hours for which employer contributed to Electricians Funds where there was no indication that the parties intended to require double payments for work performed by Electricians).

-8-

covered under an East Coast Local 700 CBA, 40 hours per week for at least 50 weeks per year,

"***regardless of the number of weeks in which the Employee performs any work.***" (J.A. 447

(emphasis added).)

The Rules require contributions for an extended period, which could last years, until: (a) the

employer ceases to have any obligation under any applicable IA or IBT CBAs; (b) the formal

dissolution of the company; (c) the Controlling Employee ceases to be a Controlling Employee, or

retires; (d) such time as no employee has worked under the CBAs for at least 12 months; or (e) such

time as no employee(s), other than the Controlling Employee, has worked under the CBAs requiring

contributions to the Plans for a minimum of 1,500 hours in the aggregate among all such employees

during any 12-month period. (J.A. 447-48.)

Defendants have claimed that the Rules were adopted because individuals who could control

the number of hours reported on their behalf to the Health Plan deliberately manipulated their

reporting in order to pay the minimum level necessary to qualify for coverage under the Health

Plan. (J.A. 906.)[9] Although the Rules apply to all three Plans, Defendants have offered no rationale

for applying them to the Pension Plan or the IA Plan.

After the Plans threatened to sue Plaintiff to enforce the Controlling Employee Rules, Pig

Newton filed this lawsuit seeking a declaration that the Rules are invalid. The Plans filed a

counterclaim to collect the contributions allegedly due under the Rules and attendant damages under

Section 515 of ERISA.[10] Following discovery, the parties now cross-move for summary judgment.

---

[9] *See* Letter dated August 7, 2012, from William Cole to William Zuckerman. (J.A. 906 (emphasis in original).)

[10] Section 515 of ERISA states: "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145.

**STANDARD OF REVIEW**

Fed. R. Civ. P. 56(a) provides that "[t]he court shall grant summary judgment if . . . there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." In light of the absence of any genuine issue of material fact, summary judgment of Plaintiff's declaratory judgment action is warranted.

Defendants' contention that Plaintiff is bound by the Controlling Employee Rules is subject to *de novo* review by the Court. Although the Trust Agreements grant the Directors authority and discretion to interpret the Trust Agreements and determine benefits for participants, they do not grant the Directors discretion or authority to interpret CBAs or resolve disputes between the Plans and Employers.[11] In construing similar provisions, courts have applied a *de novo* standard of review.[12]

**ARGUMENT**

I. **Defendants Lacked the Authority to Adopt the Controlling Employee Rules.**

A. **The Rules are Invalid under *La Barbera.***

Defendants exceeded their authority, as granted by ERISA, the CBAs, and the Plans' creation documents, in purporting to adopt the Controlling Employee Rules. In *La Barbera v. J.D. Collyer Equipment Corp.,* 337 F.3d 132 (2d Cir. 2003), the Second Circuit prohibited trustees from changing the contribution requirements of the CBAs in exchange for an automatic rule, as the

---

[11] The Health Trust Agreement, Article IV, Section 1, states: "The Directors shall have the power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein and any construction adopted by the Directors in good faith shall be binding . . . ." (J.A. 383.) Article VI, Section 10, states: "The Directors . . . shall have the power to construe and interpret the provisions of the plan of benefits, including any summary plan description or other writing disseminated to Employees, beneficiaries and their dependents . . . ." (J.A. 403.)

[12] *See, e.g., Roca v. Westbury Transp. Inc.,* 19 F. Supp. 2d 44, 47-48 (E.D.N.Y. 1998) ("The obligations of the employer to contribute to the Fund are . . . the result of a bargaining and negotiations process between the employer group and the union, to which the Fund was not a party. Of course, the CBA could have granted the Fund discretion to resolve all disputes as to the content of contract clauses, including those containing employer contribution obligations, but it did not do so. Similarly, the Trust Agreements lack such a provision. In sum . . . the dispute here involves an interpretation of the CBA which does not contain a provision granting the Fund discretion to interpret its terms, and, is, therefore, subject to a *de novo* review.") (citing *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)).

Directors have purported to do here. This case is indistinguishable from *La Barbera*, which is therefore controlling.

