UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PIG NEWTON, INC.,
Plaintiff,

-against-

THE BOARDS OF DIRECTORS OF THE MOTION PICTURE INDUSTRY PENSION PLAN, THE MOTION PICTURE INDUSTRY INDIVIDUAL ACCOUNT PLAN, AND THE MOTION PICTURE INDUSTRY HEALTH PLAN,
Defendants.

Case No. 13-CIV-7312 (KPF)

**DEFENDANTS' RULE 56.1 STATEMENT**

Pursuant to Rule 56.1 of the Local Rules of this Court, Defendants Boards of Directors of the Motion Picture Industry Pension Plan, the Motion Picture Industry Individual Account Plan, and the Motion Picture Industry Health Plan ("Defendants" or the "Plans"), by their attorneys Spivak Lipton LLP, submit that the following facts are undisputed:

1. Defendants administer the Motion Picture Industry Pension Plan ("Pension Plan"), the Motion Picture Industry Individual Account Plan (the "IAP" or the "Individual Plan"), and the Motion Picture Industry Health Plan ("Health Plan"). (Defendants' Amended Counterclaim ("Am. Counterclaim") ¶ 3; Answer to Am. Counterclaim ¶ 3.)

2. The Plans are multi-employer plans that were established in 1952 (Health Plan), 1953 (Pension Plan), and 1979 (Individual Plan) pursuant to trust instruments entered into by and between certain employers and members of an employer association, and various unions which represent individuals employed in a wide variety of crafts within the entertainment industry. (Declaration of Shanda Zuniga ("Zuniga Decl.") dated July 11, 2014 ¶ 4; see also Joint Appendix dated July 11, 2014 ("JA"), Tab 5, JA-359.)[1]

---

[1] Citations to the parties' Joint Appendix shall be designated herein as Joint Appendix, Tab #, JA-[page number]. The Joint Appendix is being filed with Plaintiff's motion papers.

3. The Plans provide pension, individual retirement, and health benefits to approximately 55,000 individuals (plus their dependents) who work in the entertainment industry throughout the United States and Canada under collective bargaining agreements ("CBAs") and participation agreements which provide for contributions to the Plans. (Zuniga Decl. ¶ 5.)

4. Pursuant to the Plans' terms, individuals must work certain minimum hours in covered employment in order to qualify for benefits through the Plans. (Joint Appendix, Tab 5, JA-399-400 (Health Plan, Article VI, § 5); id., Tab 6, JA-502, -510 (Pension Plan, Article I, § 29 & Article II, § 3); id., Tab 7, JA-704, -712 (Individual Plan, Article II, § 3).)

5. Plaintiff Pig Newton is the producer of the television series "Louie" (the "Series"), as well as other entertainment ventures, including televised and web-based comedy shows. (Complaint ("Compl.) ¶ 2; Am. Answer ¶ 2; Transcript of the April 8, 2014 Deposition of Louis Szekely ("Dep. Tr."), Joint Appendix, Tab 1, JA-3 (Dep. Tr. 8:11-23).)

6. Louis Szekely ("Szekely") is, and has at all times been, Pig Newton's sole owner and shareholder. (Compl. ¶ 3; Am. Answer ¶ 3.)

7. Plaintiff employs Mr. Szekely in connection with various functions, including as the producer, sole writer, sole director, star performer, and as an editor of the Series. (Compl. ¶ 4; Am. Answer ¶ 4.)

8. Mr. Szekely has performed editing services for the Series in each of the four seasons of the Series that have been produced to date. (Joint Appendix, Tab 1, JA-12 (Dep. Tr. 43:3-8).)

9. He has also performed editing services for Pig Newton which are not related to the Series. (See, e.g., Joint Appendix, Tab 1, JA-35-JA-36 (Dep. Tr. 137:11-139:12);

Declaration of Gillian Costello ("Costello Decl.") dated July 11, 2014, Exhibit A ("Exh."), Bates Nos. PN000338-PN000339.)

