UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PIG NEWTON, INC.,

                       Plaintiff,

          -against-

THE BOARDS OF DIRECTORS OF THE
MOTION PICTURE INDUSTRY PENSION
PLAN, THE MOTION PICTURE
INDUSTRY INDIVIDUAL ACCOUNT
PLAN, AND THE MOTION PICTURE
INDUSTRY HEALTH PLAN,

                    Defendants.

Case No. 13-CIV-7312 (KPF)

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

SPIVAK LIPTON LLP
*Attorneys for Defendants*
1700 Broadway, 21st Floor
New York, NY 10019
(212) 765-2100 (Telephone)
(212) 541-5429 (Telecopier)

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND FACTS ...........................................................................................2

    A. The Parties.................................................................................................2

        1.  The Plans.................................................................................2

        2.  Pig Newton.............................................................................2

    B. The Collective Bargaining Agreements ......................................................3

    C. The Trust Acceptances ..............................................................................4

    D. The Trust Agreements' Controlling Employee Provisions ............................4

    E. The First Audit ..........................................................................................6

    F.  Pig Newton Did Not Keep Accurate Records of Mr. Szekely's Time ...........7

    G. Plaintiff Made Certain Contributions on Behalf of Mr. Szekely ..................8

    H. The Plans Notify Plaintiff of Delinquencies ................................................9

    I.  The Second Audit ......................................................................................9

    J. Pig Newton Did Not Make the Contributions ..............................................10

ARGUMENT
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
SHOULD BE GRANTED ...............................................................................11

POINT I
THE PLANS' COUNTERCLAIM SHOULD BE
GRANTED: PIG NEWTON HAS FAILED TO MAKE
ALL CONTRIBUTIONS REQUIRED UNDER THE
TRUST AGREEMENTS AND CBAs.................................................................11

    A.  Pig Newton Is Liable Under ERISA and the Governing Plan Documents.................12

    B.  Pig Newton Failed To Make Any Contributions Relating To Mr. Szekely's
Work on Season One of the Series ..............................................................14

i

C.  Plaintiff Cannot Pick and Choose the Plans Provisions To Which It Will Adhere ..... 15

D.  Pig Newton Is Liable For Unpaid Contributions, Interest, Liquidated Damages, Costs and Fees ................................................................................................................ 15

POINT II
    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED ............................................... 16

A.  Plaintiff Focuses on CBA Language To the Exclusion of the Governing Trust Agreements ................................................................................................. 16

B.  The Directors' Interpretation of the Trusts Is Entitled To Deference ........................... 20

C.  Plaintiff Alleges That It Should Only Have To Contribute For "Hours Worked or Guaranteed," But It Failed To Maintain Accurate Records of Such Work ...................................................................................................... 21

D.  The *La Barbera* Case Is Inapposite ........................................................................... 22

E.  Plaintiff's Unique Circumstances Do Not Justify Invalidating Longstanding Trust Provisions ................................................................................................. 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242, 106 S. Ct. 2505 (1986) ................................................................11

Benson v. Brower's Moving & Storage, Inc.,
    907 F.2d 310 (2d Cir. 1990) ...........................................................................12

Borntrager v. Central States, Southeast & Southwest Areas
Pension Fund,
    577 F.3d 913 (8th Cir. 2009) ...................................................................... 18-19

Celotex Corp v. Catrett,
    477 U.S. 317, 106 S. Ct. 2548 (1986) ................................................................11

Central States, Southeast & Southwest Areas Pension Fund v.
Central Transport, Inc.,
    472 U.S. 559, 105 S. Ct. 2833 (1985) ...............................................................15

Conkright v. Frommert,
    559 U.S. 506, 130 S. Ct. 1640 (2010) ...............................................................20

Firestone Tire & Rubber Co. v. Bruch,
    489 U.S. 101, 109 S. Ct. 948 (1989) .................................................................20

In re WorldCom, Inc. ERISA Litig.,
    354 F. Supp. 2d 423 (S.D.N.Y 2005) ...........................................................19 n.10

La Barbera v. J.D. Collyer Equipment Corp.,
    337 F.3d 132 (2d Cir. 2003) .........................................................................22, 23

Mastrobuono v. Shearson Lehman Hutton, Inc.
    514 U.S. 52, 115 S. Ct. 1212 (1995) ...........................................................19 n.10

Sinai Hosp. of Baltimore, Inc. v. Nat'l Benefit Fund for Hosp. & Health
Care Employees,
    697 F.2d 562 (4th Cir. 1982) ..........................................................................19

This Is Me, Inc. v. Taylor,
    157 F.3d 139 (2d Cir. 1998) ......................................................................19 n.10

Truckmen's & Warehousemen's Assoc. of Rochester v. N.Y. State Conference
Pension & Retirement Fund,
    751 F. Supp. 351 (W.D.N.Y. 1990) ..................................................................18

i

**Statutes and Other Authorities**

Fed. R. Civ. P. 56 .................................................................................................................1, 11

Employee Retirement Income Security Act, 29 U.S.C. § 1104 ......................................................15

Employee Retirement Income Security Act, 29 U.S.C. §1132(g) .........................12, 13, 13 n.8, 16

Employee Retirement Income Security Act, 29 U.S.C. §1145 ......................12, 13, 13 n.8, 22, 23

Restatement (Second) of Trusts § 187 .........................................................................................20

Defendants Boards of Directors of the Motion Picture Industry Pension Plan, Motion Picture Industry Individual Account Plan, and Motion Picture Industry Health Plan (collectively, "Defendants" or the "Plans") submit this memorandum of law in support of their motion for summary judgment dismissing Plaintiff Pig Newton, Inc.'s ("Plaintiff" or "Pig Newton") Complaint ("Compl.") and granting Defendants' Amended Counterclaim ("Am. Counterclaim") pursuant to Federal Rule of Civil Procedure 56.

