**Kauff McGuire & Margolis LLP**
950 Third Avenue
Fourteenth Floor
New York, New York 10022
(212) 644-1010 (Tel)
(212) 644-1936 (Fax)

**Attorneys for Plaintiff**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PIG NEWTON, INC., <br><br> Plaintiff, <br><br> -against- <br><br> THE BOARDS OF DIRECTORS OF THE MOTION PICTURE INDUSTRY PENSION PLAN, THE MOTION PICTURE INDUSTRY INDIVIDUAL ACCOUNT PLAN, AND THE MOTION PICTURE INDUSTRY HEALTH PLAN, <br><br> Defendants. | 13-CIV-7312 (KPF) <br> ECF Case <br><br> **DECLARATION OF** <br> **LOUIS SZEKELY** |

**LOUIS SZEKELY** hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I formed Pig Newton, Inc. ("Pig Newton"), a New York corporation. I am the sole owner and Chief Executive Officer of Pig Newton. I have personal knowledge of the facts set forth in this declaration, which I make in opposition to Defendants' Motion for Summary Judgment and in further Support of Plaintiff's Motion for Summary Judgment in the captioned matter.

2. Pig Newton produces the television series entitled "Louie" (the "Series"), which recently completed its fourth season.

3. I created the Series and also serve as its producer, writer, director, star performer, and editor.

4. In connection with the Series, I became a member of Local 700, IATSE ("Local 700"), a union covering editors. As a signatory to a collective bargaining agreement ("CBA") covering editors and other IATSE-represented employees, Pig Newton made contributions to the Motion Picture Industry Pension Plan, the Motion Picture Industry Individual Account Plan, and the Motion Picture Industry Health Plan (the "Heath Plan") (collectively, the "Plans") on my behalf for my editing services beginning with the second season of the Series.

5. Prior to my becoming a member of Local 700, Pig Newton produced the initial season of the Series ("Season One"), and in connection with that season I contributed some amount of editing services (together with the Local 700-covered editor, Doug Abel). Until discovery in this case, I was unaware that Pig Newton had an obligation to make contributions on my behalf, notwithstanding that I was not yet a Local 700 member. (Pig Newton made contributions on behalf of Mr. Abel for all of his editing work during that period.) While Pig Newton makes no excuse for its failure to make contributions for Season One, that failure was based on our misunderstanding of its obligations; there was no intent to evade our obligations.

6. I now understand that in the event that the Court determines that I am eligible to participate in the Plans, Pig Newton is required to contribute to the Plans on behalf of my editing work that I performed in Season One, and Pig Newton is fully prepared to make such contributions for my Season One editing work, should the Court so rule.

7. Whether I am eligible to participate in the Plans, however, is a matter in dispute in this case. During the course of this litigation, I learned that the Trust Agreements for the Plans provide eligibility criteria for participation in the Plans. Among those criteria is the requirement that employees covered by a CBA that provides for benefits under the Plans must have IATSE-covered work under the CBA as their "principal employment."

8. I previously testified that editing services is not my principal employment. As I testified at my deposition in this action on April 8, 2014, I perform many different roles for Pig Newton, and this has been true for each of the four seasons of the Series as well as for the entire year in which the Series was not in production. Of all the roles I perform for Pig Newton, I spend the least amount of time on editing. And as important as it is for me to be able to edit the Series and my other projects for Pig Newtown, as compared to all of my other roles and duties for Pig Newton, my editing work is far less significant. (This is particularly true in light of the fact that my director role provides for me the creative right to participate in and oversee the editing of the Series and everything else I direct, even were I unable to edit.)

9. Not only is editing far from my principal employment with Pig Newton as a general matter, even in those periods in which I perform bargaining unit work, such editing work does not constitute my principal employment.

10. Further to this point, for the first three seasons of the Series, I began editing while we were still in production, and during that time I would continue to perform my roles as producer, director, writer, and performer. In the first and third seasons, I shared editing duties, first with Mr. Abel on Season One, and then with Susan Morse in connection with the third season. That sharing of duties only served to further minimize the importance and time commitment of my editing relative to my other roles. Beginning with the fourth season of the

Series, I deferred the commencement of my editing work until production was completed, but even during post-production (of all seasons) I am always producing, continually engaged in writing, promoting the upcoming season of the Series as a performer (by guest appearances on talk shows, for example), and performing my wide-ranging duties as chief executive of the company, which often includes development of other projects.

11. In short, assuming that the term "principal" employment is given its ordinary meaning, I am never principally employed as an editor, as editing is never my most important or most consequential duty among all of the duties I perform for Pig Newton.

12. Defendants' opening brief attempts to take me to task for failing to keep precise records of my time spent editing. In response to those attempts, I can state categorically that Pig Newton's reporting of my editing work for the purposes of making contributions to the Plans was always done in good faith and there was never an attempt to underreport my hours. Any absence of more precise timekeeping on my part did not reflect any intent to deceive the Plans or to make contributions at a level lower than reflective of my actual work. As a practical matter, moreover, given that the guaranteed hours that Pig Newton reported on my behalf for the second, third, and fourth seasons of the Series exceeded my worked hours, there was no need for more precise timekeeping on my part.

13. Prior to the demands from the Plans that culminated in this litigation, I was unaware of the Plans' "Controlling Employee Rules" that are being challenged in this litigation. The Plans' assertion in their opening brief that Pig Newton "agreed" to the rules is no more than a formalistic legal argument, as we never knowingly agreed to them or even knew they existed.

14. I understand that the Plans implemented the Controlling Employee Rules in order to redress perceived fraud upon the Plans by certain owner-participants who would report just

enough hours to maintain their eligibility for benefits under the Health Plan. The rationale underlying the Rules is not present here. I maintain eligibility for health and pension benefits under multiemployer benefits plans attendant to my guild- and union-covered employment for my services as a performer (as to which I am eligible for benefits under both the AFTRA Health and Retirement Plans and the SAG Pension and Health and Welfare Plans), as a writer (under the WGA Plans), and as a director (under the DGA Plans); I have no need for eligibility under the Plans. Indeed, I have never made a claim for benefits under the Plans, and I have expressed my willingness to withdraw from participation in the Health Plan in order to resolve this matter.

[Remainder of this Page Intentionally Left Blank]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2014.

_____
Louis Szekely