**Kauff McGuire & Margolis LLP**
**950 Third Avenue**
**Fourteenth Floor**
**New York, New York 10022**
**(212) 644-1010 (Tel)**
**(212) 644-1936 (Fax)**

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PIG NEWTON, INC.,

                Plaintiff,

       -against-

THE BOARDS OF DIRECTORS OF THE MOTION
PICTURE INDUSTRY PENSION PLAN, THE
MOTION PICTURE INDUSTRY INDIVIDUAL
ACCOUNT PLAN, AND THE MOTION PICTURE
INDUSTRY HEALTH PLAN,

                Defendants.

13-CIV-7312 (KPF)

ECF Case

**BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AND**
**IN FURTHER SUPPORT OF PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

I.      Defendants Fail to Distinguish *La Barbera*, Which Compels the
        Determination That the Controlling Employee Rules are Invalid and
        Unenforceable. .......................................................................................................1

II.     Defendants' Claim that Plaintiff Agreed to the Rules Fails in Light of *UPS*
        and Because The Trust Agreements Were Not Effectively Incorporated by
        Reference Into the CBAs ........................................................................................4

III.    Defendants' Contention that the "Guarantees" Referred to in the CBAs
        Include the Requirements of the Controlling Employee Rules is Meritless and
        Must be Rejected ....................................................................................................6

IV.     Defendants' Claim for Unpaid Contributions in Connection with Mr.
        Szekely's Editing Services Is Irrelevant to Plaintiff's Motion Seeking a
        Declaration That the Rules are Invalid, and The Claim Fails Because Mr.
        Szekely is Ineligible to Participate in the Plans ....................................................10

V.      Defendants' Allegations of Inaccurate Reporting are Irrelevant to Either
        Party's Motion .......................................................................................................13

VI.     Defendants' Remaining Arguments Lack Merit ....................................................15

CONCLUSION ...................................................................................................................19

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Central States, SE and SW Areas Pension Fund v. Central Transp., Inc.*,
   472 U.S. 559 (1985)......................................................................................................16

*Diamond v. Treasurers and Ticket Sellers Union Local 751 Pension Fund*,
   No. 05 Civ. 1937 (PAC), 2006 WL 2462907 (S.D.N.Y. Aug. 22, 2006) ..........................10

*La Barbera v. A. Morrison Trucking, Inc.*,
   No. 08 CV 3095 (RJD)(JO), 2011 WL 703859 (E.D.N.Y. Feb. 18, 2011).........................12

*La Barbera v. J.D. Collyer Equip. Corp.*,
   337 F.3d 132 (2d Cir. 2003).....................................................................................*passim*

*N.Y. State Teamsters Conference Pension and Retirement Fund v. Boening
   Bros., Inc.*,
   92 F.3d 127 (2d Cir. 1996).............................................................................................16

*Natale v. Central Parking Systems of N.Y.*,
   958 F. Supp. 2d 407 (E.D.N.Y. 2013) ...........................................................................12

*New York State Teamsters Conference Pension & Retirement Fund v. United
   Parcel Service, Inc.*,
   382 F.3d 272 (2d Cir. 2004) ........................................................................ 4, 5, 8, 16,17

*Perreca v. Gluck*
   295 F. 3d 215 (2d Cir. 2002)........................................................................................ 6

*Reilly v. Reem Contracting Corp.*,
   380 Fed. Appx. 16 (2d Cir. 2010)..................................................................................12

**Statutes**

29 U.S.C. § 1059...........................................................................................................14

29 U.S.C. § 1132(g)(1) ..................................................................................................19

Plaintiff, Pig Newton, Inc., respectfully submits this Brief in Opposition to Defendants'

Motion for Summary Judgment and in Further Support of Plaintiff's Motion for Summary

Judgment.[1]

## INTRODUCTION

Plaintiff's opening papers showed that Defendants are unable to avoid the Second Circuit's

holding in *La Barbera v. J.D. Collyer Equip. Corp.*, 337 F.3d 132 (2d Cir. 2003), a case that is

directly on point, which invalidated a rule indistinguishable from the Controlling Employee Rules at

issue here. Faced with *La Barbera* and other Second Circuit authority, Defendants failed to offer

any support for their claim to $116,366.40[2] in contributions from Plaintiff. Defendants' misguided

arguments ignore or badly misinterpret applicable law and rely heavily on immaterial facts that fail

to rehabilitate the patently improper Controlling Employee Rules. Accordingly, Pig Newton's

motion for summary judgment should be granted in its entirety and Defendants' motion for

summary judgment should be denied in all respects.

## ARGUMENT

**I.     Defendants Fail to Distinguish *La Barbera*, Which Compels the Determination
       That the Controlling Employee Rules are Invalid and Unenforceable.**

Pig Newton's opening brief reviewed the Second Circuit's decision in *La Barbera*, 337 F.3d

132, which holds that trustees of a multiemployer plan exceeded their rulemaking authority by

adopting the "100% owner rule." Applying *La Barbera* to the facts of this case, Plaintiff showed

that the Plans' Controlling Employee Rules must be declared invalid and unenforceable.

In their opening brief, Defendants sought to dismiss *La Barbera* as inapposite due to the

manner in which the trustees in *La Barbera* implemented their rule. Defendants argued that *La

Barbera* is distinguishable because in that case the trustees adopted their 100% owner rule by

---

[1] All terms defined in Plaintiff's opening brief ("Pl. Br.") have their same meaning in this submission.

