UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                               :

PIG NEWTON, INC.,                     :

                           :

                   Plaintiff,    :       13 Civ. 7312 (KPF)

                           :

             v.                :       OPINION AND ORDER

                           :

THE BOARDS OF DIRECTORS OF THE   :
MOTION PICTURE INDUSTRY PENSION   :
PLAN, *et al.*,                     :

                           :

                   Defendants. :

                           :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 5, 2015

KATHERINE POLK FAILLA, District Judge:

On October 16, 2013, Plaintiff/Counter-Defendant Pig Newton, Inc.

("Plaintiff" or "Pig Newton"), commenced this action against Defendants/

Counter-Plaintiffs the Boards of Directors ("Defendants" or the "Directors") of

the Motion Picture Industry Pension Plan, Health Plan, and Individual Account

Plan (the "Plans"), under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-

2202, seeking a declaration that certain provisions of the Plans' Trust

Agreements are invalid and unenforceable. In response, the Directors

counterclaimed against Pig Newton under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1191c, 1202-1242, 1301-

1461, for delinquent contributions under terms of the Trust Agreements. The

parties have now cross-moved for summary judgment. For the reasons stated

in this Opinion, the Court finds that the disputed provisions are valid and

enforceable, and awards summary judgment in Defendants' favor.

## BACKGROUND[1]

**A.     Factual Background**

### 1.     The Relationship Between the Parties

Pig Newton is the producer of the television series "Louie" (the "Series"), as well as other entertainment ventures, including televised and web-based comedy shows.  (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 1).  Louis Szekely ("Szekely") is, and has at all times been, Pig Newton's sole owner and shareholder.  (Def. 56.1 ¶¶ 6, 18; *see also* Pl. 56.1 ¶ 1).  Plaintiff employs Szekely in connection with various functions, including as the producer, sole writer, sole director, star performer, and as an editor of the Series.  (Def. 56.1 ¶¶ 7, 35, 36; Pl. 56.1 ¶ 2).  The instant action focuses entirely on the services Szekely provides as an editor for Pig Newton.  He has performed editing services for the Series in each of the four seasons of the Series that have been produced to date, in addition to performing editing services for Pig Newton related to other ventures.  (Def. 56.1 ¶¶ 8-9).

Defendants are trustees tasked with administering three "multiemployer plans": the Motion Picture Industry Pension Plan (the "Pension Plan"), the Motion Picture Industry Individual Account Plan (the "IAP" or the "Individual Plan"), and the Motion Picture Industry Health Plan (the "Health Plan")

---

[1]     The facts in this Opinion are drawn from Defendants' Local Rule 56.1 Statement ("Def. 56.1"); Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1"); the declarations ("[Name] Decl.") and exhibits thereto submitted with the parties' briefs; and the Joint Appendix ("JA") submitted by the parties.  Citations to a party's Local Rule 56.1 Statement incorporate by reference the documents and deposition testimony cited therein.  Finally, the Plaintiff's and Defendants' opening briefs are referred to as "Pl. Br." and "Def. Br.," respectively; their opposition briefs are referred to as "Pl. Opp." and "Def. Opp."

(collectively, the "Plans").  (Def. 56.1 ¶ 1; Pl. 56.1 ¶¶ 6-8).[2]  The Plans were first established between 1952 and 1979, pursuant to declarations of trust ("Trust Agreements") entered into by and between certain employers, and various unions that represent individuals employed in a wide variety of crafts within the entertainment industry.  (Def. 56.1 ¶ 2).

The Plans provide pension, individual retirement, and health benefits to approximately 55,000 individuals (and their dependents) who work in the entertainment industry throughout the United States and Canada under collective bargaining agreements ("CBAs") and participation agreements that provide for contributions to the Plans.  (Def. 56.1 ¶ 3).

### 2.    The Agreements

There are four relevant sets of documents to the instant dispute: (i) CBAs between Plaintiff and its union, the International Alliance of Theatrical Stage Employees, Moving Picture Technicians and Allied Crafts of the United States, Its Territories and Canada (the "IATSE"); (ii) one-page "Agreements of Consent" signed by representatives of Plaintiff and the IATSE; (iii) one-page trust acceptance sheets ("Trust Acceptances") signed by representatives of Plaintiff and the IATSE; and (iii) the Trust Agreements themselves.[3]

---

[2]  "The term 'multiemployer plan' means a plan ... to which more than one employer is required to contribute, [and] which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer[.]"  29 U.S.C. § 1002(37)(A).

[3]  Although different versions of these documents are part of the record, the language animating the instant dispute remains the same throughout these versions.  (*See* Pl. 56.1 ¶ 10; Def. 56.1 ¶ 61 n.6).  Additionally, although the Pension Plan, Individual Plan, and Health Plan are governed by separate Trust Agreements, each contains the same disputed language.  (*See* Def. 56.1 ¶¶ 21-23 & nn.2-4).

a. **The CBAs**

Since 2010, Pig Newton and the IATSE have been parties to various
CBAs, including four "Low Budget Episodic Cable Agreements" (one for each
season of the Series) and two "Producer-IATSE Basic Agreements" (collectively,
the "IATSE CBAs"). (*See* Pl. 56.1 ¶¶ 9-10; Def. 56.1 ¶¶ 10-11; JA 65-353, 795-
818, 821-44, 847-52, 876-901). Pig Newton was represented by counsel in
negotiating the CBAs into which it entered. (Def. 56.1 ¶ 55). The IATSE CBAs
apply to Plaintiff's employees to the extent they are engaged in the editing — as
separate from, for example, the producing, writing, and directing — of
television shows and films. (*See id.* at ¶ 13; Pl. 56.1 ¶ 11). Because of the
intense specialization of unions within the entertainment industry, employees
who perform multiple roles in connection with their work for Plaintiff belong to
multiple unions. (*See* Def. 56.1 ¶ 19; Pl. 56.1 ¶ 4). Pig Newton, therefore,
contributes to multiple benefit plans, and does so for Szekely, who belongs to
multiple unions as a result of his multifaceted work for Pig Newton. (*See* Pl.
56.1 ¶ 5; Def. 56.1 ¶ 64).[4]

Of particular relevance, the IATSE CBAs obligate Plaintiff to make
contributions to each of the Plans, pursuant to the Trust Agreements governing
the Plans, for any of its employees covered by the CBAs. (Def. 56.1 ¶ 12; Pl.
56.1 ¶ 6). Generally, the IATSA CBAs require Plaintiff to contribute set hourly
rates to the Plans on behalf of covered employees based on the number of hours
"worked or guaranteed." (Pl. 56.1 ¶ 12 (quoting JA 805, 831, 857, 886)). They

---

[4]     Because Szekely belongs to several unions, he has coverage under multiple health
plans, and is a participant in multiple retirement plans. (Def. 56.1 ¶ 64).