The CBAs in *La Barbera* required contributions to the funds "for each hour worked," subject to a 40-hour weekly maximum. *Id.* at 134. They also incorporated the funds' trust agreements. The *La Barbera* CBA stated: "The Trust Agreements . . . as they shall be amended from time to time, are hereby made a part of this Agreement with the same force and effect as if fully incorporated herein." (O'Leary Decl. ¶ 5 & Ex. B.) The trust agreements authorized the trustees to construe the trust agreements and provided that their construction would be binding upon contributing employers. (O'Leary Decl. ¶ 6 & Ex. C.)

The motivation for the rule in *La Barbera* is the same as in this case. In response to concerns that firms owned by one person ("100% owners") reported the minimum hours required to qualify for health coverage, the trustees adopted a resolution – the "100% owner rule" – that if an owner reported *any* hours in a month, the company had to contribute 160 hours per month (or 200 hours in five-week months) for that month, irrespective of the amount of work the owner performed in a month.

The District Court had granted summary judgment to the employers, holding that the rule was arbitrary and capricious and that the CBAs did not permit the trustees to demand contributions for hours that were not worked, and the Second Circuit affirmed. 337 F.3d at 133, 136. Because the Court of Appeals found the rule invalid under either a *de novo* or arbitrary and capricious standard of review, it did not decide the applicable review standard. *Id.* at 136.

The Second Circuit's opinion noted that the CBA provided the framework for calculating contributions due, and that the trust agreement vested the trustees with broad discretion to locate and preserve fund assets. *Id.* at 137. The Court then articulated two requirements for contribution

rules adopted by trustees: first, such rules have to be narrowly tailored, and, second, trustees cannot

modify CBAs. *Id.* at 137-38.[13] The 100% owner rule violated both of these tenets. The Court found:

> the rule applies no matter how accurately or in what detail the firm reports hours
> worked by an owner/employee and flatly dictates that if an owner/employee
> works any hours in one week, the firm must report and pay contributions to the
> Funds as though 40 hours were worked each week in that month . . . . The truth
> simply does not matter.

*Id.* at 138.

The Court held that neither ERISA nor the trust agreement allowed the trustees "to

substitute an automatic and draconian levy" for the contribution requirements in the CBAs or

remedial steps available under the trust agreement where the employer's recordkeeping is

insufficient. *Id.*[14] It noted that the rule exceeds any measure required to prevent actuarial damage

through underreporting "because it applies even when the hours reported – *e.g.*, one hour in a year –

would not qualify an owner/employee for benefits." *Id.* The Court observed that requiring payment

of 160 or 200 hours per month to the funds, even if that number is false, substantially modifies the

CBAs with regard to the cost of benefits for owners/employees, and held that the trustees could not

revise the contribution provisions to "abandon[] the link between eligibility and hours worked by an

employee." *Id.*

The Second Circuit's reasons for invalidating the 100% owner rule apply with even greater

force to the Controlling Employee Rules. First, the Rules are much broader and more draconian

than those thrown out in *La Barbera*: the 100% owner rule increased the owner's contribution

---

[13] The Second Circuit's requirement that the trustees fashion narrowly tailored rules in furtherance of their fiduciary duties is consistent with Supreme Court and Second Circuit precedent on the authority of multi-employer trustees.  *See Central States, SE and SW Areas Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 582 (1985) ("powers of a benefit plan are limited to prudent actions furthering the legitimate purposes of the plan"); *New York State Teamsters Conference Pension and Retirement Fund v. Boening Bros., Inc.*, 92 F.3d 127, 134 (2d Cir. 1996) (fund's payroll audit of employer must not be "broader in scope than necessary to achieve its objective and no more extensive than the scope of the trustees' authority").

[14] The trust agreements in *La Barbera* included provisions allowing trustees to estimate hours owed to the funds if the employers' recordkeeping was inadequate or missing. 337 F.3d at 134.

obligation only in those months in which the owner had covered employment, whereas these Rules demand full-time contributions month-in and month-out, regardless of whether *any* work at all is performed.