10. Since in or around 2010, Plaintiff and the International Alliance of Theatrical Stage Employees, Moving Picture Technicians and Allied Crafts of the United States, its Territories and Canada, AFL-CIO, CLC ("IATSE") and the East Coast Locals of IATSE have been parties to various collective bargaining agreements (collectively, "IATSE CBAs") governing the wages, hours, and working conditions of certain of Plaintiff's employees. (Am. Counterclaim ¶ 10; Answer to Am. Counterclaim ¶ 10.)

11. Among the agreements entered into between Plaintiff and the IATSE are agreements entitled "Agreement of Consent- Limited Production Agreement for Project Titled 'Louie'" ("Agreement of Consent"). Pursuant to the Agreements of Consent, Plaintiff "agree[d] to become a party to and be bound by," among others, (1) the Producer-IATSE Basic Agreement between the Alliance of Motion Picture and Television Producers, Inc. (the "AMPTP") and IATSE and its West Coast Studio Locals; (2) the Videotape Electronics Supplemental Basic Agreement and the Supplemental Digital Production Agreement between the IATSE and the AMPTP; and, (3) the Trust Agreements of the Plans, and amendments, modifications, extensions, supplements, or renewals of the agreements specified therein. (Am. Counterclaim ¶ 11; Answer to Am. Counterclaim ¶ 11; Joint Appendix, Tab 9, JA-819, id., Tab 12, JA-845, id., Tab 15, JA-873; id., Tab 19, JA-902.) Copies of the Producer-I.A.T.S.E. and M.P.T.A.A.C. Basic Agreements of 2009 and 2012 are included in the Joint Appendix at Tab 3, JA-65-208 and Tab 4, JA-209-353, respectively.

12. The IATSE CBAs obligate Plaintiff to make timely contributions to the Plans for its employees covered by the CBAs. (Compl. ¶ 6; Am. Answer ¶ 6; Am. Counterclaim ¶ 12;

Answer to Am. Counterclaim ¶ 12; Joint Appendix, Tab 8, JA-806 (Article 7); Tab 11, JA-832 (Article 7); Tab 14, JA-838 (Article 7); Tab 18, JA-887 (Article 7).)

13.  Editing services are covered by the IATSE CBAs.  (Am. Counterclaim ¶ 15; Answer to Am. Counterclaim ¶ 15; see, e.g., Joint Appendix, Tab 8, JA-798; id., Tab 11, JA-824, JA-839; id., Tab 14-JA 850, JA-865; id., Tab 18, JA-879, JA-896.)

14.  In addition to the IATSE CBAs, since in or around 2009, Pig Newton has been party to collective bargaining agreements with other unions which provide for contributions to the Plans, including with Studio Transportation Drivers Local 399, International Brotherhood of Teamsters.  (See, e.g., Zuniga Decl. Exh. A, Bates Nos. PN000763-PN000767) and Theatrical Teamsters Local 817 (Zuniga Decl. Exh. B, Bates Nos. D003949-D003951).

15.  The IATSE CBAs provide that "[t]he company "agrees to execute the MPIPHP `Trust Acceptance Agreement' and `Company Data Sheet,' attached hereto."  (Joint Appendix, Tab 8, JA-806 (Article 7(A)(iv)); id., Tab 11, JA-832 (Article 7(A)(iv)); id., Tab 14, JA-858 (Article 7(A)(iv)); id., Tab 18, JA-887 (Article 7(A)(iv).)

16.  Pig Newton agreed to and did execute Trust Acceptances pursuant to which Plaintiff, "represent[ed] and agree[d]" among other things, that Plaintiff "is familiar with the provisions of the respective collective bargaining agreements and Declarations of Trust establishing" the Plans.  (Joint Appendix, Tab 10, JA-820 (¶ 1); id., Tab 13, JA-846 (¶ 1); id., Tab 16, JA-874 (¶ 1); id., Tab 20, JA-903 (¶ 1).)