<u>PRELIMINARY STATEMENT</u>

Pig Newton—a television production company—expressly agreed to be bound to collective bargaining agreements ("CBAs") and Trust Agreements which require it to make certain contributions to the Plans in accordance with the terms of those documents.  The Plans seek to have Plaintiff live up to its agreements, and request payment of contributions in accordance with the CBAs and Trust Agreements.  Pig Newton, however, seeks to avoid application of the Plans' terms, and instead asks the Court to invalidate certain generally-applicable Plan provisions pertaining to shareholder-owner "Controlling Employees" (such as Pig Newton's principal) that have been in effect for decades.

Plaintiff ignores controlling Plan language and relies on inapposite case law. Accordingly, Defendants' motion for summary judgment dismissing the Complaint should be granted.  At the same time, Defendants' Amended Counterclaim should be granted, because under the governing documents and law, Plaintiff is liable for the contributions owed, along with statutory interest, liquidated damages, and fees and costs.

<u>BACKGROUND FACTS</u>

A.      <u>The Parties</u>

      1.      <u>The Plans</u>

Defendants administer the Motion Picture Industry Pension Plan ("Pension Plan"), the

Motion Picture Industry Individual Account Plan ("IAP" or the "Individual Plan"), and the

Motion Picture Industry Health Plan ("Health Plan").  (Defendants' Rule 56.1 Statement

("Statement") ¶ 1.)  The Plans are multi-employer plans that were established in 1952 (Health

Plan), 1953 (Pension Plan), and 1979 (Individual Plan) pursuant to trust instruments entered into

by and between certain employers and members of an employer association, and various unions

which represent individuals employed in a wide variety of crafts within the entertainment

industry.  (<u>Id.</u> ¶ 2.)  The Plans provide pension, individual retirement, and health benefits to

approximately 55,000 individuals (plus their dependents) who work in the entertainment industry

throughout the United States and Canada under CBAs and participation agreements which

provide for contributions to the Plans.  (<u>Id.</u> ¶ 3.)  Pursuant to the Plans' terms, individuals must

work certain minimum hours in covered employment in order to qualify for benefits through the

Plans.  (<u>Id.</u> ¶ 4.)


      2.      <u>Pig Newton</u>

Plaintiff Pig Newton is the producer of the television series "Louie" (the "Series"), as

well as other entertainment ventures, including televised and web-based comedy shows.

(Statement ¶ 5.)  Louis Szekely ("Szekely") is, and has at all times been, Pig Newton's sole

owner and shareholder.  (<u>Id.</u> ¶ 6.)  Plaintiff employs Mr. Szekely in connection with various

functions, including as the producer, sole writer, sole director, star performer, and as an editor of

the Series.  (Id. ¶ 7.)  Mr. Szekely has performed editing services for the Series in each of the

four seasons of the Series that have been produced to date.  (Id. ¶ 8.)  He has also performed

editing services for Pig Newton which are not related to the Series.  (Id. ¶ 9.)


B.     The Collective Bargaining Agreements

       Since in or around 2010, Plaintiff and the International Alliance of Theatrical Stage

Employees, Moving Picture Technicians and Allied Crafts of the United States, its Territories

and Canada, AFL-CIO, CLC ("IATSE") and the East Coast Locals of IATSE have been parties

to various collective bargaining agreements (collectively, "IATSE CBAs") governing the wages,

hours, and working conditions of certain of Plaintiff's employees.  (Statement ¶ 10.)[1]  The

IATSE CBAs obligate Plaintiff to make timely contributions to the Plans for its employees who

perform work covered by the CBAs.  (Id. ¶ 12.)  Editing services are covered by the IATSE

CBAs.  (Id. ¶ 13.)


       In addition to the IATSE CBAs, since in or around 2009, Pig Newton has been party to

collective bargaining agreements with other unions which provide for contributions to the Plans,

including with Studio Transportation Drivers Local 399, International Brotherhood of Teamsters

and Theatrical Teamsters Local 817.  (Statement ¶ 14.)

---

[1] Among the agreements entered into between Plaintiff and the IATSE are agreements entitled
"Agreement of Consent- Limited Production Agreement for Project Titled 'Louie'" ("Agreement
of Consent").  Pursuant to the Agreements of Consent, Plaintiff "agree[d] to become a party to
and be bound by," among others, (1) the Producer-IATSE Basic Agreement between the
Alliance of Motion Picture and Television Producers, Inc. (the "AMPTP") and IATSE and its
West Coast Studio Locals; . . . and, (3) the Trust Agreements of the Plans, and amendments,
modifications, extensions, supplements, or renewals of the agreements specified therein.
(Statement ¶ 11.)

C.     <u>The Trust Acceptances</u>

The IATSE CBAs provide that "[t]he company agrees to execute the MPIPHP 'Trust Acceptance Agreement' and 'Company Data Sheet,' attached hereto." (Statement ¶ 15.)  Pig Newton agreed to and did execute these documents.  In the Trust Acceptances, Plaintiff "represent[ed] and agree[d]" among other things, that Plaintiff "is familiar with the provisions of the respective collective bargaining agreements and Declarations of Trust establishing" the Plans.  (<u>Id.</u> ¶ 16.)  In addition, Plaintiff agreed that "by this Trust Acceptance [Plaintiff] agrees and intends to become a party and to participate in the [Plans] to the same extent as though the [Plaintiff] had executed such Trust Agreements or their counterparts with respect to the employees covered by the collective bargaining agreement."  (<u>Id.</u> ¶ 17.)

The Company Data Sheets that Pig Newton executed pursuant to the CBAs contained a section with the heading "Controlling Officers/Shareholder Information."  Among other things, on each Company Data Sheet, Pig Newton identified the Officer/Shareholder Name as Louis Szekely, his title as President, and his percentage of shares as 100%.  (Statement ¶¶ 18, 19.)