[2] That amount, which Defendants calculated through June 24, 2014, continues to increase on a weekly basis.

separate resolution and not by an amendment to the trust agreements, as the Directors did here. This procedural difference in adopting rules that are substantively indistinguishable[3] leads Defendants to claim that the Controlling Employee Rules were not "instituted pursuant to the trustees' rulemaking authority" because they were included in the Trust Agreements. (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Br.") at 23.)

This argument strains credibility. It is undisputed that the Controlling Employee Rules were not the result of collective bargaining between Plaintiff and the Union but, rather, were rules unilaterally adopted by the Directors. The fact that the Directors promulgated the Rules by amending the Trust Agreements does not alter the undisputed fact that the Rules were not collectively bargained but were adopted by the Directors in reliance on their rulemaking authority. (JA-906-908, Aug. 7, 2012 Letter from W. Cole to W. Zuckerman stating that the Rules were adopted by the Plans.) Whether the Directors act by resolution, amendment, or otherwise, their actions purporting to modify the terms of a collective bargaining agreement or a trust agreement necessarily implicate their rulemaking authority.[4] Further highlighting the fact that Rules were not bargained is the undisputed fact that Plaintiff's executives were entirely unaware of the existence of the Rules prior to the Plans' claims that resulted in this litigation. (Declaration of Louis Szekely, dated Aug. 15, 2014 ("Szekely Decl.") ¶ 13; Declaration of Blair Breard ("Breard Decl.") ¶ 13.)

---

[3] The Rules are indistinguishable from the 100% owner rule as a matter of law, in that in each case the plan fiduciaries exceeded their rulemaking authority, but (as Plaintiff observed in its opening brief) the Rules are more draconian and less narrowly tailored than the 100% owner rule, and as such the reasoning behind the Second Circuit's holding in *La Barbera* applies with even greater force in this case.

[4] As Plaintiff observed in its opening brief, there is nothing in the CBAs that authorize the Directors to impose a different contribution obligation other than the bargained provision – *i.e.*, that contributions are due on hours worked or guaranteed. The CBAs do permit the Directors to change the hourly rates in the CBAs, if necessary, to cover the cost of health benefits, subject to other reallocation provisions so that the employer's financial obligation is not increased. (Pl. Br. at 4, n.4.) Although the record does not contain the pertinent Trust Agreements – the creation documents that established the Plans – nothing in the Trust Agreements that are included in the record suggests, let alone confers, the type of authority that the Directors exercised in adopting the Rules. As Plaintiff previously demonstrated, numerous provisions in the Trust Agreements clearly recognize that the Directors' authority is constrained by the CBAs. (*Id.* at 18.)

-2-

Defendants apparently argue that the existence of the Trust Agreements as amended and containing the Rules establishes Defendants' authority to have implemented the Rules, because they are part of the Trust Agreements. This is a transparent tautology. The Second Circuit's reference to authority in trust agreements in *La Barbera* was to the rulemaking authority under ERISA or as initially granted to the trustees under the trust agreement, and it determined that the 100% owner rule was "not authorized" by either source. *Id.* at 139. This reference was not intended to afford the trustees *carte blanche* to amend such trust agreements to extend their authority.[5]

Further, Defendants' argument compels the absurd conclusion that multiemployer plan fiduciaries are exempt from *any* limitation on the rulemaking authority that the Second Circuit recognized in *La Barbera*, so long as they incorporate any such rules into the applicable trust agreements. According to Defendants' logic, the trustees in *La Barbera* could have avoided their unfavorable outcome and enforced their 100% owner rule if they had promulgated the rule pursuant to a trust agreement amendment rather than a resolution. This facile effort to escape *La Barbera* ignores the Second Circuit's analysis in that case. The Court invalidated the rule not because the trustees set forth the rule in a resolution, but because the rule exceeded the trustees' authority under the collective bargaining agreements, ERISA, and the trust agreements by "substitut[ing] an automatic and draconian levy on a narrow class of employers for the per-hours-worked rules set out in the collective bargaining agreements." *Id.* at 138.[6]

---

[5] Defendants refer to the Rules as having been "in effect for decades" (Def. Br. at 1, 4), but the observation is meaningless. The fact is that Plaintiff challenged the Rules as soon as the Plans sought to apply them to Pig Newton. If, as Plaintiff urges, the Directors exceeded their authority by adopting the Rules, Defendants may not rescue them from unenforceability merely because they avoided legal scrutiny until now.

[6] Defendants rely upon outdated and out-of-circuit cases to assert that where there is a conflict between the terms of a CBA and those of a trust agreement, the trust agreement prevails. (Def. Br. at 18-19.) This argument, even if accepted by the Court as a general proposition, again presupposes that the Directors had the authority to amend the Trust Agreements to include the Rules and create the conflict in the first place. *La Barbera* can only be read to reject such a conclusion.

In sum, for the very same reasons the Second Circuit invalidated the 100% owner rule in *La Barbera*, the Controlling Employee Rules are unenforceable. Their incorporation in the Trust Agreements does nothing to immunize them from *La Barbera*'s holding.

## II.       Defendants' Claim that Plaintiff Agreed to the Rules Fails in Light of *UPS* and Because The Trust Agreements Were Not Effectively Incorporated by Reference Into the CBAs.