4

also provide that such contributions shall be made "[i]n accordance with" provisions of the Trust Agreements regarding contributions.  (JA 82, 88, 228, 233).

### b.    The Agreements of Consent

Among the agreements entered into between Plaintiff and the IATSE are one-page Agreements of Consent.  Pursuant to these Agreements of Consent, Plaintiff "agree[d] to become a party to and be bound by," a number of other ancillary documents, including, "the Trust Agreements of the Plans," and "any amendments, modifications, extensions, supplements, or renewals of the [Trust] Agreements."  (Def. 56.1 ¶ 11 (citing JA 819, 845, 873, 902); *see also* Pl. 56.1 ¶¶ 16-17).

### c.    The Trust Acceptances

To memorialize further the link between the IATSE CBAs and the Trust Agreements, employers — such as Pig Newton — are required to sign one-page Trust Acceptance sheets.  (*See* Def. 56.1 ¶ 15; Pl. 56.1 ¶ 18).  The Trust Acceptances provide that contributions are required for services "actually rendered in connection with motion picture production" and — echoing language in the CBAs — "for each hour guaranteed by or each hour worked for the Employer by employees for whom the Employer is obligated … to make the required contributions."  (Pl. 56.1 ¶ 18 (quoting JA 820, 846, 874, 875, 903)).

Pig Newton executed Trust Acceptances pursuant to which Plaintiff, "represent[ed] and agree[d]" among other things, that Plaintiff was "familiar with the provisions of the respective collective bargaining agreements and [Trust Agreements] establishing" the Plans.  (Def. 56.1 ¶ 16).  In addition, by

executing the Trust Acceptances, Plaintiff "agree[d] and intend[ed] to become a party and to participate in the [Plans] to the same extent as though the [Plaintiff] had executed such Trust Agreements or their counterparts with respect to the employees covered by the collective bargaining agreement." (*Id.* at ¶ 17; Pl. 56.1 ¶ 19).

### d.   The Trust Agreements

The Plans each have separate Trust Agreements and, because of various amendments, there were at least 10 different versions in effect between 2010 and 2014.  (*See* Pl. 56.1 ¶¶ 20-21).  The Trust Agreements themselves are long and labyrinthine (*see id.*), referencing special conditions and exceptions relevant to particular classes of employees covered by the CBAs of at least 13 separate unions (*see, e.g.*, JA 431-43).

The Trust Agreements grant the Directors a variety of general and specific powers relating to administration of the Plans.  (Def. 56.1 ¶ 61). Among other powers, the Trust Agreements grant the Directors the "power to construe the provisions of the [Trust] Agreement … and the terms used [t]herein," and provide that "any construction adopted by the Directors in good faith shall be binding upon the Unions, the Employers and the Employees and their families and dependents."  (JA 383 (Health Plan)).[5]

---

[5]   The Pension Plan and Individual Account Plan Trust Agreements grant Directors the same authority.  (*See* JA 578 (Pension Plan); *id.* at 763 (Individual Plan) (incorporating relevant provision from Pension Plan)).

### 3. The Controlling Employee Provisions

Pursuant to the Trust Agreements, individuals must work certain minimum hours in covered employment (for the present purposes, editing) in order to qualify for benefits through the Plans. (Def. 56.1 ¶ 4). Thus employees who work sporadically, or only for brief periods of time, may not accrue the minimum hours needed to qualify for health benefits, pension vesting credits, or IAP vesting credits. (*See id.* at ¶¶ 4, 26).

The incentives that animate the present dispute can be summarized as follows: Certain employees ("Controlling Employees") exist, who, by virtue of their ownership interest in an employing entity, have more control over the number of hours they work (or report) than the average employee. (*See* Def. 56.1 ¶ 25). Such a Controlling Employee, recognizing that a minimum hour threshold exists, could self-allocate that precise amount of hourly work — thus maximizing the benefit-to-contribution ratio. (*See id.* at ¶¶ 25-26). In the more sinister version of this scenario, a Controlling Employee, who likely has access to the employing entity's books and records, could falsify the number of hours worked so that he or she obtains benefits, while ensuring that the company pays the bare minimum in contributions.[6]

In response to what the Directors perceived as abuse of the minimum hour threshold by Controlling Employees, the Directors added new provisions

---

[6]     To be clear, there is no indication that Pig Newton has attempted to take advantage of the minimum hour threshold in order to guarantee benefits for Szekely or any other employee for that matter. In fact, Szekely, who has coverage under multiple health plans, has never filed a health claim through the Health Plan, and has offered to withdraw from participation in the Health Plan in order to resolve this action. (*See* Def. 56.1 ¶¶ 64-65; Szekely Decl. ¶ 14).

to the Trust Agreements (the "Controlling Employee Provisions" or the "Provisions"). (*See* Def. 56.1 ¶¶ 20, 25-27, 63; Zuniga Decl. ¶¶ 10, 19; Szekely Decl. ¶ 14). It is unclear precisely when these amendments occurred, but — for present purposes — it is enough to note that they occurred decades ago (*see* Def. 56.1 ¶ 20), which is before Pig Newton became a party to any of the agreements relevant to the instant dispute.

The Provisions were designed to ensure that if a Controlling Employee worked *any* hours under a CBA requiring contributions to the Plans, the employer would be obligated to make contributions on his or her behalf for a specified number of hours per week and a specified number of weeks per year, regardless of the number of hours actually worked. (Def. 56.1 ¶ 27).

Specifically, the Health Plan's Trust Agreement defines "Controlling Employee" as follows:

> A qualified Controlling Employee of an Employer shall mean an Employee ... who is also a shareholder of the corporation or member of the LLC or is an officer of such Employer or is the spouse of such a shareholder, member of the LLC or officer, and whose Employer employs at least one other employee performing work covered under the applicable collective bargaining agreement in addition to the Controlling Employee[.]

(JA 366).[7]

The Trust Agreements detail the contribution obligations of "Controlled Employers" for Controlling Employees. The Health Plan's Trust Agreement provides in part:

---

[7]    The Pension Plan and Individual Account Plan Trust Agreements contain substantially similar definitions. (*See* JA 488 (Pension Plan); *id.* at 690 (Individual Plan)).

> Contributions by Employers ... on behalf of any
> Controlling Employee shall be made at the composite
> rates set forth in Article II, Section I, Paragraph B,
> above, as set forth below.  A Controlling Employee of an
> Employer, as described in the previous sentence, shall
> mean an Employee ... which Employee is also a
> shareholder of the corporation or member of the LLC, or
> is an officer of the Employer or the spouse of such a
> shareholder, member of the LLC ... and is not the only
> Employee of the Employer who works under an
> applicable collective bargaining agreement.    The
> Employer of such Controlling Employee shall be called
> a Controlled Employer.