Second, as the Second Circuit observed in *La Barbera,* but even more so in this case, "the truth simply does not matter." *Id.* at 138. Mr. Szekely's editing responsibilities occupy the least amount of his time of any of his services for the Series, yet Defendants demand full-time contributions on his behalf. According to Defendants, the Rules were adopted to protect the Health Plan, but they purport to equally apply to the Pension Plan and the IA Plan, with no explanation as to why they are needed to protect those Plans.[15] The application of the Rules seems particularly suspect with respect to the IA Plan, which is a defined contribution, "money in, money out" type of plan. Indeed, the trustees in *La Barbera* had not sought to apply their rule to the defined contribution plan that they administered, the Local 282 Annuity Trust Fund.[16]

Third, the Second Circuit concluded that the 100% owner rule exceeded any measure required to prevent actuarial damage through underreporting, because it applied even if the owner would not qualify for benefits. That conclusion is all the more apparent in this case. Based on Mr. Szekely's limited covered employment under the IA CBAs, the hours reported on his behalf were insufficient for him to attain eligibility under the Health Plan. Mr. Szekely has never received any

---

[15] Pig Newton's document requests sought documents reflecting the adoption of the Rules with respect to the Pension Plan and the IA Plan as well as the Health Plan. Although the Plans produced documents showing the motivation for adopting the Rules for the Health Plan, no documents were produced evidencing the need for the Rules for the other two Plans. (O'Leary Decl. ¶ 9.)

[16] With respect to the IA Plan and the Pension Plan, the Directors are demanding full-time contributions for Mr. Szekely for non-work periods. By requiring contributions to the Plans for non-work periods, the Rules make actual employment irrelevant to the obligation to contribute to the Plans. But Section 401(a) of the Internal Revenue Code requires that only employees of employers may accrue pension benefits. 26 U.S.C. § 401(a) (qualified plan may be established "for the exclusive benefit of [] employees or their beneficiaries"). This raises the question of whether the Directors' demand for contributions for individuals not performing services for the employer violates the Internal Revenue Code, thereby threatening the tax-qualification of the Pension and IA Plans. *See IRS Revenue Ruling 1973-238,*1973-1 C.B. 193; 1973 IRB LEXIS 489 (Jan. 1973) (pension plan that permitted former employees to earn additional pension credits for period after cessation of employment is not tax-qualified plan). In this regard, note that the Trust Agreements prohibit the Directors from making any amendments "contrary to any other applicable law or governmental rule or regulation." (J.A. 413.)

health benefits and offered to permanently waive coverage. (J.A. 21; O'Leary Decl. ¶ 18 & Ex. N.) And, in fact, Mr. Szekely apparently does not qualify for benefits because Pig Newton does not satisfy the Health Plan's 1,500-hour requirement.[17]

Defendants seek to portray the Health Plan as a victim of manipulation by Controlling Employees who, absent the Rules, would report the bare minimum for health coverage.[18] In this case, as illustrated by Mr. Szekely's deposition testimony, nothing could be further from the truth:

> [T]hey wanted us to pay as if I had worked 40-hour weeks every week of the year. And in truth, my work as an editor was far more limited than that . . . . There's [] whole years where I don't edit. Last year when I took a year off, I edited for two weeks on my HBO special. And so for that two weeks of work, I was supposed to be paying into my health and welfare for an entire year. And that seems not right . . . . And so I was presented with the option, we can . . . try to change the situation[], because we were trying to finagle it for the benefit of the health fund, find a way that we could . . . satisfy them, but there – it didn't work. So we were thinking, okay, well, let's go ahead and try to change it . . . . I don't want to be doing this. In a billion years I don't want to be bringing a lawsuit to anybody. It's so much easier to go the little extra step . . . to stay in compliance, but compliance here seems like it's defective. It feels like that the rules are defective, and it's bringing something onto us that's unfair.

(J.A. 21.)

The Trust Agreements offer the Directors a variety of ways to redress any perceived manipulation short of rewriting the negotiated contribution requirements. For example, the Directors are authorized to reject any Employer or any specific group of employees from the Plan

---

[17] Discovery has shown that Mr. Szekely will never attain eligibility for coverage under the Health Fund, even if the contributions demanded under the Rules were made to the Plans. (*See* O'Leary Decl. ¶ 11& Ex. G (Jan. 23, 2013 e-mail from Teri Smith, stating: "This guy is going to be mad as he will not meet the 1500.0 hour requirement on a rolling 12 month period.").)  The Plans' demand for additional contributions for an individual who is never going to qualify for coverage casts doubt on whether the Rules are related to legitimate plan concerns. Defendants' rhetoric about requiring contributions that are sufficient to cover the costs of benefits cannot be credited where it is clear that Defendants had no intention of ever offering Mr. Szekely coverage under the Health Fund in the first instance. The Directors' demands for money from Pig Newton for benefits that they claim he is ineligible for because of their 1,500 hour rule should not be countenanced.