17.  In addition, Plaintiff agreed that "by this Trust Acceptance [Plaintiff] agrees and intends to become a party and to participate in the [Plans] to the same extent as though the [Plaintiff] had executed such Trust Agreements or their counterparts with respect to the

employees covered by the collective bargaining agreement." (Joint Appendix, Tab 10, JA-820 (¶ 7); id., Tab 13, JA-846 (¶ 7); id., Tab 16, JA-874 (¶ 7); id., Tab 20, JA-903 (¶ 7).)

18. The Company Data Sheets that Pig Newton executed pursuant to the CBAs contained a section with the heading "Controlling Officers/Shareholder Information." On each Company Data Sheet, Pig Newton identified the Officer/Shareholder Name as Louis Szekely, his title as President, and his percentage of shares as 100%. (Joint Appendix, Tab 28, JA-933-JA-939.)

19. The Sheets list his Union Affiliation as DGA [Directors Guild of America], WGA [Writers Guild of America], SAG [Screen Actors Guild], and AFTRA [American Federation of Radio and Television Artists] (Company Data Sheets), although the Company Data Sheet dated February 11, 2013 lists no Union affiliations, and the September 13, 2013 Sheet adds "IA" [IATSE] to Mr. Szekely's list of Union Affiliations. (Joint Appendix, Tab 28, JA-933-JA-939; see also id., Tab 1, JA-6 (Dep. Tr. 19:21-21:10).)

20. For decades, the Plans' Trust Agreements have contained provisions pertaining to "Controlling Employees." (Zuniga Decl. ¶ 8.)

21. The Health Plan's Trust Agreement defines "Controlling Employee" as follows:

> A qualified Controlling Employee of an Employer shall mean an Employee ... who is also a shareholder of the corporation or member of the LLC or is an officer of such Employer or is the spouse of such a shareholder, member of the LLC or officer, and whose Employer employs at least one other employee performing work covered under the applicable collective bargaining agreement in addition to the Controlling Employee. . . .

(Joint Appendix, Tab 5, JA-366 (Health Plan-Article I, § 2(a)(vi).)[2]

[2] There are non-substantive variations in the language of the Pension Plan and the Individual Plan. (Joint Appendix, Tab 6, JA-488 (Pension Plan-Article I, § 11(E)); id., Tab 7, JA-690 (Individual Account Plan-Article I, § 12(E)).)

22. The Trust Agreements detail the contribution obligations of Controlling Employers for Controlling Employees. The Health Plan's Trust Agreement provides in part:

> Contributions by Employers which are privately held corporations, limited liability companies ("LLC"), or other eligible business entities, on behalf of any Controlling Employee shall be made at the composite rates set forth in Article II, Section I, Paragraph B, above, as set forth below. A Controlling Employee of an Employer, as described in the previous sentence, shall mean an Employee ... which Employee is also a shareholder of the corporation or member of the LLC, or is an officer of the Employer or the spouse of such a shareholder, member of the LLC . . . and is not the only Employee of the Employer who works under an applicable collective bargaining agreement. The Employer of such Controlling Employee shall be called a Controlled Employer.

(Joint Appendix, Tab 5, JA-446 (Health Plan-Exhibit A(30), Article II, § 4(A)).) [3]

23. The Heath Plan's Trust Agreement further states:

> Contributions shall be made for such Controlling Employee for fifty-six (56) hours per week, and for not less than forty-eight (48) weeks in any calendar year, regardless of the number of weeks in which the Employee performs any work.
>
> However, for Controlling Employees working under the following Collective Bargaining Agreements at the times specified below, contributions shall be made for such Employee for forty (40) hours per week and for not less than fifty (50) weeks in any calendar year, regardless of the number of weeks in which the Employee performs any work:
>
> . . .
>
> (iii) Effective March 25, 2004, Controlling Employees working under Collective Bargaining Agreements described in Article II, Section 1.B.3 (East Coast agreements).