D.     <u>The Trust Agreements' Controlling Employee Provisions</u>

For decades, the Plans' Trust Agreements have contained provisions pertaining to "Controlling Employees."  (Statement ¶ 20.)  The Health Plan's Trust Agreement defines "Controlling Employee" as follows:

> A qualified Controlling Employee of an Employer shall mean an Employee . . . .who is also a shareholder of the corporation or member of the LLC or is an officer of such Employer or is the spouse of such a shareholder, member of the LLC or officer, and whose Employer employs at least one other employee performing work covered under the applicable collective bargaining agreement in addition to the Controlling Employee.

4

(Statement ¶ 21.)[2]


The Trust Agreements detail the contribution obligations of Controlling Employers for

Controlling Employees.  The Health Plan's Trust Agreement provides in part:

> Contributions by Employers which are privately held corporations, limited
> liability companies ("LLC"), or other eligible business entities, on behalf of
> any Controlling Employee shall be made at the composite rates set forth in
> Article II, Section I, Paragraph B, above, as set forth below.  A Controlling
> Employee of an Employer, as described in the previous sentence, shall mean
> an Employee . . . which Employee is also a shareholder of the corporation or
> member of the LLC, or is an officer of the Employer or the spouse of such a
> shareholder, member of the LLC . . . and is not the only Employee of the
> Employer who works under an applicable collective bargaining agreement.
> The Employer of such Controlling Employee shall be called a Controlled
> Employer.

(Statement ¶ 22.)[3]  The Health Plan's Trust Agreement further states:

> Contributions shall be made for such Controlling Employee for fifty-six (56)
> hours per week, and for not less than forty-eight (48) weeks in any calendar
> year, regardless of the number of weeks in which the Employee performs any
> work.
>
> However, for Controlling Employees working under the following Collective
> Bargaining Agreements at the times specified below, contributions shall be
> made for such Employee for forty (40) hours per week and for not less than
> fifty (50) weeks in any calendar year, regardless of the number of weeks in
> which the Employee performs any work:
> . . .
> (iii)        Effective March 25, 2004, Controlling Employees working under
> Collective Bargaining Agreements described in Article II, Section I.B.3 (East
> Coast agreements).

---

[2] There are non-substantive variations in the language of the Pension Plan and the Individual
Plan.  (Statement ¶ 21 n.2.)

[3] There are non-substantive variations in the language of the Pension Plan and the Individual
Plan.  (Statement ¶ 22 n.3.)

(Statement ¶ 23.)[4]  The CBAs under which Mr. Szekely has performed covered work are East Coast agreements as described in Article II, Section 1.B.3 of the Trust Agreement's Exhibit A(30), and, hence, the reduced 40-hour requirement applies, rather than the standard 56-hour requirement.  (Id. ¶ 24.)[5]

The Controlling Employee provisions serve the purpose of addressing the problem that certain individuals, in addition to performing services under CBAs providing for contributions to the Plans, held a relationship to their signatory employers under which they were in a position to control the number of hours contributed on their behalf.  (Statement ¶ 25.)  This resulted in a number of situations under which such employers contributed the minimum number of hours needed to keep such Controlling Employees eligible for health benefits or pension and IAP vesting credits.  (Id. ¶ 26.)  The Controlling Employee provisions were designed to ensure that if a Controlling Employee works any hours under a CBA requiring contributions to the Plans, the Controlled Employer must make contributions on their behalf for a specified number of hours per week and weeks per year, regardless of the number of hours actually worked.  (Id. ¶ 27.)

E.    The First Audit

The Trust Agreements empower the Directors to audit the books and records of signatory employers to ensure compliance with contribution requirements under the applicable CBAs and Trust Agreements.  (Statement ¶ 28.)  In or around January 2012, the Plans audited the books and

---

[4] There are non-substantive variations in the language of the Pension Plan and the Individual Plan.  (Statement ¶ 23 n.4.)

[5] This is the numbered section for the Health Trust.  The corresponding section pertaining to East Coast Agreements in the Pension and Individual Account Plans is Pension Plan Exhibit A(31), Article II, Section 1(b)(2).  (Statement ¶ 24 n.5.)

records of Pig Newton for the period November 29, 2009 through January 29, 2011.  (<u>Id.</u> ¶ 29.)

The auditors determined that Pig Newton had made all required contributions for that period.

(<u>Id.</u> ¶ 30.)  They also found that "No controlling-employees shareholders were identified as

having performed covered labor."  (<u>Id.</u>)

 

    The audit report was incorrect.  Although Pig Newton kept no records of such work

(Statement ¶ 31), and Pig Newton's original Complaint in the matter alleged inaccurately that

Mr. Szekely began covered work only during the second season of the Series (<u>see</u> Compl. ¶ 4),

Mr. Szekely admitted during his deposition that he in fact performed bargaining unit work during

the first season of the Series (Statement ¶ 31).  Pig Newton also admitted this in its Answer to

the Plans' Amended Counterclaim.  (<u>Id.</u>)  Pig Newton did not report any hours or make any

contributions on behalf of Mr. Szekely relating to Season One of the Series. (<u>Id.</u> ¶ 32.)