Defendants further contend that, because the Rules were contained in the Trust Agreements (pursuant to their purported amendment), the Rules are valid because they "were agreed to by Plaintiff in the CBAs and Trust Acceptances." (Def. Br. at 23.) As Plaintiff demonstrated in its opening brief, this argument fails in light of the Second Circuit's decision in *New York State Teamsters Conference Pension & Retirement Fund v. United Parcel Service, Inc.*, 382 F.3d 272, 279 (2d Cir. 2004), where the Court rejected an attempt to vary the terms of a CBA by summary provisions in boilerplate documents very similar to those that Defendants rely upon here. As Plaintiff also observed in its opening brief, the argument further wrongly assumes the effective incorporation by reference of the Trust Agreements into the Agreements of Consent to the CBAs and the Trust Acceptances.

To the extent that Defendants' argument may be read to suggest that Plaintiff had effective notice of the Rules and therefore should be bound by them, Defendants again badly misconstrue *La Barbera*. In that case, in addition to the trustees having adopted the rule without resort to formal amendment, the employers at issue had no notice whatsoever of the rule at the time that they signed the CBAs, in that the rule had not yet been adopted. Indeed, in *La Barbera* the trustees purported to adopt a rule with retroactive application. 337 F.3d at 135 and n.2 (noting that trustees adopted the rule in 1998 and applied it to work performed two years earlier in 1996). Therefore, had the Court wanted to decide the case on the ground that the employers had no notice of the rule, it had the facts to do so. Notably, however, the Second Circuit in *La Barbera* never mentions this consideration, nor was it mentioned by the District Court in its opinion. To the contrary (and as discussed above

-4-

and in Plaintiff's opening brief), *La Barbera*'s holding rests *entirely* on whether the trustees exceeded their authority in adopting the rule. Notice, or lack thereof, is irrelevant. Accordingly, any notice argument by Defendants is irrelevant.

In *UPS* the Court held that funds' participation documents could facilitate the administration of contribution collections, but they could not be used as an alternative source for collective bargaining terms. According to the Second Circuit, an employer who enters into a participation agreement with a multiemployer plan is only assenting to the actions taken by the trustees within the scope of their authority in administering the plan. *Id.* at 279. Because the applicable CBAs limit the contribution obligation to hours "worked or guaranteed," the Directors may not simply substitute a 2,000 hour minimum annual requirement for the much more limited requirement in the CBA. (Plaintiff's Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 ¶12.) There is no question that the Rules seek to impose an alternative source for collective bargaining terms than the CBA, which is precisely what *UPS* found impermissible.

Further, Defendants' contention that the Trust Agreements with the Controlling Employee Rules "were agreed to by Plaintiff in the CBAs and Trust Acceptances" is false. (Def. Br. at 23.) The CBAs make no reference to the Trust Agreements, and as Plaintiff demonstrated in its opening brief, the Trust Acceptances and the Agreements of Consent fail to clearly identify the Trust Agreements that they purport to incorporate; they point to the Plans' original creation documents, decades old, which have not been produced. (Pl. Br. at 20-23.) Indeed, the Plans themselves recognize that the documents referred to are the original creation documents. (Def. Br. at 4 (stating that Plaintiff represented in the Trust Acceptance its familiarity with the "Declarations of Trust

4820-8830-9532

*establishing* the Plans.") (emphasis added).)  Accordingly, Defendants' argument that Plaintiff

agreed to the Rules in the CBAs or the Trust Acceptance is unsupported by the facts.[7]

**III.    Defendants' Contention that the "Guarantees" Referred to in the CBAs Include the
<u>Requirements of the Controlling Employee Rules is Meritless and Must be Rejected.</u>**

Straining to rescue the patently invalid Rules, Defendants contend that certain "guarantees"

referenced in the CBAs include the Rules' purported requirements to make contributions on behalf

of a Controlling Employee on a full-time, full-year basis, regardless of the number of hours such

employee performs covered work. (Def. Br. at 19.) This argument is plainly without merit.

Defendants make this argument in order to resolve the obvious conflict between the Rules

and the CBAs. The CBAs require Plaintiff to contribute set hourly rates to the Plans on behalf of

covered employees "for all hours worked or guaranteed." (JA- 805, 831, 857, 886.) As Plaintiff

demonstrated in its opening brief, the Controlling Employee Rules conflict with the CBAs, because

they improperly modify the basis of contributions due from the number of hours worked or

guaranteed under the CBA to a flat 2,000 hours per year, regardless of whether the Controlling

Employee works *any* hours. (Pl. Br. at 12-13, 19.)

Nowhere in the CBAs is there a hint of a purported "guarantee" that relates to this

contribution required by the Rules, yet Defendants assert that "there is no . . . conflict" between the

Rules and the CBAs, because "the 40-hour contribution requirement is, of course, a guarantee."

(Def. Br. at 19.)[8] As shown below, that statement is unsupportable. Defendants also argue that the

---

[7] Thus Defendants' assertions that they "simply seek" to have Plaintiff "live up to its agreements" should be
disregarded. (*See* Def. Br. at 1, 14.)

[8] Defendants contend that interpreting the 40-hour contribution requirement as a guarantee is consistent with the
principle of contract construction that the language of multiple provisions should be read to eliminate any arguable
conflict. (Def. Br. at 19, n.10.) Defendants overlook that this principle of contract construction applies *only if possible*.
*Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002). Construing the CBA's contribution provision and the Trust
Agreements' Controlling Employee Rules to form a harmonious whole would require interpretive gymnastics that are
inappropriate given the clear and unambiguous conflict between these two provisions. More importantly, and as
demonstrated above (Point I, *supra*), the entire argument relies on the faulty premise that the Directors had the authority
to amend the Trust Agreements to include the Rules in the first place.