(JA 446).

With particular respect to contributions made by Controlled Employers

who are parties to the IATSE CBAs at issue here, the Health Plan's Trust

Agreement provides that:

> [C]ontributions shall be made for such [Controlling]
> Employee for forty (40) hours per week and for not less
> than fifty (50) weeks in any calendar year, *regardless of
> the number of weeks in which the Employee performs
> any work*[.]

(JA 447 (emphasis added)).[8]

### 4.    Pig Newton's Contributions on Behalf of Szekely

Among the various services he performs for Pig Newton, Szekely spends

the least amount of his time editing.  (Szekely Decl. ¶ 8; Pl. 56.1 ¶ 23).  Editing

accounts only for 15% of the time Szekely works, and he often goes many

months without spending any time performing editing work.  (*See* Pl. 56.1

¶¶ 22-23).  Perhaps for this reason, only 8% of the total compensation Szekely

---

[8]     The Pension Plan and Individual Account Plan Trust Agreements contain substantially
similar provisions regarding the contribution obligations.  (*See* JA 608-09 (Pension
Plan); *id.* at 777-78 (Individual Plan)).

receives from Pig Newton is attributed to his editing services.  (*See* Breard Decl. ¶ 12).

Pig Newton made contributions to the Plans on behalf of Szekely, but only for the hours he performed editing work.  (*See* Pl. 56.1 ¶ 22).  For 2011, Pig Newton contributed to the Plans on behalf of Szekely based on 50 hours per week of work for approximately 12 weeks of work; for 2013, Pig Newton contributed to the Plans based on 50 hours per week of work for approximately 2 weeks of work; and, for 2014, Pig Newton contributed to the Plans based on 40 hours per week of work for approximately 2 weeks of work.  (*See id.*).  For 2010 and 2012, Pig Newton did not make any contributions on behalf of Szekely.  (*Id.*).

### a.  Contributions for Season One

In January 2012, the Directors audited the books and records of Pig Newton for the period November 29, 2009, through January 29, 2011 — which roughly corresponds to the period of time during which Szekely was working on Season One of the Series.  (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 24).  The auditors determined that Pig Newton had made all required contributions for that period.  (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 24).  They also found that "[n]o controlling-employees/shareholders were identified as having performed covered labor." (Zuniga Decl., Ex. C).

Defendants now assert that the January 2012 audit report was incorrect, and that Plaintiff owes contributions on behalf of Szekely at the Controlling Employee level for Season One.  (*See* Def. 56.1 ¶ 31).[9]

Although Pig Newton did not contribute any amounts on behalf of Szekely for Season One, it now asserts this was in error.  (*See* Szekely Decl. ¶¶ 5-6).  Plaintiff mistakenly believed it did not need to contribute to the Plans on behalf of Szekely during Season One because Szekely was not then a member of the IATSE, which Plaintiff concedes is an incorrect interpretation of its obligations under the CBAs.  (*Id.*).  Regardless, Plaintiff argues it should be liable, at most, for contributions for hours actually worked by Szekely performing editing services.  (*Id.*).[10]

### b.    Contributions for Seasons Two Through Four

By letter dated November 12, 2012, the Directors notified Pig Newton of their intent to conduct another audit relating to Plaintiff's contributions to the Plans.  (Def. 56.1 ¶ 44).  An audit was conducted, and by letter dated March 15, 2013, the Plans notified Plaintiff that the audit found it failed to report accurately the hours and dollars upon which contributions were due during the audit period of January 30, 2011, to November 12, 2012.  (*Id.* at ¶ 45).  The auditors found that Pig Newton "failed to report the guarantee requirements for the controlling employee and assessments were made," and further found that

---

[9]     Plaintiff has not raised, and thus this Court has no occasion to consider, whether Defendants should be estopped from seeking contributions for Season One based on the result of the January 2012 audit report.

[10]    Plaintiff does not completely concede liability for contributions accruing during Season One because of the argument that Szekely's "principal employment" with Pig Newton did not involve editing during that time period.  *See* Discussion Sec. B(1)(d).

"[t]he Employer failed to report the guaranteed requirements for Controlling Employee, Louis Szekely[.]" (JA 919).

Defendants continue to assert that Plaintiff owes contributions for Szekely based not on how many hours he worked, but instead pursuant to the 40-hour-per-week, 50-week-per-year level imposed by the Provisions. (*See generally* Def. 56.1 ¶¶ 32-58, 66). Including interest, liquidated damages, and audit fees, the Defendants seek a total of $116,366.40, as of June 24, 2014. (*Id.* at ¶ 66).

**B.    Procedural Background**

The parties' submissions in this case have been comprehensive. Plaintiff filed its Complaint on October 16, 2013, seeking a declaratory judgment that it was not required to contribute funds to the Plans pursuant to the Controlling Employee Provisions. (Dkt. #1 ¶ 63). On February 7, 2014, Defendants filed their Answer and Counterclaim, seeking contributions calculated by reference to the Provisions, as well as interest and liquidated damages. (Dkt. #9). Plaintiff filed an Answer to the Counterclaim on March 3, 2014. (Dkt. #10). Each of these pleadings was amended once more, making the Complaint (Dkt. #1), the Amended Answer and Amended Counterclaim (Dkt. #11) and the Amended Answer to the Amended Counterclaim (Dkt. #14), the operative pleadings. Cross-motions for summary judgment were anticipated from the outset (*see* Dkt. #8 (Case Management Plan)), and these motions are now fully briefed (Dkt. #19-42).

## DISCUSSION

### A.    The Standard for Summary Judgment Motions

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or

otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010)) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted); *see also Vargas* v. *Transeau*, 514 F. Supp. 2d 439, 442 (S.D.N.Y. 2007) (observing that "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment (internal quotation marks and citations omitted)), *aff'd sub nom. Vargas* v. *Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009) (summary order).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

The standard used to decide cross-motions for summary judgment, such as the motions pending before the Court, "is the same as that for individual summary judgment motions[,] and a court must consider each motion independent of the other." *Worldwide Home Prods., Inc.* v. *Time Inc.*, No. 11 Civ. 3633 (LTS), — F. Supp. 3d —, 2015 WL 568710, at *8 (S.D.N.Y. Feb. 11, 2015) (internal quotation marks omitted); *Auscape Intern.* v. *Nat'l Geographic Soc.*, 409 F. Supp. 2d 235, 238 (S.D.N.Y. 2004) ("A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" (quoting *Heublein, Inc.* v. *United States*, 996 F.2d 1455, 1461 (2d Cir. 1993))).