[18] *See* Aug. 7, 2012 letter from William Cole to William Zuckerman, explaining that the Rules were adopted because shareholders were contributing the minimum number of hours needed to keep Controlling Employees eligible for health benefits while failing to contribute additional hours under the CBA (J.A. 906); *and* January 23, 2013 e-mail from Teri Smith to Ruben Ramirez, stating: shareholders "cannot hop[] in and hop[] out when they want as a shareholder" (O'Leary Decl. ¶ 15 & Ex. K.)

and to terminate any employer deemed to have engaged in practices detrimental to the Plans. (J.A. 385.) The Directors can also adopt more stringent eligibility rules to attain coverage or offer Controlling Employees an opportunity to decline coverage, as Mr. Szekely sought to do here. The Second Circuit cited the availability of other options to address perceived cheating in finding that the trustees exceeded their authority in *La Barbera*. 337 F.3d at 137. In short, while the Directors have a number of ways to respond to perceived cheating, what they cannot do is simply substitute their Rules for negotiated contribution requirements.

The Second Circuit was also concerned about the rule's impact on certain employers; it stated:

> Indeed . . . the substantive effect of altering the eligibility rules is aggravated by its limited application to a small group of firms with particular ownership characteristics. Were we to recognize a power in benefit plan trustees to work such changes[,] . . . we would open the door to measures by plan trustees that might drive selected, disfavored employees out of business.

*Id.* at 138. A letter from Howard Fabrick, a former director, to the current Directors, urging them to more narrowly tailor the Rules shows that the Rules have resulted in the type of harm that the Court predicted. (O'Leary Decl. ¶ 10 & Ex. F.)  ("[O]ver the years the rule has been in place, I have seen more than one situation where the application of the rule imposed undue economic hardship on a small business and led many to avoid becoming union signatories or let their signatory status lapse.").)

Defendants have tried to distinguish *La Barbera* by arguing that there the trustees adopted the 100% owner rule as a stand-alone rule, whereas Defendants promulgated the Controlling Employee Rules by amendments to the Trust Agreements, but it is a distinction without a difference. The Second Circuit invalidated the 100% owner rule because it was overly broad and in conflict with the CBAs, not because of the form the trustees chose in adopting it. Indeed, under Defendants' theory, the Directors have limitless authority to re-write the CBA's contribution

obligation, provided they do so in an amendment to the Trust Agreements. The legal impediment in
*La Barbera* was not that the rule was memorialized in a resolution versus an amendment to the trust
agreement. Rather, it was the fundamental absence of the trustees' authority to alter the bargaining
parties' agreed-upon contribution obligation.[19]

### B.   *UPS* Further Refutes Defendants' Position.

The Second Circuit again reviewed the issues in *La Barbera* in *UPS*, in which UPS'
contribution obligations to certain multiemployer health and pension plans were disputed. UPS had
executed CBAs requiring contributions and had also signed one-page, boilerplate documents –
referred to as "participation agreements" – stating UPS' agreement to be "bound by all the rules and
regulations" of the funds and, further, that the participation agreement superseded any agreement
between the bargaining parties that was contrary or inconsistent with the participation agreement or
the funds' rules. 382 F.3d at 275-76.

The district court had determined that the participation agreement governs when in conflict
with a CBA. The Second Circuit disagreed, finding instead a much narrower purpose to such
agreements. It explained that "the function of the participation agreements like the ones in this
appeal is to facilitate the administration of contribution collections – not to serve as an alternative
source for collective bargaining terms." *Id.* at 279. According to the Court, an employer who enters
into a participation agreement with a multiemployer plan is only assenting to the actions taken by
the trustees within the scope of their authority in administering the plan. In reaching its decision, the
Court focused on the necessity of examining "the documents that created the Funds" to determine
whether such "creation documents" gave the trustees "the power to use their rules and regulations to

---

[19] The folly of Defendants' attempt to distinguish *La Barbera* on this procedural ground is seen for what it is by
considering that, if Defendants are correct, the trustees in *La Barbera* would only have had to ask the Court for a brief
recess so they could vote to convert their rule into an amendment. Obviously, such a ploy would not have changed the
outcome in *La Barbera*.

supersede the written terms of CBAs." The Court found that the funds' creation documents conferred limited authority on trustees and did not empower them to do so. *Id.* at 281.