(Joint Appendix, Tab 5, JA-447 (Health Plan-Exhibit A(30), Article II § 4(A)(1)).)[4]

---

[3] There are non-substantive variations in the language of the Pension Plan and the Individual Plan. (Joint Appendix, Tab 6, JA-608-JA-609 (Pension Plan-Exhibit A(31), Article II, § 4(a)(1)); id., Tab 7, JA-777 (Individual Account Plan-Exhibit A(31), Article II, § 4(a)(1)).

[4] There are non-substantive variations in the language of the Pension Plan and the Individual Plan. (Joint Appendix, Tab 6, JA-609 (Pension Plan-Exhibit A(31), Article II, § 4(a)(1)); id., Tab 7, JA-778 (Individual Account Plan-Exhibit A(31), Article II, § 4(a)(1)).)

24. The CBAs under which Mr. Szekely has performed covered work are East Coast agreements as described in Article II, Section 1.B.3 of the Trust Agreement's Exhibit A(30), and, hence, the reduced 40-hour requirement applies, rather than the standard 56-hour requirement. (See Joint Appendix, Tab 5, JA-436-437 (Health Plan-Exhibit A(30), Article II, Section 1.B.3).)[5]

25. The Controlling Employee provisions serve the purpose of addressing the problem that certain individuals, in addition to performing services under CBAs providing for contributions to the Plans, held a relationship to their signatory employers under which they were in a position to control the number of hours contributed on their behalf. (Zuniga Decl. ¶ 10; Joint Appendix, Tab 22, JA-906.)

26. This resulted in a number of situations under which such employers contributed the minimum number of hours needed to keep such Controlling Employees eligible for health benefits or pension and IAP vesting credits. (Zuniga Decl. ¶ 10; see also Joint Appendix, Tab 22, JA-906.)

27. The Controlling Employee provisions were designed to ensure that if a Controlling Employee works any hours under a CBA requiring contributions to the Plans, the Controlled Employer must make contributions on their behalf for a specified number of hours per week and weeks per year, regardless of the number of hours actually worked. (Zuniga Decl. ¶ 10; see also Joint Appendix, Tab 22, JA-906.)

28. The Trust Agreements empower the Directors to audit the books and records of signatory employers to ensure compliance with contribution requirements under the applicable CBAs and Trust Agreements. (Joint Appendix, Tab 5, JA-394-395 (Health Plan-Article V, § 6);

---

[5] This is the numbered section for the Health Plan. The corresponding section pertaining to East Coast Agreements in the Pension and Individual Account Plans is Pension Plan Exhibit A(31), Article II, Section 1(b)(2). (Joint Appendix, Tab 6, JA-601.)

Joint Appendix, Tab 6, JA-519 (Pension Plan-Article III, § 8); id., Tab 7, JA-723 (Individual Plan-Article III, §5).)

29. In or around January 2012, the Plans audited the books and records of Pig Newton for the period November 29, 2009 through January 29, 2011. (Joint Appendix, Tab 21, JA-904-905.)

30. The auditors determined that Pig Newton had made all required contributions for that period. (Joint Appendix, Tab 21, JA-904.) They also found that "No controlling-employees shareholders were identified as having performed covered labor." (Zuniga Decl. ¶ 11 & Exh. C thereto (Bates No. D005703).)

31. The audit report was incorrect. Although Pig Newton kept no records of such work (see Joint Appendix, Tab 1, JA-14 (Dep. Tr. 51:19-52:7)), and Pig Newton's original Complaint in the matter alleged inaccurately that Mr. Szekely began covered work only during the second season of the Series (see Compl. ¶ 4), Mr. Szekely admitted during his deposition that he in fact performed bargaining unit work during the first season of the Series (Joint Appendix, Tab 1, JA-10-JA-11, JA-12 (Dep Tr. 37:24-38:16, 43:7-14).) Pig Newton also admitted this in its Answer to the Plans' Amended Counterclaim. (Am. Counterclaim ¶ 19; Answer to Am. Counterclaim ¶ 19.)