 

F.    <u>Pig Newton Did Not Keep Accurate Records of Mr. Szekely's Time</u>

    After Season One of the Series, Pig Newton did begin to keep certain records purportedly

pertaining to Mr. Szekely's time spent in service as an editor.  (Statement ¶ 33.)  But Plaintiff did

not keep accurate records of such hours.  (<u>Id.</u> ¶ 34.)  Mr. Szekely performs multiple duties at one

time, and, as he stated: "It's hard because I have so many jobs.  It's very difficult to figure out

how many hours I worked on any job in any particular week.  It's very difficult.  <u>I don't report it</u>,

I don't go somewhere in person.  I do it at home.  I do several things simultaneously."  (<u>Id.</u> ¶ 35

(emphasis added).)  As a result of Mr. Szekely's multiple and often interconnected duties, Pig

Newton's time records appear to show, for example, that he worked as an editor and actor at overlapping hours in the same day.  (Id. ¶ 36.)[6]

Thus, Mr. Szekely did not record the time that he spent working as an editor (Statement ¶ 37), although the Crew Time Cards that Plaintiff maintained for Mr. Szekely's work as an editor required the employee and supervisor to "attest under penalty of perjury to the information provided herein"  (id). Mr. Szekely stated:

> [M]y hours are very erratic and they're so mixed in with this other stuff, that the best we can do is a good-faith estimate of how much time I probably spent editing, allocated towards editing, averaged over a bunch of days during a period of time.  So there are days where I don't do any work at all because I would have my kids. . . . and then there are other days I'll put in, you know, I'll work for 24 hours straight because I'm on a creative role [sic].  And then during a day, especially, I'll be editing for an hour, producing for an hour, writing, you know, doing all this stuff.  So clocking in and out isn't an accurate assessment of the time.  I think these cards probably represent a good estimate of what I ended up doing over—you know, averaged over time.

(Id. ¶ 38.)

G.    Plaintiff Made Certain Contributions on Behalf of Mr. Szekely

After Season One, Pig Newton did report some hours and make certain contributions to the Plans on behalf of Mr. Szekely.  (Statement ¶ 39.)  Thus, Plaintiff reported hours and made contributions to the Plans on behalf of Mr. Szekely at the rate of 50 hours per week for the period on or about April 17, 2011 through on or about July 16, 2011.  (Id.)  For other periods, it

---

[6] For example, for the week ending May 7, 2011, Mr. Szekely's time records as an editor and as an actor have him working overlapping hours as both an editor and an actor on May 3, May 4, and May 5, 2011.  (Statement ¶ 36.)  On those same days, his Crew Time Card for his director duties reports him working as a director, with the designation "flat," but with no hours recorded.  (Id.)  The record shows similar, apparently overlapping time reported for his work as both an editor and in different capacities in other weeks, including for week ending May 14, 2011 and for week ending March 15, 2014.  (Id.)

contributed at the rate of 40 hours per week, and yet other periods, it contributed nothing for him. (Id.)[7]

H.      The Plans Notify Plaintiff of Delinquencies

On or about March 13, 2012, the Plans issued a Controlling Shareholder Billing letter to Plaintiff informing Plaintiff that it owed a total of $10,531.00 in contributions on behalf of Mr. Szekely for the period July 24, 2011 to January 21, 2012.  (Statement ¶ 41.) A second request was issued on or about April 11, 2012.  (Id.)

By email dated March 29, 2012, Plaintiff's production accountant inquired about the March 13, 2012 letter.  Sandra Gallegos of the Plans' Employer Contracts Department explained that contributions for the controlling employee are due at 40 hours per week, 50 weeks per year, and that the Plans' records show that Louis Szekely is listed as the controlling employee of Plaintiff.  (Statement ¶ 42.)  She also provided Pig Newton with the section of the Trust Agreement regarding Controlling Employees and a copy of a Resolution Regarding Delayed Eligibility.  (Id. ¶ 43.)

I.      The Second Audit

By letter dated November 12, 2012, the Plans notified Pig Newton of their intent to conduct an audit relating to Plaintiff's contributions to the Plans.  (Statement ¶ 44.)  An audit

---

[7] For example, Mr. Szekely testified that "I edited some of the episodes last year.  We had another editor, Susan Morse, last year."  (Statement ¶ 40.)  (He further testified that, while Susan Morse worked as an editor for Season 3, "some episodes, I edited myself.")  (Id.)  However, while Pig Newton reported time and made contributions for Ms. Morse during the period March 31, 2012 through August 4, 2012, it made no contributions for Mr. Szekely during that period. (Id.)

was conducted, and by letter dated March 15, 2013, the Plans notified Plaintiff that the audit

found it failed to accurately report the hours and/or dollars upon which contributions were due

during the audit period of January 30, 2011 to November 12, 2012.  (Id. ¶ 45.)  Specifically, the

audit found that Pig Newton "failed to report the guaranteed requirements for Controlling

Employee, Louis Szekely for the period 7/24/2011 to 11/10/2012.  A total of 2,640.0 hours (66.0

weeks) were assessed to the [Plaintiff]."  (Id. ¶ 46.)  As a result, the audit found that Plaintiff

owed a total of $38,596.53, consisting of contributions totaling $27,935.16, interest in the

amount of $3,004.14, liquidated damages of $5,587.23, and audit costs of $2,070.00.  (Id. ¶ 47.)

J.      Pig Newton Did Not Make the Contributions

        Pig Newton did not make the contributions found owing pursuant to the audit.

(Statement ¶ 48.)  Instead, Plaintiff argued and continues to argue that it should not have to make

the contributions required pursuant to the Controlling Employee provisions because, it asserts,

the CBAs require contributions to the Plans "for all hours worked or guaranteed," and the

contributions sought on behalf of Mr. Szekely were "not contributions for hours 'worked or

guaranteed.'"  (See id.; Compl. ¶¶ 9, 10.)

        Subsequent to the audit, Plaintiff was repeatedly advised that additional amounts were

accruing and due to the Plans on behalf of Mr. Szekely, and demand was made for those

contributions.  (Statement ¶ 49.)  Among other things, the Plans issued Controlling Shareholder

Billing letters for the periods following the audit informing Plaintiff of the amounts due for such

periods.  (Id. ¶ 50.)  The Controlling Shareholder Billing letters informed Plaintiff that "[t]he

contributions listed above are due immediately and will become delinquent ten (10) business

days from the date of this bill.  Once delinquent, contributions will be subject to interest and

liquidated damages as provided in the MPI Trust Agreements."  (Id. ¶ 51.)  Despite repeated

demands for payment, Pig Newton has failed and refused to make all required contributions to

the Plans.  (Id. ¶ 52.)