Directors have consistently interpreted the Rules as a guarantee, and that the Directors'
interpretation on this point is entitled to "great deference." Each of these arguments fails, as well.

As a threshold matter, it is important to recognize what the CBAs mean by the requirement
that the employer make contributions "for all hours worked or guaranteed." It is self-evident that
"hours worked" refers to hours worked by the employee. It is equally clear that "hours guaranteed"
refers to hours guaranteed by the employer, subject to the guaranteed wage provisions in the CBAs.
The Low Budget Episodic Cable Agreement (V.3 1 0) for Season One (JA-795 to 812), as well as
the CBAs for each of the subsequent seasons, includes the following guarantees:

- work day consists of a minimum of 8 hours (JA-799);

- work week consists of either 5 or 6 consecutive work days (JA-799);

- 4-hour idle pay requirement (JA-804);

- specifying holidays which must be recognized through paid day off or premium rate pay (JA-807); and

- pay for cancellation of previously called employees if specified advance notice is not provided (JA-808).

Each such guarantee specified in the CBAs is a term negotiated between Plaintiff and the Union
requiring Plaintiff to pay minimum wages to the employee and to contribute to the Plans based upon
such required wage payments. For example, if an employee is dismissed from work after only seven
hours of work, the CBAs require Plaintiff to pay the employee wages for eight hours and to
contribute to the Plans on his or her behalf for eight hours, because the employee is guaranteed
eight hours of wages under the CBAs.

Unlike all of the foregoing guarantees, the Controlling Employee Rules are nowhere to be
found in the CBAs, as a guarantee or otherwise. Unlike every guarantee specified in the CBAs, the
Rules were not collectively bargained by Plaintiff and the Union; rather, they were unilaterally

imposed by Defendants. As such, it cannot be said that the requirements of the Rules were guaranteed *by the employer*. And importantly, every guarantee set out in the CBAs is a requirement to pay wages and contributions thereon, whereas under the Controlling Employee Rules there is no requirement to pay wages at all, only a purported requirement to make contributions to the Plans based upon the arbitrary and imputed allotment of 40 hours per week over 50 weeks per year.

Perhaps recognizing that their claim that the Rules amount to just another guarantee in the CBAs is not credible, Defendants again rely upon the argument that "by agreeing to the Trusts," which purportedly were incorporated by reference into the CBAs, Plaintiff "agreed to the allegedly additional requirement" imposed by the Rules. (Def. Br. at 9.) According to this theory, "the 40-hour contribution requirement of the Trust Agreements is as much a part of the CBAs as the 'guarantee' language of the body of those documents." (*Id.*) But as detailed above (Point II, *supra*), the Second Circuit specifically rejected such a conclusion in *UPS*, 382 F.3d 272, and Defendants cannot even establish that the Trust Agreements containing the purported Rules were effectively incorporated by reference into the CBAs.[9]

Defendants' claim, moreover, that the Directors have consistently interpreted the Rules as a guarantee is refuted by Defendants' own documents produced in this litigation. For example, the Plans' audit reports of numerous employers highlight that the Plans themselves distinguished the CBA's guarantees from the Controlling Employee Rules. Specifically, the Plans' auditor's reports reflect that the Plans treated the CBA's guarantees and the Controlling Employee Rules as two

---

[9] Further, this is another argument advanced by Defendants that compels absurd conclusions. According to Defendants' logic, nothing would preclude the Plans from, for example, amending the Trust Agreements to require contributions on 2,000 hours per year for all employees, not just Controlling Employees, regardless of whether the employees continue to be employed. Applying Defendants' arguments, the employer would be required to comply with the Plans' rule because (1) the incorporation of amendments into the Trust Agreements saves the Directors from having to craft narrowly tailored rules that do not conflict with the CBAs as required by *La Barbera*, and (2) the Directors construe the reference to guarantees in the CBA to encompass rules adopted by the Directors. In fact, however, Defendants are not free to entirely disregard the negotiated contribution obligation of employers and impose instead an exponentially greater financial obligation. As such, their interpretation of "guarantee" does not survive review under either a *de novo* or arbitrary and capricious standard.

entirely separate and distinct categories. For example, the Plans' auditor's report for Vision

Investments, Inc. included a section entitled "Guarantees" which stated that "[t]here were no

discrepancies found due to non compliance with the appropriate daily, weekly, holiday, idle or on

call guarantee provisions." The same report separately reflected its findings concerning compliance

with the Controlling Employee Rules under the separate heading entitled "Controlling-Employee /

Shareholder." (Aug. 15, 2014 Declaration of E. O'Leary ("Aug. 15, 2014 O'Leary Decl."), ¶ 4 Ex.

A, auditor's report on Vision Investments, Inc.) The Plans' auditor's report for Infinite Justice

Productions reflected the same distinction. In fact, the report reflects an interpretation of guarantees

that matches Plaintiff's interpretation – *i.e.*, guarantees refer to the daily, weekly, holiday, idle, and

on-call guarantees that are expressly enumerated in the CBA. The report on Infinite Justice

Productions had one heading entitled "Guarantees" which included the following:

> Recorded the results of testing guarantee compliance arising from the
> employer's understanding and application of the appropriate daily,
> weekly, holiday, idle, or on-call guarantee provisions and there was a
> high accuracy rate amongst the sampled population.