## B.  Analysis

### 1.  Plaintiff's Motion for Summary Judgment Is Denied

Under Section 515 of ERISA,

> [e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  ERISA plans and collective bargaining agreements are construed according to federal common law.  *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO* v. *United Technologies Corp.*, 610 F.3d 44, 51 (2d Cir. 2010); *Fay* v. *Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).  Courts may, however, look to state law principles governing contract

law interpretation for guidance.  *United Technologies Corp.*, 610 F.3d at 51

("While it is true that traditional contract rules do not always rigidly apply to

collective bargaining agreements, courts must look to traditional state contract

law, when it is not inconsistent with federal labor policy, to form the content of

the federal common law governing labor agreements." (internal quotation

marks and citation omitted)); *Lifson* v. *INA Life Ins. Co. of N.Y.*, 333 F.3d 349,

352-53 (2d Cir. 2003) ("ERISA federal common law is largely informed by state

law principles.  We apply familiar rules of contract interpretation in reading an

ERISA plan." (internal citation omitted)).

This Court must review the agreements as a whole, giving terms their

plain meanings.  *See, e.g.*, *Brass* v. *Am. Film Techs., Inc.*, 987 F.2d 142, 148 (2d

Cir. 1993) ("Where the [contract] language is plain and unambiguous, a court

may construe the contract and grant summary judgment.").  The threshold

question here "is whether the contract is unambiguous with respect to the"

provisions on which the parties rely.  *Cont'l Ins. Co.* v. *Atl. Cas. Ins. Co.*, 603

F.3d 169, 180 (2d Cir. 2010) (internal quotation marks omitted).  "An

ambiguity exists where the terms of the contract could suggest more than one

meaning when viewed objectively by a reasonably intelligent person who has

examined the context of the entire integrated agreement and who is cognizant

of the customs, practices, usages and terminology as generally understood in

the particular trade or business."  *Law Debenture Trust Co. of N.Y.* v. *Maverick

Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).  "Whether the contract is

16

ambiguous is a question of law for the court." *Cont'l Ins. Co.*, 603 F.3d at 180 (internal quotation marks omitted).

Plaintiff puts forth an array of arguments as to why it is not required to make contributions in accordance with the Provisions. The Court will address each in turn.

### a. The Controlling Employee Provisions of the Trust Agreements Are Not Invalid

Relying on the Second Circuit's decision in *La Barbera* v. *J.D. Collyer Equip. Corp.*, 337 F.3d 132 (2d Cir. 2003), Plaintiff argues the Directors lacked the authority to create the Controlling Employee Provisions, and that they should therefore be rendered invalid. (Pl. Br. 12-15). Although the Court appreciates Plaintiff's thoughtful arguments on an issue that has generated little case law, it cannot agree that Second Circuit precedent supports, much less compels, the invalidation of these trust provisions.

In *La Barbera*, the Second Circuit found that trustees of a benefit fund had exceeded their authority in adopting a "100% owner rule" similar in impact to the Provisions at issue here. 337 F.3d at 135. The rule in *La Barbera* required an employer to contribute funds on behalf of a Controlling Employee at the level of 40 hours a week for each week of every month the Controlling Employee was reported to have worked in covered employment — regardless of the actual number of hours worked in a given month. *Id.*[11] The Court found

---

[11]   As Plaintiff points out, the Controlling Employee Provisions at issue in the instant action are, given Szekely's circumstances, significantly more punitive than the 100% owner rule in *La Barbera* was. This is because the 100% owner rule applied only to the month in which covered employment was performed, rather than to the entire calendar year. (Pl. Br. 12-13). To take a concrete example, one of the Controlling Employees in *La Barbera* worked 8 hours in February 1996. 337 F.3d at 135 n.2. The trustees

that "neither ERISA, the collective bargaining agreements, nor the Trust Agreement vest[s] the Trustees with authority to adopt the 100% owner rule." *Id.* at 137.

Plaintiff's attempt to transfer the holding of *La Barbera* to the instant case is predicated, in part, on a semantic sleight-of-hand, one that obscures the fact that the Controlling Employee Provisions here are part of the Trust Agreements.  That is, by repeatedly referring to the Provisions as "rules" rather than provisions of the Trust Agreements (Pl. Br. 7-15; Pl. Opp. 2-4), Plaintiff elides the distinction between rules promulgated pursuant to the Directors' discretionary rulemaking authority and "provisions" that are themselves part of Plaintiff's contract with the Directors.  *See Welfare Fund, New England Health Care Emps.* v. *Bidwell Care Ctr., LLC*, 419 F. App'x 55, 58 (2d Cir. 2011) (summary order) (noting the distinction between "cases … where trust documents contain[] a general rule-making provision," and those in which "the fund creation documents" dictate the contribution terms).

---

"deemed that [he] worked 160 hours in that month — 40 hours per week for each week — and charged [him] for contributions on that basis."  *Id.*  Under the Plans at issue in this case, that same employee would be charged for calendar year contributions on the basis of 2,000 hours of work — even assuming the 8 hours of work performed in February constituted the sum total of his work for the year. (*See* Pl. Br. 13, 22).  Moreover, the Controlling Employee Provisions would require contributions on behalf of that same employee for the entire calendar year even if he did not perform *any* hours of work, until one of the conditions for ceasing contributions under the Provisions was met. (*See id.*; *see also* JA 447-48 (listing the occurrences that permit the cessation of Controlling Employee contributions)).  Significantly, however, the *La Barbera* decision was not predicated on the punitive or overbroad nature of the challenged provisions (though those factors were discussed), but rather on the absence of trustee authority to enact them.  As discussed *supra*, unlike the employers in *La Barbera*, Pig Newton assented to the Provisions when it executed the agreements that incorporated the Trust Agreements.

Significantly, the trustees in *La Barbera* adopted their 100% owner rule as a unilateral resolution; it was not part of the CBAs or the Trust Agreement to which the employers were parties. 337 F.3d at 135-36. The Second Circuit explicitly noted that "neither ERISA, the collective bargaining agreements, *nor the Trust Agreement* vest[s] the Trustees with authority to adopt the 100% owner rule." *Id.* at 137 (emphasis added). Indeed, the trust agreement in *La Barbera* was repeatedly invoked as a potential — yet deficient — source for the power the trustees sought to wield. *See id.* at 138 ("We see nothing in ERISA or *the Trust Agreement* that authorizes the Trustees to substitute an automatic and draconian levy ... for the per-hours-worked rules set out in the collective bargaining agreements[.]" (emphasis added); *id.* at 139 ("[W]e find that the 100% owner rule is not authorized either by the broad powers accorded Trustees under ERISA and *the Trust Agreement*[.]" (emphasis added)).