Essentially, Defendants argue for a construction of the provisions in the Trust Acceptance and the Agreement of Consent reflecting Pig Newton's acknowledgment to be bound to certain Trust Agreements that would give the Directors unfettered discretion to revise the IA CBAs. *UPS* conclusively puts such argument to rest.[20]

Nothing in the Trust Agreements here authorizes Defendants to modify Plaintiff's contribution obligation. As an initial matter, although *UPS* requires an examination of the Plans' creation documents, Defendants have not produced any of the actual creation documents but only some of the amended and restated versions. In any event, the Trust Agreements that have been produced do not suggest that the Directors have the broad authority exercised in this case to disregard the negotiated contribution obligation. For example, the Trust Agreements list 16 general powers of the Directors, such as the authority to purchase insurance policies, make investment decisions, and enter into administrative contracts. (J.A. 383-86.)  With respect to employers, the Trust Agreement authorizes the Directors to accept or reject any Employer for inclusion in the Plan. (J.A. 385.) It empowers the Directors to construe the Trust Agreement, but not the CBAs. (J.A. 383.)

The Trust Agreement provisions on contributions restrict the Directors' amendment power to amending the composite rates set forth in the Trust Agreement to comply with changes in the CBAs. Article V, Section 1, states: "The Directors shall have the authority to amend the composite rates set forth in Exhibit A . . . in order to reflect changes in the contributions provided for in the

---

[20] *See also United Food and Commercial Workers and Participating Food Industry Employers Tri-State Health and Welfare Fund v. Super Fresh Food Markets Inc.*, No. 04 Civ. 1226, 2008 WL 3874304, *23 (D.N.J. Aug. 19, 2008) ("While the CBAs may have allowed the Trustees to increase the rate per active employee . . . if the funds were insufficient . . . . [t]he Trustees could not alter the explicitly stated portion of the contribution obligation that was collectively bargained.") (citing *NLRB v. Amax Coal Co.*, 453 U.S. 322, 336 (1981)).

respective [CBAs] between the Employers and the Unions and the Guilds, which are the parties to the Trust." (J.A. 391.) The Trust Agreement confers no power to change the basis upon which Employers contribute – *i.e.*, from hours worked to a minimum floor of 2,000 hours per year. This Article addresses administrative issues regarding collections, such as mode of payment, remedies upon default, payroll audits, and collection agents, among other topics, and authorizes the Directors to terminate Employers, but, again, does not hint of any power of the Directors to collect contributions not required by the CBAs. (J.A. 393.)

Other provisions in the Trust Agreement recognize that the Directors' authority is constrained by the CBAs. Article V, Section 4, states that Directors can change contribution payment due dates provided that the change is "satisfactory to the Employer or Employers concerned." (J.A. 391.) Article V, Section 11, authorizes Directors to appoint collection agents "provided that such Agent is authorized by the appropriate Collective Bargaining Agreements." (J.A. 397.) Article X, Section 2 prohibits amendments that will conflict with then-existing CBAs, or that will be contrary to any other applicable law or governmental rule or regulation. (J.A. 413.)

The Directors' unilateral re-writing of the bargaining parties' negotiated contribution obligation by application of the Controlling Employee Rules wreaks havoc on federal labor policy, which requires mandatory collective bargaining over an employer's contribution obligation to a trust fund. In *Professional Administrators, Ltd. v. Kopper-Glo Fuel, Inc.*, 819 F. 2d 639, 643 (6th Cir. 1987), the Sixth Circuit held that trustees acted contrary to public policy when they unilaterally increased contributions over those specified in the CBAs, thereby increasing wages "without resorting to the collective bargaining process." The Court noted that, in accordance with Section 301 of the LMRA, 29 U.S.C. § 158(d), contributions to benefit funds are mandatory subjects of collective bargaining. *Id.* The Court further observed that "trustees do not bargain with each other to

set the terms of the [CBA], and that trustees cannot require contributions not required by the

original CBA." *Id.* The Court stated:

> Trustees are [] not in a position to participate in the collective bargaining process.
> We agree with the court of appeals that cited *Amax* as authority for the
> proposition that "fund trustees have no power to resolve issues that are properly
> the subject of collective bargaining." *Hauskins v. Stratton*, 721 F. 2d 535, 537 (5th
> Cir.  1983). *See also Hawkins v. Bennett*, 704 F. 2d 1157, 1159 (9th Cir.  1983)
> ("the [collective bargaining agreement] fixes the employer's contribution to the
> fund"). The amounts to be contributed by an employer to a trust fund are a matter
> for collective bargaining. .   .   .   [W]e find that an award approving a unilateral
> increase in contribution rates is contrary to federal labor policy underlying
> mandatory collective bargaining. "

*Id.* at 644.