32. Pig Newton did not report any hours or make any contributions on behalf of Mr. Szekely relating to Season One of the Series. (Am. Counterclaim ¶ 19, Answer to Am. Counterclaim ¶ 19; Zuniga Decl. ¶ 16 & Exh. D thereto (Bates Nos. D004414, D005724).)

33. After Season One of the Series, Pig Newton did begin to keep certain records purportedly pertaining to Mr. Szekely's time spent in service as an editor. (See, e.g., Costello Decl. Exh. B, Bates Nos. PN00039-PN00051.)

34. But Plaintiff did not keep accurate records of such hours. (See Joint Appendix, Tab 1, JA-43 (Dep. Tr. 168:25-169:20).)

35. Mr. Szekely performs multiple duties at one time, and, as he stated: "It's hard because I have so many jobs. It's very difficult to figure out how many hours I worked on any job in any particular week. It's very difficult. I don't report it, I don't go somewhere in person. I do it at home. I do several things simultaneously." (Joint Appendix, Tab 1, JA-43 (Dep. Tr. 168:25-169:5).)

36. As a result of Mr. Szekely's multiple and often interconnected duties, Pig Newton's time records appear to show, for example, that he worked as an editor and actor at overlapping hours in the same day. For example, for the week ending May 7, 2011, Mr. Szekely's time records as an editor and as an actor have him working overlapping hours as both an editor and an actor on May 3, May 4, and May 5, 2011. (Costello Decl. Exh. C compare Bates Nos. PN000041 with PN000017 and PN00082.) On those same days, his Crew Time Card for his director duties reports him working as a director, with the designation "flat," but with no hours recorded. (Costello Decl. Exh. C, Bates No. PN 000033.) The record shows similar, apparently overlapping time reported for his work as both editor and in different capacities in other weeks, including for week ending May 14, 2011 (see Costello Decl. Exh. D, Bates Nos. PN00042, PN000084-85, PN000034), and for week ending March 15, 2014 (see Costello Decl. Exh. E, Bates Nos. PN000265 and PN000266).

37. Thus, Mr. Szekely did not record the time that he spent working as an editor (see, e.g., Joint Appendix, Tab 1, JA-35 (Dep. Tr. 134:5-23)), although the Crew Time Cards that Plaintiff maintained for Mr. Szekely's work as an editor required the employee and supervisor to "attest under penalty of perjury to the information provided herein," (see, e.g., Costello Decl.,

Exh. B, Bates Nos. PN00039-PN00051).

38. Mr. Szekely stated:

> [M]y hours are very erratic and they're so mixed in with this other stuff, that the best we can do is a good-faith estimate of how much time I probably spent editing, allocated towards editing, averaged over a bunch of days during a period of time. So there are days where I don't do any work at all because I would have my kids. . . .and then there are other days I'll put in, you know, I'll work for 24 hours straight because I'm on a creative role [sic]. And then during a day, especially, I'll be editing for an hours, producing for an hour, writing, you know, doing all this stuff. So clocking in and out isn't an accurate assessment of the time. I think these cards probably represent a good estimate of what I ended up doing over—you know, averaged over time.

(Joint Appendix, Tab 1, JA-35 (Dep. Tr. 134:6-23).)

39. After Season One, Pig Newton did report some hours and make certain contributions to the Plans on behalf of Mr. Szekely. Thus, Plaintiff reported hours and made contributions to the Plans on behalf of Mr. Szekely at the rate of 50 hours per week for the period on or about April 17, 2011 through on or about July 16, 2011. (Zuniga Decl. ¶ 12, Exh. D thereto (Bates Nos. D004414, D005724); Am. Counterclaim ¶ 20; Answer to Am. Counterclaim ¶ 20.) For other periods, it contributed at the rate of 40 hours per week, and yet other periods, it contributed nothing for him. (Id.)