ARGUMENT

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT SHOULD BE GRANTED

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  There are no genuine disputes as to any material facts that warrant a trial as to

the claims or counterclaims in this action, and Defendants are entitled to judgment as a matter of

law on both Plaintiffs' claims and Defendants' counterclaim.  Here, summary judgment should

be granted in the Defendants' favor because Plaintiff cannot carry its burden of proof at trial and

there is insufficient evidence to return a verdict for Plaintiff.  See Celotex Corp. v. Catrett, 477

U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 249-50, 106 S. Ct. 2505, 2511 (1986).


POINT I

THE PLANS' COUNTERCLAIM SHOULD BE GRANTED:
PIG NEWTON HAS FAILED TO MAKE ALL CONTRIBUTIONS
REQUIRED UNDER THE TRUST AGREEMENTS AND CBAs


Despite its agreement to be bound by the terms of the Plans' governing documents, Pig

Newton claims that it should not have to follow particular Plans provisions.  Plaintiff's attempt to

11

unilaterally exempt itself from certain provisions of the Plans is contrary to the terms of the Plans and the Employee Retirement Income Security Act ("ERISA"), and should be rejected.

A.    Pig Newton Is Liable Under ERISA and the Governing Plan Documents.

Pursuant to Section 515 of the ERISA:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

Under the terms of the Plans and the CBAs, Pig Newton was obligated to make contributions to these multiemployer Plans on behalf of its Controlling Employee, Mr. Szekely, at the rate of 40 hours per week for no less than 50 weeks per year.  (Statement ¶¶ 12, 53.) Pursuant to the CBAs, Pig Newton agreed to contribute to the Plans in accordance with the Plans' governing documents, but has failed and refused to so contribute.  (Statement ¶¶ 15, 16, 17, 52.)  "Simply put, benefit plans must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations. . . . For this reason, Congress placed employee benefit plans in a position superior to the original promisee, analogous to a holder in due course."  Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 314 (2d Cir. 1990) (citation omitted).  Accordingly, pursuant to the plain language of Sections 515 and 502(g)(2) of ERISA, the CBAs, and the Trust Agreements,

Pig Newton is liable to the Plans for all delinquent contributions, as well as statutorily-required interest, liquidated damages, and costs and fees.[8]  See 29 U.S.C. §§ 1145 & 1132(g)(2).

The material facts establishing Pig Newton's liability are undisputed.  It is undisputed that Mr. Szekely's work as an editor was covered by the IATSE CBAs, and that the IATSE CBAs required Plaintiff to make contributions to the Plans for covered work.  (Statement ¶¶ 12, 13.)  It is undisputed that, pursuant to the IATSE CBAs, Pig Newton agreed to and did execute Trust Acceptance Agreements under which it "represent[ed] and agree[d]" that it: (a) "is familiar with the provisions of the respective collective bargaining agreements and Declarations of Trust establishing" the Plans; and (b), "agrees and intends to become a party and to participate in the [Plans] to the same extent as though the [Plaintiff] had executed such Trust Agreements or their counterparts with respect to the employees covered by the collective bargaining agreement." (Statement ¶¶16, 17.)[9]

Mr. Szekely is Pig Newton's sole owner-shareholder (Statement ¶ 6), and along with other employees, he indisputably performs covered work (id. ¶ 56).  He is thus a Controlling

---

[8] Section 502(g)(2) of ERISA provides that in any action to enforce Section 515, "the court shall award the plan-(A) the unpaid contributions, (B) interest on the unpaid contributions; (C) an amount equal to the greater of-(i) interest on the unpaid contributions, or (ii) liquidated damages . . . (D) reasonable attorney's fees and costs . . . and (E) such other legal or equitable relief as the court deems appropriate."  29 U.S.C. §§ 1132(g)(2)(A)-(E).

In addition, the Trusts Agreements provide that, in the event of default, an Employer will be charged interest and liquidated damages in accordance with Section 502(g)(2) of ERISA (Statement ¶ 54), and in any suit for payment of monies owed to the Plans, the Employer shall be liable, among other things, for all sums owed, interest, liquidated damages, and costs and fees (id.).

[9] Pig Newton was represented by counsel in negotiating the CBAs.  (Statement ¶ 55.)

Employee within the meaning of the Trust Agreements.  (Id. ¶¶ 20-23.)  Likewise, Pig Newton,

as his employer, is a Controlled Employer under the Trust Agreements.  (Id.)


Here, the Plans simply seek to have Pig Newton live up to its bargain.  Plaintiff failed and

refused to contribute on behalf of Mr. Szekely at the rate of forty (40) hours per week for not less

than fifty (50) weeks in a year, as mandated by the Trust Agreements.  (Statement ¶ 23.)  The

Trusts provide in part that:

> The failure of an Employer to pay the contributions required hereunder at the
> times and in the manner specified shall constitute a violation of such Employer's
> obligations hereunder.  All contributions are due on a weekly basis, and shall be
> deemed due and owing as of the end of each payroll week. . . . The failure of an
> Employer to pay the contributions as required hereunder within ten (10) working
> days after the end of the payroll week shall constitute a violation of such
> Employer's obligation under the Declaration of Trust, and shall subject the
> Employer to such remedies as are herein specified, in addition to remedies which
> the Directors may determine and establish by resolution.

(Statement ¶ 57.) Plaintiff is in violation of its obligations under the Trusts.


B.   Pig Newton Failed To Make Any Contributions Relating To Mr. Szekely's Work on
     Season One of the Series.


While Pig Newton claims that it is only required to contribute to the Plan for Mr.