The report's findings on the "Controlling Employee/Shareholder" findings were included under a

separate heading. (Aug. 15, 2014, O'Leary Decl., ¶ 5 Ex. B, auditor's report on Infinite Justice

Productions.)  Further, the audit report of Pig Newton for the period from November 29, 2009, to

January 29, 2011, also treated "guarantees" and Controlling Employee liability as two distinct

matters. (July 11, 2014, Declaration of Shanda Zuniga, Ex. C, Auditor's Report Outline on Pig

Newton (section entitled "Guarantee" stating that the auditor tested Pig Newton's records to ensure

it properly implemented "the appropriate daily, weekly, and holiday guarantees" and addressing

liability under the Controlling Employee Rules in a separate section).) In sum, the Plans' own

document production establishes that the Plans did not interpret the Controlling Employee Rules as

one of the guarantees in the CBAs and refutes their assertion that the Directors have consistently

interpreted the Controlling Employee Rules as a CBA guarantee.

Defendants' contention that the Directors' interpretation of the Controlling Employee Rules as a guarantee is entitled to "great deference" should be rejected out of hand. Although Defendants neglect to specifically address whether the standard of review is *de novo* or arbitrary and capricious, the cases that they cite suggest that they are advocating an arbitrary and capricious standard of review. (Def. Br. at 20.) However, Pig Newton has already established that the Directors' interpretation of the contribution requirements in the CBA warrants *de novo* review. (Pl. Br. at 10, n.13, n.14.) Moreover, Defendants' principal support for deferring to their interpretation – *i.e.*, the consistency of Defendants' interpretation – has already been refuted.

Plaintiff's opening papers identified numerous documents produced by Defendants that established the Plans' haphazard interpretation and application of the Rules. A striking example is the admission by a Plans' representative that there were many years in which the Plans lacked any monitoring system regarding the Controlling Employee Rules and, therefore, did not enforce the Rules. (Pl. Br. at 8 n.8; July 11, 2014 O'Leary Decl. ¶ 20, Ex. P, document D005614.) To the extent that the Directors might otherwise be entitled to some deference in their interpretation, there is sufficient justification for the Court to afford no such deference. *See Diamond v. Treasurers and Ticket Sellers Union Local 751 Pension Fund*, No. 05 Civ. 1937 (PAC), 2006 WL 2462907, *7 (S.D.N.Y. Aug. 22, 2006) (repeated errors and contradictions by the funds "evidence a process so seriously flawed that deference to the Trustees' interpretation is not appropriate here.").

**IV.    Defendants' Claim for Unpaid Contributions in Connection with Mr. Szekely's Editing Services Is Irrelevant to Plaintiff's Motion Seeking a Declaration That the Rules are Invalid, and the Claim <u>Fails Because Mr. Szekely Is Ineligible To Participate in the Plans.</u>**

As Plaintiff acknowledged in its opening papers, at his deposition Louis Szekely testified that he performed limited editing work on Season One of the Series for which contributions were not made to the Plans. (JA-11-13, Szekely Dep. 38:15-16; 43:12-47:13.) The Plans' subsequent demand for contributions for such work was the basis of Defendants' amended counterclaim. (*See*

-10-

Docket No. 11.) Notwithstanding Defendants' attempts to highlight this unremarkable and freely acknowledged admission, the Court should not be distracted by it. Plaintiff's failure to have made contributions on the small amount of work that Mr. Szekely performed in connection with Season One is immaterial to the central issue in this case: whether the Directors exceeded their authority by implementing the Controlling Employee Rules, requiring them to be declared invalid and unenforceable. Moreover, as demonstrated in Plaintiff's opening brief, based upon the limited nature of Mr. Szekely's editing work relative to his other duties for Plaintiff, he does not satisfy the definition of "Employee" under the Trust Agreements and is therefore ineligible to participate in the Plans.[10] Accordingly, no contributions are due for Mr. Szekely's editing work in Season One (or any season) of the Series, and Plaintiff is due a refund or credit of all contributions made on behalf of Mr. Szekely.

As set forth in the Mr. Szekely's accompanying declaration, he was not yet a member of Local 700 at the time he performed editing work in Season One. (Szekely Decl. ¶¶ 4-5.) Although Plaintiff made contributions on behalf of Doug Abel, a Local 700–member editor who also worked on Season One, Plaintiff mistakenly understood that its contribution obligation was contingent on

---

[10] Plaintiff demonstrated in its opening brief that under the Plans' Trust Agreements, only "Employees" are eligible to participate in the Plans, and an "Employee" is defined, *inter alia*, as a person whose "principal employment" with the signatory employer is work covered under the IA CBA. (Pl. Br. at 24.) If the term "principal" (which the Directors themselves selected; *i.e.*, it was not a collectively bargained term) is to be accorded any meaning, it is clear that Mr. Szekely does not meet the Plans' own definition for eligibility. In that case, Plaintiff, far from being liable to the Plans under the Rules, should be refunded or credited amounts it has contributed on Mr. Szekely's behalf. (*Id.* at 23-25.)