Plaintiff argues that whether the Controlling Employee Provisions are "rules" or part of the Trust Agreements is immaterial, and that essentially any extra contribution requirements imposed outside the CBAs must be invalidated as beyond the scope of the Directors' rulemaking authority. (*See* Pl. Opp. 2). However, *La Barbera* does not support this conclusion, and the Second Circuit implicitly recognized in that decision that a "link between eligibility and hours worked by an employee" in the CBA *could be* abandoned if authorized by a provision of the trust agreement. *See* 337 F.3d at 138 ("While the Trustees have broad powers to adopt regulations regarding eligibility, those powers do not extend to abandoning the link between eligibility and hours worked by an

19

employee, *save for the remedial provisions of* [the trust agreement's] Article VI, § 1(d)." (emphasis added) (internal citation omitted)).

In *La Barbera*, the Second Circuit scoured the relevant CBA and trust agreement to discern whether the trustees had power to enact the 100% owner rule, finding eventually that they did not.  337 F.3d at 138.  This Court, following the same approach, encounters no difficulty in reaching the opposite conclusion: The Controlling Employee Provisions are explicitly authorized by the Trust Agreements.  The Court's analysis does not depend on the interpretation of whether a rule comports with the latent rulemaking authority vested by the Trust Agreements; there is, instead, an explicit provision in the Trust Agreements for calculating contributions for Controlling Employees with which the employers and the Directors are obligated to comply.

Plaintiff may be correct that the Controlling Employee Provisions — like the 100% owner rule in *La Barbera* — are broader than necessary to curb perceived manipulation by some Controlling Employees.  But Plaintiff is incorrect in concluding that *La Barbera* requires this Court to scrutinize a trust provision as it would a unilateral resolution.  *See Bidwell Care*, 419 F. App'x at 58 (suggesting that *La Barbera*'s application is limited to instances "where trust documents contain[] a general rule-making provision").  The Second Circuit "sa[id] no more than that the 100% owner rule as formulated [wa]s invalid because it [wa]s not expressly or impliedly authorized by either ERISA, the collective bargaining agreements, or *the Trust Agreement*."  *La Barbera*, 337

20

F.3d at 138 (emphasis added).  The Court is guided by the Second Circuit's careful cabining.

As a related argument, Plaintiff argues that "[n]othing in the Trust Agreements here authorizes Defendants to modify Plaintiff's contribution obligation" under the CBAs.  (Pl. Br. 17).  Plaintiff relies for this argument on *New York State Teamsters Conference Pension & Ret. Fund* v. *United Parcel Serv., Inc.* ("*UPS*"), 382 F.3d 272, 279 (2d Cir. 2004), in which the Second Circuit reiterated the need to focus on "the terms of [a plan's] creation documents" in analyzing whether the trustees of a plan have acted within their authority.  382 F.3d at 274; *see also id.* at 281 ("[T]he rulemaking authority of a multiemployer plan is limited by the terms of the plan's creation documents.").  Plaintiff asserts that the only documents that can convey authority upon trustees of a plan are the *original* documents that created the plan.  (*See* Pl. Br. 17 ("[A]lthough *UPS* requires an examination of Plans' creation documents, Defendants have not produced any of the actual creation documents but only some of the amended and restated versions.")).  Such an argument misses the mark.  A careful reading of *UPS* reveals that the Second Circuit used the term "creation documents" simply to refer to the controlling trust provisions, and specifically to distinguish these from the one-page participation agreements (documents akin to the Consent Agreements and Trust Acceptances executed in this case).  *See UPS*, 382 F.3d at 275 ("The Funds were created by ... trust agreements[.]"); *id.* at 279 ("We ... disagree with the district court's characterization of the Participation Agreements as 'trust

21

provisions.'"); *id.* ("[A]n employer who enters into a 'participation agreement' with a multiemployer plan is only assenting to all actions taken by the plan trustees *within the scope of the trustees' authority in administering the plan*." (internal quotation marks, citations, and brackets omitted) (emphasis in *UPS*)). The Second Circuit placed no particular emphasis on the *original* trust agreements in *UPS*, to the exclusion of any amended versions that may have been in effect, nor is there any indication that "creation documents" was intended to refer to anything as a term of art more specific than "the terms and conditions of [the] plan" referred to in Section 515 of ERISA.[12]

Further, the Court notes the obvious temporal refutation of Plaintiff's argument that the Directors "unilateral[ly] re-wr[ote]" the terms of the CBAs. (Pl. Br. 18).  In *La Barbera*, the 100% owner rule took effect years after the execution of the relevant CBAs and trust agreements.  337 F.3d at 135-36. Here, it is indisputable that the Controlling Employee Provisions appeared in the Trust Agreements as of the date that Plaintiff became a party to the CBAs and the Trust Agreements.  This is significant because — unlike in *La Barbera* — Plaintiff cannot claim that the Directors have engaged in any attempts to expand their power to collect contributions after Plaintiff's execution of the myriad relevant agreements.  Since execution, Directors have been "bound by [their] common law and ERISA fiduciary duties to abide by the terms of the trust," which includes the Controlling Employee Provisions.  *New*

---

[12]   In this regard, it bears noting that the Court has found no decision of the Second Circuit or any district court within it that has interpreted the "creation documents" language in *UPS* (or, for that matter, the *UPS* decision) in the restrictive manner that Plaintiff suggests.

*York State Teamsters Conference Pension & Ret. Fund* v. *Boening Bros.*, 92 F.3d 127, 132 (2d Cir. 1996) (internal quotation marks and citation omitted).

The coincident execution of the CBAs and the Trust Agreements, and their overlapping nature, also takes much of the steam out of Plaintiff's argument that the Controlling Employee Provisions have interfered with or superseded a collectively bargained term regarding contributions.  (*See* Pl. Br. 18).  Indeed, the cases cited by Plaintiff — in which courts have invalidated the actions of plan trustees — involve employers who complained of intervening, unilateral resolutions.  *See Prof'l Adm'rs Ltd.* v. *Kopper-Glo Fuel, Inc.*, 819 F.2d 639, 641 (6th Cir. 1987) (finding trustees lacked authority to amend the Plan in late 1980 to change "amount[s] specified in … 1979 and 1980 collective bargaining agreements")); *United Food & Commercial Workers* v. *Super Fresh Food Markets Inc.*, No. 04 Civ. 1226 (RMB), 2008 WL 3874304, at *24 (D.N.J. Aug. 19, 2008) (finding "[c]ontrary to federal labor policy, the unilateral change to the employers' contribution requirement to the Fund" where CBAs were entered into in 1999 and 2000, and trustees changed the contribution methodology in 2003).  However, "[t]he context here is not that of a pension fund trustee trying to intervene in the collective bargaining process or improperly modify contribution payment rates[.]  Rather, the outcome of collective bargaining process … was that the parties chose to adopt CBAs that: [i] provided only one avenue for [Pig Newton] to make contributions …; and [ii] incorporated the Trust Agreement[s], which explicitly granted the