The Second Circuit recognized this important policy in *UPS*, in rejecting the district court's

holding that a fund's participation agreement supersedes and controls all terms of a CBA. 382 F.3d

at 281 (noting that such holding was "at least in tension with the strong traditional labor policy in

favor of collective bargaining that is promoted in the National Labor Relations Act, 29 U.S.C. §

151," and that "this particular aspect of the district court's opinion was overtaken by our opinion in

*La Barbera*[,] . . . which held that the rulemaking authority of a multiemployer plan is limited by

the terms of the plan's creation documents").

In this case, Pig Newton and the IA contractually agreed that the Directors could modify the

amount of the Health Plan's hourly contribution rate, subject to certain limitations. There was no

similar agreement concerning the contribution rates for the Pension Plan and the IA Plan, nor was

there any delegation of authority to the Directors with respect to the basis upon which contributions

are owed, *i.e.*, only for hours worked or guaranteed. The Directors' attempt to completely refashion

the basis upon which Plaintiff must contribute to the Plans – from an hours worked/guaranteed basis

to an arbitrary number selected by the Defendants – violates the national labor policy requiring the

bargaining parties to collectively bargain over this issue.

In sum, Defendants had no authority to adopt or implement the Controlling Employee Rules. Therefore, Plaintiff is entitled to summary judgment.

## II.     The Trust Agreements Were Not Properly Incorporated into the IA CBAs.

Even if the Rules were valid and could be applied to Mr. Szekely, they are nonetheless unenforceable in this case because, contrary to Defendants' argument, Plaintiff did not agree to be bound to them.

The IA CBAs require contributions only for hours worked or guaranteed under the CBAs. Defendants try to circumvent this contractual limitation by asserting that Plaintiff agreed to be bound to the Trust Agreements which, in turn, contain the Rules, because the Trust Agreements were purportedly incorporated by reference into the documents that Plaintiff signed. Defendants' position ignores the confusing and sloppy manner in which those executed documents refer to a variety of ill-defined and undisclosed Trust Agreements. As such, the Trust Agreements have not been properly incorporated into any of the documents that Plaintiff signed. This threshold failure dooms Defendants' contention that they are authorized to alter Plaintiff's negotiated contribution obligation.

In an ERISA Section 515 case, the Eastern District of Virginia explained the requirements for effective incorporation of a secondary document (in this case, the Trust Agreements) into a primary document – here, the IA CBAs, the Agreement of Consent and/or the Trust Acceptance  – as follows:

> "It is axiomatic in the law of contracts that, in order to incorporate a secondary document into a primary document, the identity of the secondary document must be readily ascertainable. " *Hertz Corp. v. Zurich American Ins. Co.,* 496 F. Supp. 2d 668, 675 (E.D. Va.  2007). In order for the incorporated terms to have binding effect, the parties must have knowledge of and assent to the incorporated terms. *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1201 (2d Cir.  1996). Additionally, incorporation cannot cause surprise or hardship. *Standard Bent Glass Corp. v. Glassrobots Oy,* 333 F. 3d 440, 447 (3d Cir. 2003).

*Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. DCI Signs & Awning, Inc*, No. 08
Civ. 15, 2008 WL 640252, *3  (E.D. Va. Mar. 5, 2008)  None of these incorporation requirements is
satisfied here.

Under this common-sense standard, the Plans' position fails, as it is clear that the secondary
Trust Agreements containing the Rules are not "readily ascertainable" from the primary IA CBAs,
the Agreements of Consent, or the Trust Acceptance. The Trust Acceptances refer to the
"Declarations of Trust *establishing* the (a) Motion Picture Industry Health Plan dated October 20,
1952, as amended ("Health Plan") and (b) the Motion Picture Industry Pension Plan dated October
25, 1953, as amended ("Pension Plan") and (c) the Motion Picture Industry Individual Account Plan
dated August 1, 1979, as amended ("Individual Account Plan"). (J.A. 820, 846, 874, 875, 903.) The
Agreements of Consent refer to "the Trust Agreements *established*" pursuant to a number of IA
CBAs. The Plans have produced ten different versions of the Trust Agreements for just the four-
year period between 2010 and 2014. (J.A. 819, 845, 873, 902.)