40. For example, Mr. Szekely testified that "I edited some of the episodes last year. We had another editor, Susan Morse, last year." (Joint Appendix, Tab 1, JA-12 (Dep. Tr. 43:4-6; see also id., JA-16 (Dep. Tr. 60:21-61:22) (testifying that Susan Morse was hired as an editor for Season 3, but "in some episodes, I edited myself.").) However, while Pig Newton reported time and made contributions on behalf of Ms. Morse during the period March 31, 2012 through August 4, 2012, it made no contributions for Mr. Szekely during that period. (Zuniga Decl. ¶ 12 & Exh. D thereto (Bates Nos. D4414, D005724).)

41.     On or about March 13, 2012, the Plans issued a Controlling Shareholder Billing letter to Plaintiff informing Plaintiff that it owed a total of $10,531.00 in contributions on behalf of Mr. Szekely for the period July 24, 2011 to January 21, 2012.  (Joint Appendix, Tab 27, JA-932.)  A second request was issued on or about April 11, 2012.  (Id., JA-931.)

42.     By email dated March 29, 2012, Plaintiff's production accountant inquired about the March 13, 2012 letter.  Sandra Gallegos of the Plans' Employer Contracts Department explained that contributions for the controlling employee are due at 40 hours per week, 50 weeks per year, and that the Plans' records show that Louis Szekely is listed as the controlling employee of Plaintiff.  (Zuniga Decl. ¶ 13 & Exh. E thereto (Bates Nos. D005677-D005682).)

43.     She also provided Pig Newton with the section of the Trust Agreement regarding Controlling Employees and a copy of a Resolution Regarding Delayed Eligibility.  (Zuniga Decl. ¶ 13 & Exh. E thereto (Bates Nos. D5677-D005682).)

44.     By letter dated November 12, 2012, the Plans notified Pig Newton of their intent to conduct an audit relating to Plaintiff's contributions to the Plans.  (Zuniga Decl. ¶ 14 & Exh. F thereto (Bates Nos. D004411-D004413).)

45.     An audit was conducted, and by letter dated March 15, 2013, the Plans notified Plaintiff that the audit found it failed to accurately report the hours and/or dollars upon which contributions were due during the audit period of January 30, 2011 to November 12, 2012. (Joint Appendix, Tab 23, JA-909-920.)

46.     The audit found that Pig Newton "failed to report the guarantee requirements for the controlling employee and assessments were made," and further found that "[t]he Employer failed to report the guaranteed requirements for Controlling Employee, Louis Szekely for the

period 7/24/2011 to 11/10/2012.  A total of 2,640.0 hours (66.0 weeks) were assessed to the [Plaintiff]."  (Joint Appendix, Tab 23, JA-919.)

47.  As a result, the audit found that Plaintiff owed a total of $38,596.53, consisting of contributions totaling $27,935.16, interest in the amount of $3,004.14, liquidated damages of $5,587.23, and audit costs of $2,070.00.  (Joint Appendix, Tab 23, JA-909; Compl. ¶ 43; Am. Answer to Compl. ¶ 43.)

48.  Pig Newton did not make the contributions found owing pursuant to the audit.  (Am. Counterclaim ¶ 25; Answer to Am. Counterclaim ¶ 25.)  Instead, Plaintiff argued and continues to argue that it should not have to make the contributions required pursuant to the Controlling Employee provisions because, it asserts, the CBAs require contributions to the Plans "for all hours worked or guaranteed," and the contributions sought on behalf of Mr. Szekely were "not contributions for hours `worked or guaranteed.'"  (See Compl. ¶¶ 9, 10.)

49.  Subsequent to the audit, Plaintiff was repeatedly advised that additional amounts were due to the Plans on behalf of Mr. Szekely, and demand was made for those contributions.  (Joint Appendix, Tab 27, JA-926-JA-931; id., Tab 25, JA-923-JA-924; Am. Counterclaim ¶¶ 26, 27; Answer to Am. Counterclaim ¶¶ 26, 27; Compl. ¶ 48; Am. Answer ¶ 48.)