Szekely's hours "worked or guaranteed" (see Compl. ¶¶ 31, 33), it is undisputed that Plaintiff

failed to make any contributions on behalf of Mr. Szekely relating to Season One of the Series,

even though Mr. Szekely performed bargaining unit work (Statement ¶ 58.  Accordingly, while

Plaintiff argues that it does not have to make the contributions required under the Plans'

Controlling Employee provisions because, it contends, the Controlling Employee provisions are

invalid (see Compl. ¶ 61), contributions are due to the Plans on behalf of Mr. Szekely for work

14

performed relating to Season One, even under Plaintiff's theory of its contribution obligations (see Statement ¶ 54).

C.      Plaintiff Cannot Pick and Choose the Plans Provisions To Which It Will Adhere.

The Plans' Trust Agreements are comprehensive instruments designed to govern the Plans in the best interests of the Plans' tens of thousands of participants and their beneficiaries who are covered by hundreds of different CBAs across the nation.  See 29 U.S.C. § 1104(a)(1). In order to balance the various interests at play in an actuarially-sound manner, the Trusts are, by necessity, extensive and detailed.  No signatory employer can pick and choose to which provisions it will adhere, and Plaintiff is no different.

D.      Pig Newton Is Liable For Unpaid Contributions, Interest, Liquidated Damages, Costs and Fees.

"One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets."  Cent. States, Southeast & Southwest Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559, 572, 105 S. Ct. 2833, 2841 (1985).  Defendants' Amended Counterclaim, which seeks contributions owed to the Plans in furtherance of that fundamental duty, should be granted. And Plaintiff should be required to make all contributions required pursuant to the Plans' governing documents.

The Plans' records show that Pig Newton owes the Plans, as of June 24, 2014, a total of $116,366.40 relating to delinquencies for its Controlling Employee.  For the audit period of January 30, 2011 to November 12, 2012, Pig Newton owes $27,935.16 in contributions, interest

15

of $7,753.17, liquidated damages of $7,753.17, and audit fees of $2,070.00, for a total of $45,511.50.  For the periods before and after the audit (i.e., April 16, 2010 through January 29, 2011, and November 13, 2012 to June 24, 2014, respectively), Pig Newton owes $48,858.14 in contributions, $10,998.38 in interest, and $10,998.38 in liquidated damages, for a total of $70,854.90.  (Statement ¶ 66.)  In addition, Pig Newton owes costs and attorneys' fees.  See 29 U.S.C. § 1132(g)(2)(A)-(E).


POINT II

PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED

In support of its request for declaratory and injunctive relief invalidating the Controlling Employee provisions, Pig Newton ignores the language of the Plans' governing documents and relies upon inapposite case law.  The Court should reject Pig Newton's attempt to undo longstanding, generally-applicable Trust provisions, and summary judgment should be granted dismissing Plaintiff's Complaint in its entirety.


A.    Plaintiff Focuses on CBA Language To the Exclusion of the Governing Trust Agreements.

In seeking to avoid application of the Plans' Controlling Employee provisions, Pig Newton relies upon its cramped construction of the language of the CBA, to the exclusion of the more comprehensive language of the Trust Agreements.  Thus, Plaintiff notes that the CBA provides that contributions "shall be made to the MPIPHP for all hours worked or guaranteed in the following amounts . . . ." (Compl. ¶¶ 9, 31, CBA Article 7(A)(i)), and Plaintiff alleges that

the 40-hour obligation contained in the Trusts does not constitute a "guarantee" for purposes of the CBA (see Compl. ¶¶ 9-11).

At the same time, Plaintiff ignores the Trust Acceptance's provision by which it expressly acknowledged its familiarity with the Trust Agreements and agreement to be bound thereto.  (Statement ¶¶ 16-17.)  Plaintiff did not agree to be bound to <u>certain</u> Trust provisions; it agreed, without qualification, to "become a party and to participate in the Health Plan and Pension Plan and Individual Account Plan to the same extent as though the Employer had executed such Trust Agreements."  (<u>Id.</u> ¶ 17.)  Nevertheless, Plaintiff insists upon its construction of the CBA and argues that Plaintiff should not have to make contributions on behalf of Mr. Szekely under the Controlling Employee provisions because the CBA states that contributions are made on the basis of "hours worked or guaranteed."  (<u>See</u> Compl. ¶¶ 9, 31.)

The CBA, which is the agreement between the <u>union</u> (in this case the IATSE and East Coast Local Unions) and the employer, does not purport to contain all provisions governing the participation in the Plans of Plaintiff's employees.  Indeed, it cannot.  The body of the CBA does not, for example, purport to set forth the governing Plans' definitions or eligibility criteria.  Nor does it deal in any way with health benefits for retirees.  And, beyond hourly contribution rates, it does not purport to set forth the provisions governing contributions, reporting obligations, or delinquencies.  (<u>See generally</u> Joint Appendix, Tab 8, JA-806 (Article 7); Tab 11, JA-832 (Article 7); Tab 14, JA-838 (Article 7); Tab 18, JA-887 (Article 7).)  Rather, these and numerous other provisions pertaining to administration of the Plans are dealt with extensively in the <u>Trust Agreements</u>, compliance with which is required by the CBA.  Likewise, the Trust

Acceptance does not purport to set forth the entirety of the Trust provisions to which Plaintiff agreed to be bound through its execution.  That a specific and narrowly-prescribed subset of participants—i.e., shareholder-owners who perform bargaining unit work, known as Controlling Employees—are ascribed different contribution formulas within the Trust Agreements themselves is consistent with the Directors' duties to administer the plans in the interests of the participants and beneficiaries.  See 29 U.S.C. § 1104.  Given the problems with record-keeping and the possibility for manipulation of hours, these provisions are reasonable methods of Plan administration.