Defendants may attempt to avoid this inevitable conclusion required by their own eligibility criteria by, for example, advancing an interpretation of "principal employment" that negates the meaning of "principal" and then suggesting to the Court that its interpretation should be accorded deference. Such a self-serving attempt should be rejected. To the extent that Defendants argue that the term "principal employment" is intended to apply only to periods in which the employee is engaged in CBA-covered work, the argument plainly fails as it relates to Mr. Szekely. As per his accompanying declaration, editing is *never* his chief or most significant employment with Pig Newton, relative to all of his other roles, even during periods of post-production of the Series and other projects, when he is engaged in editing. (Szekely Decl. ¶¶ 8-11.) Further, even if this argument had any validity as general matter, it has none when applied to so-called Controlling Employees, as they are *presumed always* to be performing bargaining unit work. As such, there is no colorable interpretation of "principal employment" that supports the conclusion that Mr. Szekely is an eligible "Employee" under the meaning of the Plans' Trust Agreements.

-11-

union membership and did not contribute to the Plans on behalf of Mr. Szekely. (*Id.* ¶¶ 5-6.)[11] Defendants ascribe undue significance to this error, and use it as a basis for granting their motion for summary judgment and awarding them contributions that dwarf those payable for Mr. Szekely's Local 700–covered work (as noted, Defendants are seeking $116,366.40 under the Controlling Employee Rules, plus additional amounts accruing since June 24, 2014). Such an argument is without merit or even logic.

Moreover, the Plans' allegations concerning Season One do not support an award of summary judgment based on application of the Controlling Employee Rules to each of the four seasons. *See*, *e.g.*, *Reilly v. Reem Contracting Corp.*, 380 Fed. Appx. 16, 20 (2d Cir. 2010) (summary judgment is inappropriate as to damages in delinquent contribution case); *Natale v. Cent. Parking Sys. of N.Y.*, 958 F. Supp. 2d 407, 415 (E.D.N.Y. 2013) (dismissing plans' delinquent contribution claim and noting: "the Plaintiffs at best established that the Defendants may have owed contributions, but this is insufficient to state a claim that the Plaintiffs . . . *are* entitled to relief."); *La Barbera v. A. Morrison Trucking, Inc.*, No. 08 CV 3095 (RJD)(JO), 2011 WL 703859, *6 (E.D.N.Y. Feb. 18, 2011) (denying summary judgment on damages in delinquent contribution case and stating that "[t]he more prudent approach is to hold a short bench trial at which [defendant] can contest the amount of damages.").

In sum, if the Court grants Plaintiff's motion as it pertains both to the invalidity of the Controlling Employee Rules and to Mr. Szekely's ineligibility to participate in the Plans (because his Local 700–covered work is not his "principal" employment), Plaintiff has no liability to the Plans with respect to any of the four seasons of the Series, including Season One. If the Court

---

[11] Now recognizing its error in interpreting its contribution obligations, if the Court does not conclude that Mr. Szekely is ineligible to participate in the Plans, Pig Newton will promptly make contributions to the Plans for Mr. Szekely's covered services in Season One, along with any attendant damages for late payment. (Szekely Decl. ¶ 6.) Any such liability would appear to be modest, however. Specifically, Mr. Szekely testified that his editing on Season One occupied no more than 10% of his time in a 12-month period, given that Mr. Abel also worked as an editor in Season One. (JA-88.)

invalidates the Controlling Employee Rules but finds that Mr. Szekely is eligible to participate in the Plans, then Plaintiff will acknowledge its liability for unpaid contributions for his limited editing services in Season One. In that latter event, Plaintiff respectfully requests that the parties be given an opportunity to determine the amount of additional liability with respect to Mr. Szekely's services for Season One, and Plaintiff believes that the parties should be able to resolve this issue without the need for a hearing or further written submissions.

## IV.    **Defendants' Allegations of Inaccurate Reporting are Irrelevant to Either Party's Motion.**

No doubt recognizing that the Controlling Employee Rules are contrary to Second Circuit authority, Defendants resort to yet other efforts to distract the Court with irrelevancies. Defendants devote pages of their brief to allegations of inadequate recordkeeping and suggestions of underreporting by Pig Newton. (Def. Br. at 7-8, 21-22.) The allegations and innuendo are false and misleading, but, more importantly, they have nothing whatsoever to do with either party's motion before the Court.

The Plans' own auditors have found Pig Newton's recordkeeping to be in good order. For example, the Plans' audit of Pig Newton for the period from January 30, 2011 to November 12, 2012, provides that Pig Newton's "records were observed in good condition" and did not identity a single deficiency in those records, which included a general ledger, payroll journal, crew list, and cash disbursement records. (JA-918-919.) At no time did the Plans advise Pig Newton of any missing or deficient records that would suggest a recordkeeping violation under ERISA.

Defendants' sole support for their argument that Pig Newton did not keep adequate records is the deposition testimony of Mr. Szekely in which he described his position at Pig Newton as "highly-hyphenated" due to his multiple roles as writer, producer, director, editor, and promoter, among other responsibilities. (JA-35, Szekely Dep. 135:4-18.) He further testified that he did not account for every minute of his day and was not clocking in and out, but rather performed multiple

-13-

roles in any given day, with editing being the area in which he performed the least amount of time. (JA-23, Szekely Dep. 87:8-12 ("Because even during the time blocks that I'm editing, I'm doing way – loads of other stuff. So editing may take – I don't clock in for eight-hour days as an editor. I might edit for one hour in any afternoon and that's my day.").)