23

[Directors] ... power" to demand contributions on behalf of Controlling Employees.  *In re Hostess Brand, Inc.*, 499 B.R. 406, 413 (S.D.N.Y. 2013).[13]

### b.    Plaintiff Is Bound by the Trust Agreements

Plaintiff next argues that "the Trust Agreements have not been properly incorporated into any of the documents that Plaintiff signed," and therefore that Plaintiff never agreed to be bound by the Provisions.  (Pl. Br. 20; *see also* Pl. Opp. 4-6).  Plaintiff does not contest that a Pig Newton representative signed documents that refer to, and purport to bind Plaintiff to, certain trust agreements; instead, the Plaintiff asserts that (i) the precise trust agreements to be incorporated were not "readily ascertainable"; (ii) it did not have knowledge of or assent to the Controlling Employee Provisions; and (iii) incorporation of the Trust Agreements into the contracts would result in surprise and hardship.  (Pl. Br. 20-22 (citing *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund* v. *DCI Signs & Awning, Inc.* ("*DCI*"), No. 08 Civ. 15 (JCC), 2008 WL 640252, at *3 (E.D. Va. Mar. 5, 2008)).  The Court disagrees.

"[A] person who signs an agreement is conclusively bound by it even if he did not read the agreement or understand its terms." *Kearins* v. *Panalpina, Inc.*, 570 F. App'x 9, 10 (2d Cir. 2014) (summary order) (citing *Gillman* v. *Chase*

---

[13]    At best, Plaintiff can argue that the CBAs and the Trust Agreements — the two sets of documents that govern contributions in tandem under Section 515 of ERISA — are in conflict.  *See* 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions ... shall ... make such contributions in accordance with the terms and conditions of [the multiemployer] plan or [collective bargaining] agreement."); *see also* Discussion Sec. B(1)(c), *infra*.  But even assuming a conflict between these two documents, the Court would face a situation that the Second Circuit in *La Barbera* had no occasion to reach.  *La Barbera*, 337 F.3d at 136 ("The collective bargaining and Trust agreements are interrelated and overlap, but, because we find no true conflict between them in the present circumstances, we need not discuss the problems that such a conflict might generate.").

*Manhattan Bank,* 73 N.Y.2d 1, 11-12 (1988)).  "The same is true of the terms of a document clearly incorporated by reference into the signed agreement[.]"  *Id.* (citing *PaineWebber Inc.* v. *Bybyk,* 81 F.3d 1193, 1201 (2d Cir. 1996) ("[A] party will not be bound to the terms of any document unless it is clearly identified in the agreement.")); *see also Ronan Assocs., Inc.* v. *Local 94-94A-94B, Int'l Union of Operating Eng'rs, AFL-CIO,* 24 F.3d 447, 449 (2d Cir. 1994) ("Parties to a contract are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements to which they are not party.").  Accordingly, Plaintiff's argument that it did not assent to the terms of the Trust Agreements is unavailing.

As Defendants point out, *DCI* — a district court opinion from the Eastern District of Virginia on which Plaintiff relies — provides a near-perfect illustration of why Plaintiff's argument fails.  (*See* Def. Opp. 10).  In *DCI*, an employer moved to dismiss a claim by the trustees of a plan, arguing that the "Trust Agreement [wa]s a moving and evolving target, the terms of which were unknown" to the employer.  *DCI,* 2008 WL 640252 at *3 (internal quotation marks omitted).  The district court denied the employer's motion to dismiss, noting that, "were [the trustees] to prove … that [the employer] signed a collective bargaining agreement that explicitly obligated it to abide by the terms and conditions of the Trust Agreement," the trustees would be entitled to seek contributions under the provisions of the trust.  *DCI,* 2008 WL 640252, at *3. In this case, the Directors have demonstrated the precise set of facts that the district court foreshadowed in *DCI.*

25

Plaintiff attempts to avoid this result by arguing that the documents it signed purport only to incorporate the trust agreements that "*established* the Plans." (Pl. Br. 21 (emphasis in Plaintiff's brief); *see also id.* ("[I]ndeed, they point to other documents, presumably decades old, which have not been produced.")).  This argument fails for a simple reason: As Defendants note (*see* Def. Opp. 12-13), the Trust Acceptances explicitly bind Plaintiff to the Plan's Trust Agreements "as amended" (JA 820, 846, 874, 903); the Consent Agreements are even more explicit and bind Plaintiff to "any amendments, modifications, extensions, supplements or renewals of any or all of the [Trust] Agreements" (*id.* at 819, 845, 873, 902).  In any event, it is undisputed that the Trust Agreements containing the Controlling Employee Provisions were in effect on the date Plaintiff signed the Trust Acceptances and Consent Agreements. Accordingly, the Court finds, as a matter of law, that the Trust Agreements were "referred to and described in the instrument[s] [such] that the[y] … may be identified beyond all reasonable doubt."  *PaineWebber*, 81 F.3d at 1201 (internal quotation marks and citation omitted); *see also Bozetarnik* v. *Mahland,* 195 F.3d 77, 81 (2d Cir. 1999) (reading the collective bargaining agreement and the trust agreement as a whole, where, "[a]lthough the collective bargaining agreement d[id] not specifically incorporate the [trust agreement] by reference, it refer[ed] to" the pension fund).[14]  Plaintiff is therefore bound by the Trust Agreements' terms.

---

[14]     Throughout their briefs, the parties rely on cases that apply New York State contract law principles. (*See* Pl. Br. 21-22; Def. Opp. 13).  As noted *supra*, the federal common law that governs the instant action is largely informed by state law principles governing contract interpretation.

### c.   There Is No Conflict Between the CBAs and the Trust Agreements

Although the Court has concluded that the Provisions survive scrutiny under *La Barbera* and that they are incorporated into contracts signed by Plaintiff, the Court has yet to address what Plaintiff refers to as "the obvious conflict between the [Controlling Employee Provisions] and the CBAs." (Pl. Opp. 6).  This conflict, as Plaintiff sees it, is that the CBAs require employers to make contributions based upon "all hours worked" by the employee or "guaranteed" by the employer.  (JA 805, 831, 857, 886).  Defendants, for their part, see no conflict because they assert that the Provisions provide a form of "guaranteed" number of hours upon which employers must contribute on behalf of Controlling Employees.  (Def. Br. 19).  Furthermore, they assert that their interpretation on this matter is entitled to deference by the terms of the Trust Agreements.  (*Id.* at 20-21).  Finally, assuming *arguendo* that the Provisions' contribution mandate and the CBAs' requirement to contribute based upon "hours worked or guaranteed" created tension, Defendants contend that the Court should construe the documents in a way that avoids such conflict.  (*Id.* at 19 n.10).  Plaintiff counters that this reading of "guaranteed" is inconsistent with the manner in which this particular word is used within the CBAs, and further that the differences between the CBAs and Trust Agreements on this issue are irreconcilable.  (Pl. Opp. 6-7 & n.8).  As set forth herein, Defendants have the better of this argument.