However, on their face it is clear that none of these Trust Agreements are the Trust
Agreements that *established* the Plans, as provided for in the Trust Acceptances. Nor does it appear
that any of the Trust Agreements relied upon by Defendants were *established* pursuant to any of the
IA CBAs, which are the documents referenced in the Agreements of Consent. In short, neither the
Trust Acceptances nor the Agreements of Consent clearly identify the Trust Agreements that they
purport to incorporate; indeed, they point to other documents, presumably decades old, which have
not been produced. Accordingly, the Plans' argument that the IA CBAs, the Agreements of Consent
or the Trust Acceptance incorporate the Trust Agreements by reference is wrong. *See PaineWebber*,
81 F.3d at 1201 (a party will not be bound to the terms of any document unless it is clearly
identified in the agreement) (citing *Level Export Corp. v. Wolz, Aiken & Co.,* 305 N.Y. 82, 87
(1953); *Chiacchia v. Nat'l Westminster Bank USA,* 124 A.D.2d 626, 628 (2d Dep't 1986)

("agreement with no direct reference to second document did not incorporate that document"); and *Weiner v. Mercury Artists Corp.,* 284 A.D. 108, 109 (1st Dep't 1954) ("one-page contract did not validly incorporate arbitration provision buried in 207-page booklet")).

Because the Plans' only justification for replacing the contribution obligations of the IA CBAs with the Controlling Employee Rules is their incorrect assumption that the Trust Agreements were incorporated into the documents signed by Plaintiff, and those Trust Agreements are far from readily ascertainable, Pig Newton did not agree to be bound to the Controlling Employee Rules of the Trust Agreements.

With respect to the other requirements for effective incorporation by reference, it is undisputed that Pig Newton did not have knowledge of or assent to the Controlling Employee Rules, and that their application here has resulted in surprise and is to the financial detriment of Plaintiff. The IA CBAs conditioned the contribution requirement upon hours worked or guaranteed; Paragraph 6 of the Trust Acceptance only required contributions for services "actually rendered" by the employee, and Paragraph 4 only required Plaintiff to contribute to the Health Plan "for each hour guaranteed by or each hour worked for the Employer by employees for whom the Employer is obligated hereunder to make the required contributions." (J.A. 820, 846, 874, 875, 903.) In sharp contrast, the Rules require contributions for a minimum of 2,000 hours per year, irrespective of whether any work is being performed.

The Plans' failure to properly incorporate the Rules by reference into the IA CBAs is no mere technicality; that failure deprives employers of notice of the Rules. Indeed, discovery has established that employers are unaware of the Rules. The Plans have conceded their poor performance in communicating the requirements of the Rules to Contributing Employers. For example, in one internal e-mail, a Plans' employee refers to the need to educate new employers

about "employee-shareholder obligations" and concedes that the "packet of information" provided to new signatories is "too overwhelming in print." (O'Leary Decl. ¶ 19 & Ex. O.)[21]

In short, Defendants' claim rests on the assumption that Plaintiff is bound by the Controlling Employee Rules, because they are incorporated by reference into the Trust Acceptance and the Agreement of Consent. That assumption is in error, however, because, as shown, the Trust Agreements containing the Rules are not readily ascertainable, and therefore there was no incorporation by reference. As such, Plaintiff's contribution obligation can only be measured based on the IA CBAs, which require contributions only for hours worked or guaranteed. Plaintiff is entitled to summary judgment on this ground, as well.

## III.    The Trust Agreements Containing the Controlling Employee Rules Provide That Plaintiff is Not Subject to the Rules Because Mr. Szekely is Not an "Employee."

Even if the Court were to determine that the Rules are valid, they do not apply to Pig Newton because Mr. Szekely is not a Controlling Employee under the standards crafted by Defendants.[22] The Plans determined that Mr. Szekely was a "Controlling Employee" based upon his employment as a Local 700 IA-covered editor during production of the Series. This determination was in error. As noted, the Trust Agreements define a Controlling Employee of an Employer as an Employee who is a shareholder of the corporation, a member of the LLC, or an officer of the Employer, and is not the only Employee who works under a CBA. (J.A. 446.)