50.  Among other things, the Plans issued Controlling Shareholder Billing letters for the periods following the audit informing Plaintiff of the amounts due for such periods.  (Joint Appendix, Tab 27, JA-926-JA-929.)

51.  The Controlling Shareholder Billing letters informed Plaintiff that "[t]he contributions listed above are due immediately and will become delinquent ten (10) business days from the date of this bill.  Once delinquent, contributions will be subject to interest and

liquidated damages as provided in the MPI Trust Agreements." (Joint Appendix, Tab 27, JA-926-JA-932).)

52.	Despite repeated demands for payment, Pig Newton has failed and refused to make all required contributions to the Plans. (Am. Counterclaim ¶ 27; Answer to Am. Counterclaim ¶ 27.)

53.	Under the terms of the Plans and the CBAs, Pig Newton was obligated to make contributions to these multiemployer Plans on behalf of its Controlling Employee, Mr. Szekely, at the rate of 40 hours per week for no less than 50 weeks per year. (Joint Appendix, Tab 5, JA-447 (Health Plan-Exhibit A(30), Article II § 4(A)(1)); id., Tab 6, JA-609 (Pension Plan-Exhibit A(31), Article II, § 4(a)(1); id., Tab 7, JA-778 (Individual Account Plan-Exhibit A(31), Article II, § 4(a)(1)).)

54.	The Trusts Agreements provide that, in the event of default, an Employer will be charged interest and liquidated damages in accordance with Section 502(g)(2) of ERISA (Joint Appendix, Tab 5, JA-392-393 (Health Plan Article V, §§ 5a, 5b); id., Tab 6, JA-516-518 (Pension Plan Article III, § 7); id., Tab 7, JA-720-722 (IAP, Article III, § 4)), and in any suit for payment of monies owed to the Plans, the Employer shall be liable, among other things, for all sums owed, interest, liquidated damages, and costs and fees (id., Tab 5, JA-393; id., Tab 6, JA-517; id., Tab 7, JA-721).

55.	Pig Newton was represented by counsel in negotiating the CBAs. (Joint Appendix, Tab 1, JA-9 (Dep. Tr. 30:24-31:4).)

56.	Mr. Szekely, along with other employees, performs covered work. (Am. Counterclaim ¶¶ 8, 9; Answer to Am. Counterclaim ¶¶ 8, 9; Compl. ¶ 5; Am. Answer ¶ 5.)

57.	The Trusts provide in part that:

> The failure of an Employer to pay the contributions required hereunder at the times and in the manner specified shall constitute a violation of such Employer's obligations hereunder.  All contributions are due on a weekly basis, and shall be deemed due and owing as of the end of each payroll week. . . . The failure of an Employer to pay the contributions as required hereunder within ten (10) working days after the end of the payroll week shall constitute a violation of such Employer's obligation under the Declaration of Trust, and shall subject the Employer to such remedies as are herein specified, in addition to remedies which the Directors may determine and establish by resolution.

(Joint Appendix, Tab 5, JA-392 (Health Trust Agreement, Article V, § 5); id., Tab 6, JA-516 (Pension-Article III, § 7(a)); id., Tab 7-JA-720 (IAP-Article III, § 4(a)).)

58.     Plaintiff failed to make any contributions on behalf of Mr. Szekely relating to Season One of the Series, even though Mr. Szekely performed bargaining unit work.  (Zuniga Decl. Exh. ¶ 12 & Exh. D thereto; Joint Appendix, Tab 1, JA-10-JA-11, JA-12 (Dep. Tr. 37:24-38:16, 43:12-14, 44:15-24).)

59.     When asked in his deposition about the time recorded on a timecard purporting to indicate his time spent performing editing functions, Mr. Szkeley testified, "I don't think this time card has much relation to the hours I spent." (Joint Appendix, Tab 1, JA-34 (Dep. Tr. 133:6-7).)  Nor did Mr. Szekely know why a time card identified particular hours in a day for his work.  He stated, with regard to the representation of certain hours of work recorded for his editing duties, "I'm not sure what governs exactly what these numbers are or why this is done." (Id. (Dep. Tr. 133:23-24).)