While Pig Newton's contribution obligations under Section 515 of ERISA are governed by both the CBA and Trust Agreements, see 29 U.S.C. § 1145, the purposes of those documents differ.  The Supreme Court has explained that, "A trustee's duty extends to all participants and beneficiaries of a multiemployer plan, while a local union's duty is confined to current employees employed in the bargaining unit in which it has representational rights."  Cent. States, 472 U.S. at 576, 105 S. Ct. at 2843.  Thus "a local union's duties to bargaining-unit workers is a general duty to act in the group's interests regarding the overall terms and conditions of employment.  The trustees' duty, in contrast, is to provide specific benefits to those who are entitled to them in accordance with the terms of a plan."  Id. at 576-77, 105 S. Ct. at 2843.  Moreover, if there is a conflict between the terms of a CBA and those of a trust agreement, the trust agreement prevails.  See Truckmen's & Warehousemen's Assoc. of Rochester v. N.Y. State Conference Pension & Retirement Fund, 751 F. Supp. 351, 358 (W.D.N.Y. 1990) ("trust provisions are to govern when in conflict with contrary provisions in a collective bargaining agreement"); Borntrager v. Cent. States Southeast & Southwest Areas Pension Fund, 577 F.3d

18

913, 921 (8th Cir. 2009) (collective bargaining agreements do not override the authority granted a

benefits plan in its trust agreement); Sinai Hosp. of Baltimore, Inc. v. Nat'l Benefit Fund for

Hosp. & Health Care Employees, 697 F.2d 562, 566-67 (4th Cir. 1982) ("There is no firmer

principle in the common law of trusts than that requiring the trustees to act only in accordance

with the terms of the trust.").


Here, however, there is no such conflict.  The 40-hour contribution requirement is, of

course, a guarantee.  (See Zuniga Decl. ¶ 18.)  Pig Newton's cramped interpretation of the

guarantee language in the CBA makes no sense.  Moreover, even if Pig Newton was correct in

claiming that the 40-hour contribution requirement was not a "guarantee" as contemplated by the

CBA, it could not prevail, since by agreeing to the Trusts, it agreed to that allegedly additional

requirement.  Indeed, the CBA, through the Trust Acceptance, specifically incorporates the terms

of the Trust Agreements.  (Statement ¶ 17.)  Hence, the 40-hour contribution requirement of the

Trust Agreements is as much a part of the CBAs as the "guarantee" language of the body of

those documents.[10]

---

[10] To the extent there is an arguable conflict between the 40-hour requirement of the Trusts and
the "guaranteed" language in the body of the CBA, fundamental principles of construction
require that the language of the two documents be construed to eliminate any such arguable
conflicts.  See, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63, 115 S. Ct.
1212, 1219 (1995) (noting a "cardinal principle of contract construction . . . [is] that a document
should be read to give effect to all its provisions and to render them consistent with each other");
This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998) ( "[I]t is both good sense and good
law that these closely integrated and nearly contemporaneous documents be construed
together.") (internal quotation marks and citation omitted); In re WorldCom, Inc. ERISA Litig.,
354 F. Supp. 2d 423, 442 (S.D.N.Y. 2005) (stating "[it]t is a well-established principle of
contract construction that all provisions of a contract be read together as a harmonious whole, if
possible.") (internal quotation marks and citation omitted).

B.      <u>The Directors' Interpretation of the Trusts Is Entitled To Deference</u>.

The 40-hour Controlling Employee requirement is a guarantee, and has consistently been

interpreted as such by the Plans' Directors.  (<u>See</u> Zuniga Decl. 18.)  Consistent with that

interpretation, the Plans' auditors specifically found that "the Employer <u>failed to report the</u>

<u>guarantee requirements</u> for the controlling employee and assessments were made," and further

found that "[t]he Employer failed to report <u>the guaranteed requirements</u> for Controlling

Employee, Louis Szekely."  (Statement ¶ 46.)


The Trust Agreements grant the Directors a variety of general and specific powers

relating to administration of the Plans.  (Statement ¶ 60.)  Among other things, the Trust

Agreements to which Pig Newton agreed to be bound provide that "The Directors shall have

power to construe the provisions of the Agreement and Declaration of Trust and the terms used

herein and any construction adopted by the Directors in good faith shall be binding upon the

Unions, the Employers and the Employees and their families and dependents."  (Statement ¶ 61.)

The Directors thus have discretionary authority to interpret the Plans, and it is well-settled that

they are "entitled to deference in exercising that discretion."  <u>See</u> <u>Conkright v. Frommert</u>, 559

U.S. 506, 509, 130 S. Ct. 1640, 1644 (2010) (citing <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489

U.S. 101, 109 S. Ct. 948 (1989)).  In <u>Firestone</u>, the Supreme Court noted that "[a] trustee may be

given power to construe disputed or doubtful terms, and in such circumstances the trustee's

interpretation will not be disturbed if reasonable."  <u>Id.</u>, at 111, 109 S. Ct. at 954.  Further,

"[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its

exercise is not subject to control by the court except to prevent an abuse by the trustee of his

discretion."  <u>Id.</u> (quoting Restatement (Second) of Trusts § 187) (internal quotation marks

omitted).  Accordingly, the Directors' interpretation of the 40-hour provision as a guarantee is entitled to great deference.

C.      <u>Plaintiff Alleges That It Should Only Have To Contribute For "Hours Worked or Guaranteed," But It Failed To Maintain Accurate Records of Such Work</u>.

While Pig Newton appears to argue that it should only be obligated to contribute to the Plans for the editing hours actually worked by Mr. Szekely (<u>see</u> Compl. ¶¶ 30, 34), the evidence demonstrates that Plaintiff failed to maintain records of the hours he worked in covered employment (<u>see</u> Statement ¶¶ 34, 59).  Thus, Plaintiff would not be able to accurately report and make contributions even under its own theory of how it should contribute to the Plans.