Defendants' assumption that Mr. Szekely had an obligation to recall with mathematical precision the exact amount of time he spent on editing in order for Pig Newton to be compliant with its recordkeeping obligation under Section 209 of ERISA, 29 U.S.C. § 1059, is wrong. The CBAs require contributions "for all hours worked or guaranteed." (JA-805, CBA, Article 7(A)(ii).) The CBAs have an 8-hour per day minimum. (JA-799, CBA, Article 4(B).) For any period in Seasons Two through Four in which Mr. Szekely performed editing services, it is undisputed that Plaintiff contributed either 40 or 50 hours per week for Mr. Szekely, which is consistent with the guarantees of the CBA. (Breard Decl. ¶ 11.) Moreover, given that Mr. Szekely's deposition testimony that his editing services on any given day did not exceed more than a few hours, any record-keeping deficiencies on a daily basis would be immaterial, because Pig Newton contributed hours for a full-time week. In short, Pig Newton complied with the guarantees of the CBAs, and the record is devoid of any evidence of underreporting.[12]

Even putting aside that Defendants' allegations are easily rebutted and refuted, what is most significant about them is their demonstrable irrelevance to either party's motion. If Plaintiff is correct, and the Controlling Employee Rules are unenforceable and invalid, then Defendants could pursue a claim for delinquent contributions if they truly believed that Plaintiff under-reported hours and made insufficient contributions (in the event that the Court determines that Mr. Szekely is

---

[12] The Plans' apparent criticism of Plaintiff for having time records showing that Mr. Szekely "worked as an editor and actor at overlapping hours in the same day" is also misplaced. (Def. Br. at 7-8.) The undisputed record evidence establishes that Mr. Szekely did, in fact, perform multiple duties in any given day and that Plaintiff had an obligation to contribute to numerous employee benefit plans for such work. As noted, the record is also clear that the CBAs required contributions to the Plans for a minimum of eight hours per day, regardless of whether Mr. Szekely worked for that many hours.

eligible to participate in the Plans); if Defendants somehow prevail and rescue the Rules from unenforceability, they are entitled to full-year, full-time contributions. In either case, unsupported allegations of inaccuracies in recordkeeping have nothing whatever to do with any issue before the Court.

Straining to attach relevance this argument, the Plans assert that "Plaintiff's record-keeping practices present precisely the type of problem that the Controlling Employee provisions were designed to address." (Def. Br. at 21-22). The argument flies in the face of Defendants' multiple statements to the contrary, even elsewhere in their brief. Defendants have repeatedly claimed that the Rules were adopted not to redress perceived reporting inaccuracies generally but because individuals who could control the number of hours reported on their behalf to the Health Plan deliberately manipulated their reporting in order to pay the minimum level necessary to qualify for coverage under the Health Plan. (*See* Def. Br. at 6; JA-906.) Here, there is no suggestion (nor could there be) that Mr. Szekely has ever attempted to control the number of hours reported in order to pay the minimum for coverage under the Health Plan. According to Defendants, he does not even qualify for coverage. (Pl. Br. at 14 n.17; O'Leary Decl. ¶ 11& Ex. G.) In any event, he has never made a claim for benefits, and he gets health coverage from at least four other multiemployer health plans. (Szekely Decl. ¶ 14.) In short, Defendants' attempt to find relevance in their allegations of inaccurate recordkeeping obfuscates the real issues in this case.

## VI.   <u>Defendants' Remaining Arguments Lack Merit.</u>

The remainder of Defendants' arguments, assertions, comments, and asides fail to provide any support for Defendants' motion, and they do nothing to overcome Plaintiff's entitlement to summary judgment.

For example, Defendants repeatedly assert that the Plans have a duty to provide benefits regardless of whether contributions are paid. (Def. Br. at 12 (quoting authority that plans must pay

out to beneficiaries whether or not employers live up to their obligations); and at 18 (identifying

trustees' duty to provide specific benefits to those who are entitled to them).) Presumably, this

unremarkable observation is intended to support Defendants' asserted right to impose the arbitrary

and draconian Rules upon certain participants in the Plans so that the Plans may remain solvent in

order to pay out benefits, but such an inference in entirely unwarranted. First, as noted above (Point

V, *supra*), Mr. Szekely has never made a claim for benefits under the Plans and has no need for

Health Plan benefits. (Szekely Decl. ¶ 14.) This case, therefore, presents an inversion of the Plans'

obligation to pay out benefits where no contributions are made, as here Plaintiff has made

contributions on behalf of Mr. Szekely, even though he has no need for benefits. Defendants also

risk their credibility by implying that the Rules are intended to permit the Plans to pay out benefits

to non-contributing participants when their stated (and repeated) rationale for the Rules is to avoid

fraud.[13]

Further, Defendants' characterizations of certain principles under ERISA are often

incomplete or overlook important considerations. For example, Defendants invoke the uncontested

principle central to ERISA Section 515 claims that benefit fund fiduciaries have a duty to preserve

and maintain plan assets. (Def. Br. at 15.) However, the case Defendants rely upon for this

proposition, *Central States, SE and SW Areas Pension Fund v. Central Transp., Inc.*, 472 U.S. 559

(1985), contains the Supreme Court's caution to fiduciaries that their powers "are limited to prudent

actions furthering the legitimate purposes of the plan." *Id.* at 582. Second Circuit authority has

repeated this instruction. *See N.Y. State Teamsters Conference Pension and Retirement Fund v.

Boening Bros., Inc.*, 92 F.3d 127, 134 (2d Cir. 1996) (fund's audit to identify delinquent

contributions must not be "broader in scope than necessary to achieve its objective and no more

extensive than the scope of the trustees' authority"). And, of course, the Second Circuit decision in

---

[13] As also noted above (Point V, *supra*), the asserted rationale in adopting the Rules apparently morphs in order to suit any particular argument that Defendants wish to advance.