Implicit in Plaintiff's argument is the assumption that, were there to be a conflict, the CBAs would trump the Trust Agreements.  But, as the Second

Circuit has noted, although "Section 515 requires participating employers to make pension contributions in accordance with the terms of the multiemployer plan or the terms of the CBA, [it] does not say explicitly how to resolve a conflict between the two arrangements." *UPS*, 382 F.3d at 279.  Perhaps more significantly, the Second Circuit has not squarely addressed whether one of these agreements has priority. *La Barbera*, 337 F.3d at 132 ("ERISA of course trumps the collective bargaining and Trust agreements in the case of a conflict. The collective bargaining and Trust agreements are interrelated and overlap, but, because we find no true conflict between them in the present circumstances, we need not discuss the problems that such a conflict might generate."); *see also In re AMR Corp.*, 508 B.R. 296, 318-19 (Bankr. S.D.N.Y. 2014) ("But what should be made of th[e] language [of the trust agreement] if it is inconsistent with CBA language[?]  The Second Circuit has not addressed this issue.").

In *UPS*, the Second Circuit expressed skepticism with the district court's holding that a *participation agreement* could supersede the terms of a CBA. 382 F.3d at 281 ("We need not reach the broader holding on which the district court relied: that a participation agreement supersedes and controls all terms of a CBA, written or unwritten.").  But, in doing so, the Second Circuit left open the possibility that "trust provisions" could be found to supersede those in the CBA.  *See id.* at 279 ("We think that the district court's conclusion giving controlling and superseding effect to the Participation Agreements may be an overstatement.  We also disagree with the district court's characterization of

the Participation Agreements as 'trust provisions.'").  As in *La Barbera*, the
Court need not resolve this question because it finds no true conflict exists
here.

The CBAs authorize contributions made to the Plans according to hours
"worked" by an employee or hours "guaranteed" by an employer.  The CBAs
also explicitly refer to sections of the Trust Agreements that concern
contribution requirements.  (*See, e.g.,* JA 228 ("*In accordance with Article V,
Section 1 and 2 of [the] Health Plan*, ... the [employer] shall ... pay into the
Health Plan ... for each hour worked by or guaranteed an employee by such
[employer.]" (emphasis added)).  There is no dispute that the Provisions impose
upon employers a duty to contribute on behalf of a Controlling Employee at a
certain level regardless of his or her "hours worked."  However, a conflict
between the Trust Agreements and the CBAs will only exist if the mandatory
hours for which contributions are required under the Controlling Employee
Provisions fail to constitute hours "guaranteed" by the employer.

Neither party argues that the meaning of "guaranteed" is defined within
the relevant agreements.  Plaintiff argues that the CBAs provide several
categories of hours that are "guaranteed" by employers.  (Pl. Opp. 7 (citing
"guaranteed" hours for holidays, a standard 8-hour work day, a standard work
week, certain periods of "idle" time, and cancelled work assignments)).
However, the provisions of the CBAs Plaintiff cites (*see* JA 799-808), do not
refer to any of these hours as "guaranteed."  This is simply Plaintiff's

interpretation — albeit a reasonable one — of what sorts of hours are "guaranteed" by the employer under the CBAs.

More to the point, Plaintiff cannot establish that the CBAs purport to define the universe of "hours ... guaranteed" to the exclusion of the terms of the Trust Agreements. Quite to the contrary, "[t]he collective bargaining and Trust agreements are interrelated and overlap" on the issue of contribution requirements. *La Barbera*, 337 F.3d at 136. The CBAs reference the role of the Trust Agreements in defining contribution requirements (*see* JA 82, 88, 228, 232), and, lest there be any doubt, the Trust Acceptances executed concurrently with the CBAs provide that contributions shall be made "in accordance with the provisions set forth in" the Trust Agreements (JA 820, 846, 875, 903). To that end, the Trust Agreements contain a cadre of provisions dedicated to contribution requirements. For example, Articles II and III of Exhibit A to the Health Plan's Trust Agreement (entitled "Contribution Requirements" and "Other Contributions," respectively) contain 16 pages-worth of provisions governing contributions, including the four pages comprising the Controlling Employee Provisions. (*See* JA 767-82).

Because Plaintiff is bound by the Trust Agreements, and because they are specifically referenced in the CBAs and Trust Acceptances, the Court sees no reason to preclude the possibility that their provisions contain certain types of "guaranteed" hours. *See generally Bozetarnik*, 195 F.3d at 82 (considering the plan documents and the collective bargaining agreement alongside one another and finding that the terms could be reconciled). The question then

becomes whether the contributions paid by employers for Controlling

Employees are for "hours ... guaranteed" by that employer.  The Court finds

that they are.

It is a "cardinal principle of contract construction[] that a document

should be read to give effect to all its provisions and to render them consistent

with each other." *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U.S. 52,

63 (1995); *see also Weeks Marine, Inc.* v. *Am. S.S. Owners Mut. Prot. & Indem.*

*Ass'n, Inc.*, 511 F. App'x 78, 80 (2d Cir. 2013) (summary order) ("In interpreting

a collective bargaining agreement, we read the contract as a whole, and we

construe individual phrases in their context, not in isolation."); *Kinek* v.

*Paramount Communications, Inc.,* 22 F.3d 503, 509 (2d Cir. 1994) ("all

provisions of a contract be read together as a harmonious whole, if possible").

Defendants' interpretation allows for seamless integration of the Provisions

within the "hours ... guaranteed" framework of the CBAs, while Plaintiff's

interpretation would require the Court to discard pages from each of the Trust

Agreements, and could very easily cast doubt upon the validity of many other

parts of the Trust Agreements.[15]  Accordingly, the Court finds that the

---

[15]    Because the Court agrees with Defendants' interpretation under ordinary canons of
construction, it need not reach the alternative argument that their interpretation of the
term "guaranteed" should be entitled to deference by this Court.  (*See* Def. Br. 20).  The
Court is aware that the Trust Agreements explicitly grant the Directors "the power to
construe the provisions of the [Trust] Agreement[s] ... and the terms used [t]herein" and
provide that "any construction adopted by the Directors in good faith shall be binding."
(Def. 56.1 ¶ 61).  However, the disputed term, "guaranteed," does not appear in the
Trust Agreements themselves (but rather in the Trust Acceptances and CBAs).  There is
no indication in any of the relevant agreements that deference to the Directors'
interpretation extends beyond the Trust Agreements.  *See Roca* v. *Westbury Transp.*
*Inc.*, 19 F. Supp. 2d 44, 48 (E.D.N.Y. 1998) ("Of course, the CBA could have granted the
Fund discretion to resolve all disputes as to the content of contract clauses, including

Controlling Employee Provisions set forth the hours "guaranteed" for the purposes of calculating contributions for a Controlling Employee.