Given that Mr. Szekely is a shareholder of Pig Newton which employs at least one other employee performing work covered under the IA CBA that covered Mr. Szekely, he would appear at first glance to fit the definition of Controlling Employee. But in order to be considered a

---

[21] Given that Mr. Szekely also qualifies as a participant under the Plans within the meaning of ERISA, 29 U.S.C. § 1002(7), the Plans' admitted communication failures to Mr. Szekely in his status as a participant – in contrast to Pig Newton's status as Contributing Employer – call into question whether the Directors have satisfied their fiduciary duties to him.

[22] Because this question involves the interpretation of the Trust Agreements, the Directors' action in this regard is subject to the arbitrary and capricious standard of review.

Controlling Employee, he must also meet the definition of "Employee," which exclude those employees who do not satisfy one of eleven enumerated tests, each based upon a different classification of employment and/or the identity or status of the Employer. Because the Plans treated Mr. Szekely as an Employee under the Rules due to his employment as a Local 700-covered editor, the relevant test for Employee is as follows:

> the employee's ***principal employment*** with the Employer satisfies all of the following requirements:
> (i)      the employee is in the labor pool in the United States or Puerto Rico, and
> (ii)     the employee is hired by the Employer in the United States or Puerto Rico area . . . to perform services in such areas in the Industry in connection with motion picture (including theatrical, television, music video and commercial) productions[,] . . . and
> (iii)    the employee is employed by the Employer as . . . an editorial or post-production sound employee who is working under a Collective Bargaining Agreement between an Employer and I.A.T.S.E. or Local 700 thereof[. ]

(J.A. 366-67 (emphasis added).)[23]

Thus, in order to be considered an Employee under the Rules, the employment of the employee must be his/her *principal employment* with the Employer. Yet here Mr. Szekely's employment with Pig Newton demonstrably was *not* principally for Local 700-covered editorial services but rather was for a range of services related to the production of the Series: producing, writing, directing, and performing as its star, in addition to editing.

Merriam-Webster's online dictionary defines the term "principal" as the "most important, consequential, or influential: CHIEF." http://www.merriam-webster.com/dictionary/principal. The mere listing of the several integral services that Mr. Szekely performed establishes that he was not principally employed for editorial services. He testified that his editing responsibilities comprised approximately 15% of his total responsibilities. In further support of his limited editing responsibilities, consider the allocation of Mr. Szekely's total compensation among his various

---

[23] If the Plans relied upon a different test for Employee, the result is the same. Each of the tests for Employee in Article I, Section 2(b)(A)-(K) of the Trust Agreement includes "principal employment" under a CBA subject to contributions to the Plans as a predicate.  (J.A. 366-71.)

services in connection with Season 2 of the Series – 44% was for producer services, 27% was for writing services, 14% was for directing services, 7% was for his services as a performer, and the remaining 8% was for editorial services. (Breard Decl. ¶ 12.)

In conclusion, if the term "principal employment" is to have any meaning, it must mean that the employment at issue is the "most important" or "chief" employment of the employee. As demonstrated above, the Plans cannot maintain that Mr. Szekely's employment for editorial services was his most important or chief employment by Pig Newton. To the contrary, Plaintiff's employment of Mr. Szekely for the many important services other than editorial services in connection with the Series compels the conclusion that his employment for editorial services was *not* his principal employment.

Accordingly, the Plans incorrectly determined that Mr. Szekely was a Controlling Employee, erred in applying the Rules to Pig Newton and, in fact, owe Plaintiff a refund for all contributions made on his behalf. By interpreting the Rules "in a manner inconsistent with their plain words" and by rendering the word "principal" superfluous, the Directors' actions do not survive scrutiny under the arbitrary and capricious standard of review. *See UPS,* 382 F.3d at 282. Plaintiff is entitled to summary judgment on this ground.

<u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff respectfully requests that its Motion for Summary Judgment be granted and Defendants' counterclaim be dismissed as a matter of law.

Respectfully submitted,

KAUFF MCGUIRE & MARGOLIS LLP
Attorneys for Plaintiff

By: */s/ Elizabeth O'Leary*
    William E. Zuckerman
    Elizabeth O'Leary

Dated: July 11, 2014, at New York, New York