60.     The Trust Agreements grant the Directors a variety of general and specific powers relating to administration of the Plans.  (See, e.g., Joint Appendix, Tab 5, JA-383-390 (Health Plan-Article IV); id., Tab 6, JA-578-583 (Pension Plan-Part II, Article X); id., Tab 7, JA-763 (Individual Plan-Part II, incorporating by reference Pension Plan, Part II, Articles IX through XIV.)

61. Among other things, the Trust Agreements to which Pig Newton agreed to be bound provide that "The Directors shall have power to construe the provisions of the Agreement and Declaration of Trust and the terms used herein and any construction adopted by the Directors in good faith shall be binding upon the Unions, the Employers and the Employees and their families and dependents." (Joint Appendix, Tab 5, JA-383 (Health Plan-Article IV, § 1.)[6]

62. Mr. Szekely testified that "[i]t feels like that the rules are defective, and it's bringing something onto us that's unfair." (Joint Appendix, Tab 1, JA-21 (Dep. Tr. 81:11-13).)

63. The Plans have regularly encountered instances where individuals attempt to qualify for benefits through the Plans by improperly representing themselves as Controlling Employees. (Zuniga Decl. ¶ 19.) That is, these individuals improperly seek application of the Controlling Employee provisions to themselves and their businesses in an attempt to attain benefits. (Id.)

64. Because of the unique circumstances whereby Mr. Szekely performs a plethora of job functions, Mr. Szekely has health coverage under multiple health plans, and is a participant in multiple retirement plans. (Joint Appendix, Tab 1, JA-22 (Dep. Tr. 83:25-84:20; 85:9-12).) [7]

65. Mr. Szekely has never obtained or filed a health claim through the Health Plan. (Compl. ¶ 14; Am. Answer ¶ 14; Joint Appendix, Tab 1, JA-22 (Dep. Tr. 85:4-8).)

---

[6] There are non-substantive variations in the language of the Pension Plan and the Individual Account Plan. (Joint Appendix, Tab 6, JA-578 (Pension Plan-Part II, Article X, § 1); id., Tab 7, JA-763 (Individual Plan-Part II (incorporates by reference Pension Plan Part II, Articles IX-XIV.) The Pension and Individual Plans add that, "[t]he Directors may, subject to the provisions of this Plan, establish rules and regulations for the operation of this Plan and may revise such rules and regulations from time to time." (Id., Tab 6, JA-578; id., Tab 7, JA-763.)

[7] During his deposition, Mr. Szekely appeared to be unaware that Pig Newton was suing the Individual Account Plan. (Joint Appendix, Tab 1, JA-22-JA-23 (Dep. Tr. 85:21-86:12).)

66. The Plans' records show that Pig Newton owes the Plans, as of June 24, 2014, a total of $116,366.40 relating to delinquencies for its Controlling Employee. For the audit period of January 30, 2011 to November 12, 2012, Pig Newton owes $27,935.16 in contributions, interest of $7,753.17, liquidated damages of $7,753.17, and audit fees of $2,070.00, for a total of $45,511.50. For the periods before and after the audit (i.e., April 16, 2010 through January 29, 2011 and November 13, 2012 to June 24, 2014, respectively), Pig Newton owes $48,858.14 in contributions, $10,998.38 in interest, and $10,998.38 in liquidated damages, for a total of $70,854.90. (Zuniga Decl. ¶ 17.)

Dated: July 11, 2014

          Respectfully submitted,

          SPIVAK LIPTON LLP
          *Attorneys for Defendants*
          1700 Broadway, Suite 2100
          New York, NY 10019
          Tel: (212) 765-2100
          Fax: (212) 541-5429

          By:   /s/
               Franklin K. Moss
               Gillian Costello