With regard to his time-keeping, Mr. Szekely, who performs multiple duties at one time, stated: "It's hard because I have so many jobs.  It's very difficult to figure out how many hours I worked on any job in any particular week.  It's very difficult.  <u>I don't report it</u>, I don't go somewhere in person.  I do it at home.  I do several things simultaneously."  (Statement ¶ 35 (emphasis added).)  The statements of Mr. Szekely's hours, signed under the penalty of perjury, were incorrect.  As a result of Mr. Szekely's multiple and often interconnected duties, Plaintiff's time records appear to show, for example, numerous instances in which he worked as an editor and actor and/or director at overlapping hours in the same day.  (Statement ¶ 36.)

Thus, while Pig Newton alleges that the Directors acted in an "arbitrary and capricious manner in adopting the Controlling Employee Rules" (Compl. ¶ 52), Plaintiff's record-keeping practices present precisely the type of problem that the Controlling Employee provisions were

21

designed to address.  Similarly, insofar as Plaintiff complains that the Controlling Employee

"rules require no showing of false or non-existent records for a particular period of time to

trigger their application" (Compl. ¶ 57), the evidence demonstrates that Plaintiff's records of Mr.

Szekely's time were, at best, inaccurate.  For instance, when asked in his deposition about the

time recorded on a timecard purporting to indicate his time spent performing editing functions,

Mr. Szkeley testified, "I don't think this time card has much relation to the hours I spent."

(Statement ¶ 59.)  He stated, with regard to the representation of certain hours of work recorded

for his editing duties, "I'm not sure what governs exactly what these numbers are or why this is

done."  (Id.)


Plaintiff thus urges the application of an hours-worked contribution formula that it would

not be able to satisfy.


D.     The *La Barbera* Case Is Inapposite.

Plaintiff's assertion that "[n]either ERISA, nor the applicable collective bargaining

agreements, nor the Trust Agreements vest Defendants with the authority to adopt the

Controlling Employee Rules" (Compl. ¶ 51), is misplaced.  In arguing that it should not have to

make contributions in accordance with the Plans, Plaintiff relies on the Second Circuit's decision

in La Barbera v. J.D. Collyer Equipment Corp., 337 F.3d 132 (2d Cir. 2003).  But La Barbera is

inapposite.  Section 515 of ERISA obligates an employer to make contributions required by

either the plan or the collective bargaining agreement.  29 U.S.C. § 1145.  In La Barbera, neither

the CBA nor the trust contained controlling employer rules.  In the absence of any such

requirement in the governing trust agreement or the applicable collective bargaining agreement,

the trustees adopted ad hoc a resolution (the "100% owner rule") requiring sole owners to make contributions on behalf of themselves and their families at the rate of 40 hours per week, in response to the trustees' determination that certain 100%-owners were misreporting hours in order to qualify for health benefits.  Id. at 135.  The Court invalidated the rule, stating, "[w]e of course say no more than that the 100% owner rule as formulated is invalid because it is not expressly or impliedly authorized by either ERISA, the collective bargaining agreements, or the Trust Agreement."  337 F.3d at 139 (emphasis added).

Here, by contrast, the Controlling Employee provisions are not a rule instituted pursuant to the trustees' rulemaking authority.  Rather, they are expressly contained within the Trust Agreements themselves, which in turn were agreed to by Plaintiff in the CBAs and Trust Acceptances.  Thus, in La Barbera, the plan sought a remedy not authorized "under the terms of the plan or under the terms of a collectively bargained agreement," as required by Section 515 of ERISA.  Here, the Plan documents—the Trust Agreements—were expressly accepted by Plaintiff in documents that the CBA required Plaintiff to execute, satisfying both prongs of Section 515.  In La Barbera, neither prong of Section 515 was satisfied; here, both were.

E.     Plaintiff's Unique Circumstances Do Not Justify Invalidating Longstanding Trust Provisions.

Finally, in this case, Plaintiff seeks to have the Controlling Employee provisions declared invalid not just for itself, but for all employers, participants, and potential participants.  (See Compl.  WHEREFORE clause ¶ 1.)  While Mr. Szekely may feel that the Controlling Employee provisions are "unfair" as applied to him (Statement ¶ 62), it cannot be said that the provisions

are unfair as a general matter.  Indeed, the Plans have regularly encountered instances where individuals attempt to qualify for benefits through the Plans by improperly representing themselves as Controlling Employees.  (Id. ¶ 63.)  That is, these individuals improperly seek application of the Controlling Employee provisions to themselves and their businesses in an attempt to attain benefits.  (Id.)  Here, because of the unique circumstances whereby Mr. Szekely performs a plethora of job functions, he is in the enviable and highly anomalous situation of having coverage under multiple health insurance plans and being a participant in multiple retirement plans.  (Id. ¶ 64.)[11]  Because he performs a variety of job functions that qualify him for coverage under a number of benefit plans, he has not sought benefits under the Plans (see Statement ¶ 65), and apparently does not rely on the Plans for coverage.  Based on that unique circumstance, Pig Newton seeks to undo provisions that have been in place for decades.  The Plans respectfully submit that this attempt should be rejected.

---

[11] While Pig Newton seeks to invalidate the Controlling Employee provisions of all three Plans, its Complaint focuses on the Health Plan.  (See, e.g., Compl. ¶¶ 38, 39 & Exh. 4 thereto.) During his deposition, Mr. Szekely appeared to be unaware that Pig Newton was suing the Individual Account Plan.  (Statement ¶ 64, n.7.)

<u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment dismissing Plaintiff's Complaint in its entirety and granting Defendants' Amended Counterclaim, including contributions, interest, and liquidated damages in the amount of $116,366.40, through June 24, 2014, plus all amounts accrued and owed as of judgment, in addition to attorneys' fees and costs.

Dated:  July 11, 2014

By:____/s/_____
      Franklin K. Moss
      Gillian Costello
      SPIVAK LIPTON LLP
      1700 Broadway, 21st Floor
      New York, NY 10019
      Phone: (212) 765-2100
      fmoss@spivaklipton.com
      gcostello@spivaklipton.com
      *Attorneys for Defendants*