*La Barbera*, 337 F.3d 132, focused on the trustees' failure to narrowly tailor the 100% owner rule and the fact that it exceeded any measure required to prevent actuarial damage through under-reporting. While Plaintiff does not dispute the Directors' fiduciary responsibility to preserve and maintain assets (a responsibility shared by the trustees in *La Barbera*), the Directors in this case wish to ignore their concomitant obligation to undertake that responsibility by measures that are "no broader in scope than necessary to achieve [their] objective and no more extensive than the scope of [their] authority." *Boening Bros.*, 92 F.3d at 134. As Plaintiff has demonstrated, the Rules are anything but narrowly tailored. (Pl. Br. at 12-13.)

Defendants' contention that Plaintiff seeks to "pick and choose" the Plans' provisions to which it will adhere ignores the central legal issue in this case. (Def. Br. at 15.) Far from seeking selective application of the Plans' rules, Plaintiff asks this Court to declare that the Controlling Employee Rules are unenforceable because the Directors exceeded their authority when they purported to implement them. Indeed, it was Defendants' picking and choosing which parts of the CBAs they will honor that compelled Plaintiff to challenge the Directors' rewriting of Plaintiff's negotiated agreement with the Union.[14]

Finally, Defendants' comments about Mr. Szekely's so-called "unique circumstances" (*see* Def. Br. at 23-24) can do nothing to save the invalid Rules. Defendants describe Mr. Szekely as occupying the "enviable and highly anomalous situation of having coverage under multiple health insurance plans" and suggest that even though the Rules may be unfair to him, "it cannot be said the

---

[14] Defendants' failure to recognize the propriety and significance of Plaintiff's insistence that they honor Plaintiff's collectively bargained financial obligation to the Plans is reflected in Defendants' irrelevant argument that the CBAs are silent on numerous issues, such as the Plans' eligibility criteria or health benefits for retirees. (Def. Br. at 17-18.) Of course these issues are set forth in the Plans' documents and not the CBAs. Nothing in the CBAs address the requirements for retiree eligibility for health benefits or other benefits-related eligibility issues, because these issues are not collectively bargained but are determined by the Directors. The bargaining parties do, however, specifically negotiate the contribution requirements, and the Directors lack authority to disregard those obligations. *See UPS*, 382 F.3d at 279; *see also La Barbera*, 337 F.3d at 138-39. To the extent that the Directors determine a need for stricter eligibility requirements for Controlling Employees, they are free to adopt different eligibility rules. What they are not free to do is to substitute a new contribution obligation for the one that was collective bargained. In short, it is simply immaterial that eligibility and retiree health provisions are not addressed in the CBA, because those requirements are not subject to collective bargaining.

provisions are unfair as a general matter." (*Id.*) Defendants' bald assertion notwithstanding, in *La Barbera* the Second Circuit found the far less onerous 100% owner rule, by which the trustees would "substitute an automatic and draconian levy on a narrow class of employers for the per-hours-worked rules set out in the collective bargaining agreements," to be precisely that: unfair, and unenforceable. 337 F.3d at 138. More to the point, it is the Rules' broad and unyielding purported application, like that of the 100% owner rule, regardless of the actual facts and circumstance of any individual case, that led the Second Circuit to conclude, disapprovingly, that "[t]he truth simply does not matter." *Id.*

Here, the truth is that Mr. Szekely spends only a small fraction of his time performing the bargaining unit work of editing, and Plaintiff has made or will make all required contributions in connection with the editing work he has performed and will perform.[15] Yet based upon the inflexibility of the Rules, Defendants continue to insist that Plaintiff make contributions on Mr. Szekely's behalf now totaling $116,366.40 through June 24, 2014 (and increasing on a weekly basis on the presumption of full-time work), although such contributions have nothing to do with his work under the CBAs, as Defendants freely concede. Defendants urge this result even while acknowledging that Mr. Szekely has no motive whatsoever to defraud the Plans (what Defendants claim the Rules were adopted to combat), because he has coverage under four other multiemployer benefits plans in connection with his union-covered work in other capacities. (Szekely Decl. ¶ 14.) If Defendants somehow were to prevail under these stark circumstances, not only would the truth not matter, Defendants' characterization of Mr. Szekely's position as "enviable" would be proven wrong indeed.

---

[15] As discussed (Point IV, *supra*), if the Court concludes that Mr. Szekely is ineligible to participate in the Plans based upon their own criteria, no such contributions are or will be due, and Plaintiff should be entitled to a refund or credit.

**CONCLUSION**

For all of the foregoing reasons, as well as the reasons discussed in Plaintiff's initial submissions, Plaintiff respectfully requests that the Court grant its motion for summary judgment, dismiss Defendants' counterclaim, deny Defendants' motion for summary judgment, and award Plaintiff its costs, including attorney's fees under ERISA Section 502(g)(1), 29 U.S.C. § 1132(g)(1), and such other further relief as the Court may deem just and proper.

Respectfully submitted,

KAUFF MCGUIRE & MARGOLIS LLP
Attorneys for Plaintiff

By: _/s/ Elizabeth O'Leary_
    William E. Zuckerman
    Elizabeth O'Leary

Dated: August 15, 2014
       New York, New York

4820-8830-9532