### d. Szekely Is an Employee Under the Terms of the Trust Agreements

Plaintiff's final argument, assuming all else fails, is that Szekely is not subject to the Provisions — or to any parts of the Trust Agreements — because he is not an "Employee" as defined therein.  (Pl. Br. 23-25).  More specifically, Plaintiff argues that contributions are owed only for individuals whose editing services constitute their "principal employment" with a particular employer.  (*Id.* at 24).[16]  Because Szekely spends only a fraction of the hours he works for Pig Newton on editing, Plaintiff argues that Pig Newton does not need to contribute to the Plans on behalf of Szekely, and, moreover, is owed a refund on all contributions made on behalf of Szekely to date.  (Pl. Br. 25; Pl. Opp. 11 n.10).  The Directors counter that, under the plain language of the contract, it is Szekely's work for Pig Newton *under the particular CBA* that need consist principally of editing.  (Def. Opp. 22-23).  The Court readily admits that neither interpretation is fully satisfactory.  That said, given the Directors' explicit authority to interpret terms of the Trust Agreements and the reasonableness of their interpretation, that interpretation should control.

---

those containing employer contribution obligations, but it did not do so.  Similarly, the Trust Agreements lack such a provision.").

[16]   The Health Plan's Trust Agreement provides that an individual is not considered an "Employee" under the Plan unless, *inter alia*, "the employee's principal employment with the Employer satisfies … the following requirement[]: [that] the employee is employed by the Employer as … an editorial or post-production sound employee who is working under the [CBAs]."  (JA 366-67).

32

As Plaintiff concedes, this Court should not review the Directors'
interpretation of terms in the Trust Agreements *de novo*; instead, "[b]ecause
this question involves the interpretation of the Trust Agreements, the Directors'
action in this regard is subject to the arbitrary and capricious standard of
review." (Pl. Br. 23 n.22).  *See also Conkright* v. *Frommert*, 559 U.S. 506, 512
(2010) ("If the trust documents give the trustee power to construe disputed or
doubtful terms, ... the trustee's interpretation will not be disturbed if
reasonable." (internal quotation marks and citation omitted)); *Ganton Techs,
Inc.* v. *Nat'l Indus. Grp. Pension Plan*, 76 F.3d 462, 466 (2d Cir. 1996) ("[Where]
plan documents give the trustees the discretion to interpret plan terms, we will
not substitute our judgment for theirs unless the trustees' interpretation is
arbitrary and capricious.").

The Court cannot say that the Directors' classification of Szekely as an
"Employee" under the Trust Agreements is arbitrary and capricious.  The
Directors assert, and Plaintiff does not contest, that the Directors apply their
definition of "Employee" uniformly with respect to the Plans' participants, and
that they have maintained this interpretation in deciding the eligibility of
employees under the Plans for decades.  (*See* Kutak Decl. ¶¶ 1, 3-5).

Moreover, while the Court understands Plaintiff's interpretation of the
Trust Agreements — and particularly Plaintiff's desire not to render the term
"principal" superfluous — the Court cannot say that the Directors'
interpretation is unreasonable.  Indeed, until confronted with the Directors'
application of the Controlling Employee Provisions, Pig Newton evidently agreed

33

with the Directors that Szekely qualified as an "Employee" under the terms of the Plans, and made contributions accordingly.  (*See* Zuniga Decl. ¶ 12 & Ex. D (detailing contributions Pig Newton made on behalf of Szekely based on his editing work)).

In sum, the Court finds that the Controlling Employee Provisions are valid parts of the Trust Agreements, that the Trust Agreements were properly incorporated into documents executed by Plaintiff, that the Provisions do not conflict with the terms of the CBAs, and that Szekely is a Controlling Employee for whom contributions are required.  Accordingly, Plaintiff's motion for summary judgment, requesting a declaration that the Provisions are invalid and unenforceable, is denied.

### 2.    Defendants' Motion for Summary Judgment Is Granted

Section 515 of ERISA, discussed above, "establishes an independent federal right of action distinct from the contract on which the duty to contribute is based."  *Trs. of the Nat'l Automatic Sprinkler Indus. Pension Fund* v. *Fairfield County Sprinkler Co.*, 243 F.3d 112, 115 (2d Cir. 2001) (citation omitted).  In cases in which a fiduciary brings suit to enforce Section 515 and judgment is entered in the fiduciary's favor, the benefit plan is entitled by statute to the unpaid contributions, interest, additional interest, and reasonable attorneys' fees and costs.  29 U.S.C. § 1132(g)(2)(D); *see also Richardson* v. *Laws Const. Corp.*, 557 F. App'x 57, 59 (2d Cir. 2014) (summary order).

As the foregoing suggests, the vast majority of the parties' attention in briefing the motions for summary judgment focused on the extent to which the

Controlling Employee Provisions apply to Pig Newton.  In contrast, there is no dispute as to the Directors' calculation of contributions, interest, auditors' fees, and liquidated damages owed if the Provisions do apply.  (*See* Def. 56.1 ¶ 66). As Plaintiff readily concedes, "if Defendants somehow prevail and rescue the [Provisions] from unenforceability, they are entitled to full-year, full-time contributions." (Pl. Opp. 15).  As the Defendants have done just that, their motion for summary judgment on their counterclaim for contributions owed on behalf of Szekely under the Provisions is granted.

## CONCLUSION

For the reasons stated herein, Plaintiff's motion for summary judgment seeking a ruling pursuant to the Declaratory Judgment Act declaring the Controlling Employee Provisions invalid and unenforceable is DENIED; Defendants' cross-motion for summary judgment on this issue is GRANTED. Plaintiff's Complaint is dismissed in its entirety.

Furthermore, Defendants' motion for summary judgment on its Amended Counterclaim pursuant to 29 U.S.C. § 1145 for contributions, interest, auditors' fees, and liquidated damages is GRANTED; and Plaintiff's motion for summary judgment dismissing the Amended Counterclaim is DENIED.

The Clerk is directed to terminate Docket Entries 19 and 26.

By April 10, 2015, the Directors shall file a current damages analysis, along with documentation in support of attorneys' fees and costs; Plaintiff may

file a response by April 24, 2015; and the Directors may file their reply, if any, by May 1, 2015.

SO ORDERED.

Dated:      March 5, 2015
           New York, New York

                                                  _____
                                               KATHERINE POLK FAILLA
                                       United States District Judge

36